WHATLEY DRAKE & KALLAS, LLC
Edith M. Kallas (*pro hac vice*)
ekallas@wdklaw.com
Joe R. Whatley, Jr. (*pro hac vice*)
jwhatley@wdklaw.com
Deborah Clark-Weintraub (*pro hac vice*)
dweintraub@wdklaw.com
Lili R. Sabo (*pro hac vice*)
lsabo@wdklaw.com
1540 Broadway, 37th Floor
New York, NY  10036
Tel.:  (212) 447-7070
Fax:  (212) 447-7077

HAGENS BERMAN SOBOL
   SHAPIRO LLP
Steve W. Berman (*pro hac vice*)
steve@hbsslaw.com
Robert F. Lopez (*pro hac vice*)
robl@hbsslaw.com
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Tel.:  (206) 623-7292
Fax:  (206) 623-0594

*Co-Lead Counsel for Plaintiffs*
*(Additional Counsel Listed on Signature Page)*

FILED
CLERK, U.S. DISTRICT COURT

FEB 2 4 2009
2:39

CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| In re:  EPOGEN AND ARANESP OFF-LABEL MARKETING AND SALES PRACTICES LITIGATION | Case No. 08-ML-01934 PSG (AGRx) |
| SHEET METAL WORKERS NATIONAL HEALTH FUND; UNITED FOOD AND COMMERCIAL WORKERS CENTRAL PENNSYLVANIA & REGIONAL HEALTH & WELFARE FUND; PAINTERS DISTRICT COUNCIL NO. 30 HEALTH & WELFARE FUND; IRONWORKERS LOCAL UNION NO. | Judge:  Hon. Philip S. Gutierrez **PLAINTIFFS' CORRECTED AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** **DEMAND FOR JURY TRIAL** |

1    68 AND PARTICIPATING
     EMPLOYERS HEALTH & WELFARE    )
2    FUNDS; IRONWORKERS LOCAL    )
     UNION NO. 399 AND    )
3    PARTICIPATING EMPLOYERS    )
     HEALTH AND WELFARE FUNDS;    )
4    IRONWORKER DISTRICT COUNCIL    )
     OF PHILADELPHIA AND VICINITY    )
5    BENEFIT AND PENSION PLAN;    )
     KENNETH ROSS, COMMISSIONER,    )
6    OFFICES OF FINANCIAL &    )
     INSURANCE SERVICES FOR THE    )
7    STATE OF MICHIGAN,    )
                       )
8                Plaintiffs,    )
       vs.    )
9                        )
   AMGEN, INC.,    )
10                        )
              Defendant.    )
11                        )

**TABLE OF CONTENTS**

**PAGE**

I.   SUMMARY AND OVERVIEW ................................................................. 1

II.  JURISDICTION AND VENUE ............................................................... 4

III. THE PARTIES .......................................................................................... 5

IV.  BACKGROUND ...................................................................................... 8

    A.   Background of ESAs ....................................................................... 8

    B.   FDA Approval and Marketing of Epogen and Aranesp ............... 9

        1.   Approval History of Epoetin Alfa ...................................... 9

        2.   Approval History of Darbepoetin Alfa ............................ 11

        3.   The 2004 Approval of a Weekly Dose of Epoetin Alfa ..... 13

    C.   The Deceptive Promotion of EPO for Unproven/Unsafe Uses ..... 13

    D.   Amgen Improperly Uses Third Parties To Deceptively Promote Off-Label Uses of EPO to Both Physicians and to the Public ......................... 19

        1.   Amgen Used the National Anemia Action Council To Deceptively Promote Unsafe and Unsubstantiated Uses of EPO to Physicians ................................................................ 19

        2.   Amgen Used CancerCare To Deceptively Promote Uses of EPO to the Public and to Physicians .......................... 21

        3.   Promoting EPO Uses in a Deceptive Fashion Via Continuing Medical Education ................................................ 22

    E.   Failure To Disclose Safety and Effectiveness Issues ................... 24

    F.   Amgen Conceals and Denies the Truth About the Dangers of its Products .......................................................................................... 26

    G.   Amgen Is Forced to Admit EPO's True Health Risks ................ 27

V.   DEFENDANT AMGEN CARRIED OUT ITS SCHEME THROUGH THE USE OF AN ILLEGAL ENTERPRISE ...................................... 34

    A.   The Fraudulent Marketing Enterprise ........................................ 34

    B.   Pattern of Racketeering Activity ................................................. 36

    C.   Injury ............................................................................................. 37

    D.   Fraudulent Concealment .............................................................. 37

VI.    Additional Wrongful Conduct ............................................................. 37

VII.   AMGEN'S UNLAWFUL SCHEME CAUSED PLAINTIFFS AND
       CLASS MEMBERS TO PAY CLAIMS FOR EPOGEN AND ARANESP
       PRESCRIBED FOR UNSAFE AND UNPROVEN USES ........................... 48

VIII.  CLASS ACTION ALLEGATIONS ....................................................... 49

COUNT I  Violation of 18 U.S.C. § 1962(c) Against Defendant Amgen ................... 51

COUNT II  Violation of the California UCL, Business & Professions Code
       §17200, *et seq.* (as to Amgen's "Fraudulent Marketing" Conduct") .............. 52

COUNT III  Violation of the California FAL, Business & Professions Code
       § 17500, *et seq.* (as to Amgen's "Fraudulent Marketing" Conduct) ................ 53

COUNT IV  Violation of the California UCL, Business & Professions Code
       §17200, *et seq.* (as to Amgen's "Kidney Dialysis" Conduct") ...................... 54

OTHER COUNTS ........................................................................................... 56

PRAYER FOR RELIEF .................................................................................. 56

JURY DEMAND ........................................................................................... 63

1.     Plaintiffs, by and through their respective attorneys, hereby allege as follows based upon knowledge with respect to facts concerning themselves and, as to all other matters, upon information and belief based upon the investigation of counsel, as follows:

## I.     SUMMARY AND OVERVIEW

2.     This is a nationwide class action brought against Defendant Amgen Inc. ("Amgen") for violation of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and California law, including the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL"), and the False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* ("FAL").

3.     From at least 2002 until March 9, 2007, Amgen engaged in a massive scheme to defraud Plaintiffs and the Class (defined below) and substantially increase sales of Epogen (epoetin alfa) and Aranesp (darbepoetin alfa) (sometimes jointly referred to as "EPO") by falsely promoting the use of these drugs for unsafe purposes and at dangerous dosages.

4.     Amgen, the largest biotechnology company in the world, manufactures and sells EPO.  EPO belongs to a class of drugs known as erythropoiesis-stimulating agents ("ESAs"), which encourage the creation of oxygen-carrying red blood cells.  EPO has been approved by the FDA for the treatment of anemia in patients on chemotherapy or the treatment of patients suffering from chronic kidney disease at doses sufficient to boost the level of hemoglobin to 10 to 12 grams per deciliter of blood.  In 2006, worldwide sales of Aranesp alone were over $4 billion, and combined with annual sales of Epogen ($2.511 billion), constituted nearly one half of the Company's total sales for all drugs.

5.     As set forth more fully herein, Amgensought to expand the patient population to whom these drugs could be prescribed and increase its profits by falsely promoting EPO for unsafe off-label uses.  Amgen accomplished this, *inter*

- 1 -

*alia*, through its participation in the affairs of an association-in-fact enterprise consisting of Amgen, NAAC, and CancerCare (the "False Marketing Enterprise"). Through a series of misstatements and/or omissions contained in press releases, Continuing Medical Education ("CME") presentations, physician brochures, and other marketing materials, the participants in the False Marketing Enterprise deceptively promoted the following unsubstantiated and unsafe uses of EPO:  (i) to treat cancer-induced anemia ("anemia of cancer"), as distinct from anemia due to the effect of concomitantly administered chemotherapy; (ii) to treat anemia in patients suffering from heart failure; and (iii) to treat cancer itself, such as breast cancer and head and neck cancer.  Further, as a result of Amgen's misstatements and/or omissions, Amgen was able to secure the listing of Aranesp for the treatment of anemia of cancer in the United States Pharmacopeia-Drug Information ("USP-DI"), the authoritative industry reference guide for on-label and off-label uses of prescription drugs.

6.     Unbeknownst to Plaintiffs and Class members, however, all the while Amgen was promoting EPO for these unsafe and unproven uses, it knew of, but did not disclose, the existence of serious adverse test results demonstrating that EPO is ineffective and carries significant safety risks, including increased incidents of heart attacks, strokes, accelerated tumor growth, and death (which increase as the level of hemoglobin in the blood increases) when used for the off-label purposes described above.  Amgen also failed to disclose in press releases touting purportedly positive results of certain preliminary studies of these off-label uses that the studies were actually financed and controlled by Amgen.

7.     The False Marketing Enterprise's activities had the desired effect.  In 2006, Amgen's sales of Aranesp in the U.S. alone surged 33 percent compared to the prior year.  According to Amgen's Executive Vice President of Worldwide Sales and Marketing, George Morrow, nearly $500 million of Aranesp sales were attributable to off-label use for treatment of anemia of cancer, procured through false and

- 2 -

1    misleading statements and omissions, and the vast majority of these sales were in the

2    United States.

3         8.    Even after adverse study results relating to use of EPO were publicly

4    disclosed in or about December 2006, Amgen minimized the dangers and continued

5    to tout purportedly positive preliminary study results relating to use of EPO.  It was

6    not until January 25, 2007, that Amgen finally disclosed the results of a study of

7    patients with anemia of cancer, which demonstrated that Aranesp was not only

8    ineffective in treating this patient population, but had caused increased incidents of

9    death in patients.  Then, on February 16, 2007, a publication called "The Cancer

10   Letter" published an article about the results of an October 2006 study known to

11   Amgen regarding Aranesp's effectiveness in treating patients with head and neck

12   cancer, which had been closed early due to increased mortality rates.  Faced with this

13   devastating revelation, Amgen's chief executive belatedly admitted that "in

14   retrospect, the results should have been disclosed."

15        9.    As a result of these belated disclosures, the USP-DI delisted Aranesp as

16   an accepted treatment for anemia of cancer.  Then, on March 9, 2007, the FDA

17   mandated a "black box" warning for the off-label use of EPO.  The new black box

18   warnings cautioned that use of ESAs to achieve a target hemoglobin of 12 g/dL or

19   greater in cancer patients (1) "shortened the time to tumor progression in patients

20   with advanced head and neck cancer receiving radiation therapy;" (2) "shortened

21   overall survival and increased deaths attributed to disease progression in patients

22   with metastatic breast cancer receiving chemotherapy;" and (3) "increased the risk of

23   death in patients with active malignant disease not under treatment with

24   chemotherapy or radiation therapy."  The FDA further warned in its Information for

25   Healthcare Professionals that "[u]se of an ESA in anemic cancer patients who are not

26   on chemotherapy offered no benefit and may shorten the time to death."  In addition,

27   the new black box warning reported that ESAs "increased the risk for death and for

28

1  serious cardiovascular events when dosed to achieve a target hemoglobin of greater

2  than 12g/dL."

3        10.    Next, on May 14, 2007, the Centers for Medicare & Medicaid Services

4  ("CMS") announced a proposed plan to limit coverage of EPO due to safety

5  concerns.  A final national coverage determination was issued by CMS on July 30,

6  2007, which provides coverage only for cancer patients with chemotherapy-induced

7  anemia.

8        11.    Not surprisingly, once the life-threatening results of off-label use of

9  EPO became public, U.S. sales of Aranesp dropped 14% in the first financial quarter

10  of 2007, compared to the fourth quarter of 2006, and continued to drop throughout

11  2007.  This financial setback was exactly what Amgen sought to prevent through its

12  concealment and minimization of test results showing higher incidents of heart

13  attacks, strokes, tumor growth, and death from off-label use of its products.

14        12.    As a direct and foreseeable result of the false and deceptive marketing

15  of EPO, Defendant caused Plaintiffs and the Class (defined below) to pay hundreds

16  of millions, if not billions, of dollars for the drugs that were purchased, even though

17  at all relevant times, Defendant knew, but failed to disclose, that these drugs were

18  ineffective and dangerous in such applications.

19              **II.     JURISDICTION AND VENUE**

20        13.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 for

21  claims arising under RICO, 18 U.S.C. § 1962, and has supplemental jurisdiction for

22  the remaining claims pursuant to 28 U.S.C. § 1367.  Diversity jurisdiction is also

23  conferred over this class action pursuant to the Class Action Fairness Act of 2005,

24  Pub. L. 109-2, § 7, 119 Stat. 13 ("CAFA").  The CAFA amended 28 U.S.C. § 1332

25  to add subsection (d) which, as here, confers diversity jurisdiction upon this Court

26  because various members of the Class are citizens from a state different from the

27  Defendant's states and the aggregate amount in controversy exceeds five million

28  dollars ($5,000,000).  It is appropriate to apply the California UCL and FAL to

                                  - 4 -

1    protect a nationwide class because the wrongdoing alleged herein occurred in

2    significant part in California, and the Defendant has its principal place of business

3    within the state.  The Court has personal jurisdiction over the Defendant because

4    Amgen has its principal place of business within California, and the misconduct

5    occurred in significant part in California.

6         14.    Venue is proper in this District under 28 U.S.C. § 1391 because the

7    Defendant engaged in a substantial amount of the misconduct alleged in this

8    Complaint within this District.  Additionally, a substantial part of the interstate trade

9    and commerce involved, and the violations were effected, in part, within this

10   District.

### III.    THE PARTIES

12        15.    Plaintiff Sheet Metal Workers National Health Fund is a welfare plan as

13   that term is defined in the Employee Retirement Income Security Act ("ERISA") at

14   29 U.S.C. § 1002(1) and provides post-retirement health benefits to approximately

15   17,000 retired members of the Sheet Metal Workers International Association.  The

16   post-retirement health benefit consists of a supplemental Medicare wraparound

17   commonly referred to as SMW+.  The benefit is designed to offer supplemental

18   health coverage to retired or disabled sheet metal workers and their spouses, and

19   participants who qualify must be enrolled for traditional Medicare benefits.  The

20   SMW+ coverage supplements the coverage provided by Medicare, but does not pay

21   for or supplement non-traditional Medicare benefits.

22        16.    The Sheet Metal Workers National Health Fund is governed by a Board

23   of Trustees, and Glenn Randle serves as the Chairman of the Board of Trustees.  The

24   Fund is administered in Goodlettsville, Tennessee.

25        17.    The SMW+ program provides benefits for Medicare-covered

26   hospitalizations and medical and surgical benefits, but does not provide coverage for

27   prescription drug benefits or other services which are excluded by Medicare.  The

28   SMW+ plan pays Medicare Part A hospital deductible and co-payments, and the Part

1   B 20% co-payments.  If the Medicare program honors a charge, the Sheet Metal

2   Workers National Health Fund does not adjudicate a claim but pays the appropriate

3   remaining amount which was not paid for by Medicare.  As such, SMW+

4   supplements Medicare Part A and Part B coverage, and the Sheet Metal Workers

5   National Health Fund merely defers to adjudication of the underlying Medicare

6   claim.  Upon information and belief, during the Class Period, the Sheet Metal

7   Workers National Health Fund paid for EPO for uses not specified on its FDA-

8   approved label on behalf of persons receiving the SMW+ benefit.

9        18.    Plaintiff United Food & Commercial Workers Central Pennsylvania &

10  Regional Health & Welfare Fund ("UFCW") is an "employee welfare benefit plan"

11  and an "employee benefit plan" under ERISA, 29 U.S.C. §§ 1002(1), 1002(3), and

12  1003(a).  As such, UFCW is a legal entity entitled to bring suit in its own name

13  pursuant to 29 U.S.C. § 1132(d).  UFCW is a not-for-profit trust, sponsored by and

14  administered by a Board of Trustees, and established and maintained to provide

15  comprehensive health care benefits to participant-workers who are employed under

16  various collective bargaining agreements, as well as to their dependents.  Its trustees

17  are citizens of Pennsylvania and Maryland, and they maintain a business address in

18  Harrisburg, Pennsylvania.  Accordingly, UFCW is a citizen of both Pennsylvania

19  and Maryland.  UFCW's beneficiary members include citizens of the

20  Commonwealth of Pennsylvania.  Upon information and belief, during the Class

21  Period, UFCW paid for its members' uses of EPO for uses not specified on its FDA-

22  approved label and for which EPO was not proven to be safe or effective.

23        19.    Plaintiff Painters District Council No. 30 Health & Welfare Fund

24  ("Painters") is a citizen of Illinois located in St. Charles, Illinois, and is an

25  "employee welfare benefit plan" and an "employee benefit plan" under ERISA, 29

26  U.S.C. § 1002(1), 1002(3), and 1003(a).  As such, Painters is a legal entity entitled to

27  bring suit in its own name pursuant to 29 U.S.C. § 1132(d).  Painters is a not-for-

28  profit trust, sponsored by and administered by a Board of Trustees, established and

1   maintained to provide comprehensive health care benefits to participant-workers who

2   are employed under various collective bargaining agreements and to their

3   dependents.  Upon information and belief, during the Class Period, Painters paid for

4   its members' uses of EPO for uses not specified on its FDA-approved label and for

5   which EPO was not proven to be safe or effective.

6       20.    Plaintiffs Ironworkers Local Union No. 68 and Participating Employers

7   Health and Welfare Funds ("Ironworkers Union 68"), Ironworkers Local Union No.

8   399 and Participating Employers Health and Welfare Funds ("Ironworkers Union

9   399"), and Ironworkers District Council of Philadelphia and Vicinity Benefit and

10  Pension Plan ("Ironworkers of Philadelphia") are health and welfare funds located,

11  respectively, in Trenton New Jersey; Westville, New Jersey; and Philadelphia,

12  Pennsylvania.  Upon information and belief, during the Class Period, the foregoing

13  health and welfare funds paid for their members' uses of EPO for uses not specified

14  on its FDA-approved label and for which EPO was not proven to be safe or effective.

15      21.    Plaintiff Kenneth Ross, Commissioner, Offices of Financial and

16  Insurance Services for the State of Michigan, in his capacity as liquidator of

17  Michigan Health Maintenance Organization Plans, Inc., formerly known as

18  Omnicare Health Plan, Inc. ("Omnicare"), is a Michigan official whose function is to

19  collect and liquidate all assets and liabilities of the former private third-party payor

20  Michigan Health Maintenance Organization Plans, Inc., formerly known as

21  Omnicare Health Plan, Inc.  At all times relevant to this complaint, Omnicare was a

22  private third-party payor whose function was to assume the risk of payment of

23  medical and prescription costs on behalf of the participants in its plan.  Upon

24  information and belief, during the Class Period, Omnicare paid for its members' uses

25  of EPO for uses not specified on its FDA-approved label and for which EPO was not

26  proven to be safe or effective.  Pursuant to the Notice of Substitution of Plaintiff

27  Linda A. Watters, filed on October 15, 2008 (Docket Entry No. 65), Plaintiff

28

1   Kenneth Ross was substituted in place and instead of formerly named Plaintiff Linda

2   A. Watters.

3       22.    Defendant Amgen is a Delaware corporation headquartered at One

4   Amgen Center Drive, Thousand Oaks, California.  Amgen develops, tests, and

5   markets pharmaceutical drugs, including EPO.  Amgen reported over $13.858 billion

6   in revenues in 2006.  Over $6.632 billion of these revenues were derived from its

7   sales of EPO.  Amgen manufactures Aranesp under an exclusive license by Kirin-

8   Amgen, Inc. ("Kirin-Amgen"), a joint venture between Kirin Brewery Company,

9   Limited ("Kirin Brewery") and Amgen, to market Aranesp in the United States,

10   Europe, Canada, Australia, New Zealand, Mexico, all Central and South American

11   countries and certain countries in Central Asia, North Africa and the Middle East.

12   Worldwide Aranesp sales for the years ended December 31, 2006, 2005, and 2004

13   were $4.121 billion, $3.273 billion, and $2.473 billion, respectively.  Amgen also

14   manufactures Epogen under a licensing agreement with Kirin-Amgen for marketing

15   in the United States.  Amgen retained exclusive rights to market Epogen in the

16   United States for dialysis patients.  Amgen granted the Ortho Pharmaceutical

17   Corporation (which has assigned its rights under the Product License Agreement to

18   Ortho Biotech Products, L.P., a subsidiary of Johnson & Johnson, hereafter referred

19   to as "Ortho Biotech Products, L.P." or "Johnson & Johnson") a license to

20   commercialize epoetin alfa in the United States in all markets other than dialysis.

21   Epogen sales for the years ended December 31, 2006, 2005, and 2004 were $2.511

22   million, $2.455 million, and $2.601 million, respectively.

### IV.   BACKGROUND

**A.**   **Background of ESAs**

23       23.    ESAs were first studied and licensed for the treatment of anemia in

patients with chronic renal failure in which anemia results primarily from decreased

erythropoietin (red blood cell) production by diseased kidneys.  When used in this

1    setting, ESAs may be considered a form of hormone-replacement therapy that is

2    highly successful in reducing the red blood cell transfusion requirements in the

3    majority of patients with chronic renal failure.

4          24.    In contrast to the cause of anemia in patients with renal failure, the

5    cause of anemia in patients with cancer is multifactorial and not primarily the result

6    of low erythropoietin levels.  The touted clinical benefit of ESAs in anemic patients

7    with cancer receiving myelosuppressive chemotherapy was a reduction in the

8    proportion of patients who require red blood cell transfusions – thus, to the extent

9    ESAs could boost red blood cells, transfusions could be avoided and patients would

10    not be exposed to the risks of transfusions.

**B.**    **FDA Approval and Marketing of Epogen and Aranesp**

        **1.**    **Approval History of Epoetin Alfa**

          25.    Amgen obtained FDA approval in 1989 for Epogen, a recombinant form

of erythropoietin.  Erythropoietin is a glycoprotein hormone produced by the

kidneys, which regulates red blood cell production.  However, in diseased kidneys

erythropoietin levels are decreased, which results in chronic anemia.  An estimated

60% of patients with chronic kidney failure are anemic, and about 80% of these

require blood transfusions.  Administration of recombinant human erythropoietin

replaces the requirement for transfusion by stimulating the bone marrow to increase

red blood cell production.

          26.    As a result of a joint venture program involving Amgen and Kirin

Brewery to fund the commercial development of epoetin alfa, Amgen retained U.S.

rights to epoetin alfa (branded as Epogen), while Kirin Brewery received Japanese

rights to epoetin alfa (branded as ESPO), with Kirin-Amgen retaining all other rights

worldwide.  Amgen then licensed, for a 10% sales royalty, all of its European rights

and those U.S. rights that do not include the indicated use for chronic renal failure in

dialysis patients to the Johnson & Johnson subsidiary Ortho Pharmaceutical

Corporation (which in turn assigned its rights under the Product License Agreement to Ortho Biotech).  When marketed by Ortho Biotech, epoetin alfa is branded as Procrit, while in Europe the product is marketed by Janssen-Cilag under the brand name Eprex.

27.    The FDA-approved indications and usage for epoetin alfa (Epogen/Procrit) are as follows:

      (a)    treatment of anemia of chronic renal failure patients, including patients on dialysis and patients not on dialysis;

      (b)    treatment of anemia in zidovudine-treated HIV-infected patients;

      (c)    treatment of anemia in cancer patients on chemotherapy; and

      (d)    reduction of allogeneic blood transfusion in surgery patients.

28.    Additional changes to the label have been:

- Addition of a new subsection in Warnings regarding higher mortality with treatment regimens intended to maintain a hemoglobin level of 12-14 g/dL in patients with chronic renal failure (1996).

- Revisions to Warnings and Precautions sections to include new information regarding effects on response rate, time to progression, and overall survival in solid tumors (May 2004).

- New dosing regimen (40,000 U/kg weekly) for the treatment of anemia associated with cancer chemotherapy (June 2004).

- Revisions to Warnings and Adverse reactions to include information regarding pure red cell aplasia (October 2005).

29.    The 1993 expansion to the license for epoetin alfa for the treatment of anemia associated with cancer chemotherapy was based on data provided by Amgen. The basis of approval for epoetin alfa for the expanded indication of treatment of anemia associated with cancer chemotherapy was a demonstration of a reduction in the proportion of patients transfused during chemotherapy during the second and third months of chemotherapy.  Because of concern that epoetin alfa could

potentially serve as a growth factor for malignant tumors, Amgen agreed to conduct a study, which was designed to rule out a detrimental effect of epoetin alfa on the response rate in patients with limited or extensive stage small cell lung cancer.

30.     In 1996, after serious concerns regarding the deaths in patients being dosed at hemoglobin levels higher than 12 g/dL, a new subsection in Warnings, regarding higher mortality with treatment regimens intended to maintain a hemoglobin level of 12-14 g/dL in patients with chronic renal failure, was added to the label for epoetin alfa.

31.     The hemoglobin level warning required by the FDA states:

> EPOGEN® and other erythropoieses-stimulating agents (ESAs) increased the risk for death and for serious cardiovascular events in controlled clinical trials when administered to target a hemoglobin of greater than 12 g/dL. There was an increased risk of serious arterial and venous thromboembolic events, including myocardial infarction, stroke, congestive heart failure, and hemodialysis graft occlusion.  A rate of hemoglobin rise of greater than 1 g/dL over 2 weeks may also contribute to these risks.

32.     Epogen's 2005 FDA-approved package insert regarding dosage and administration of Epogen for patients with chronic renal failure states that "EPOGEN® may be given either as an IV or SC injection.  In patients on hemodialysis, the IV route is recommended (see WARNINGS:  Pure Red Cell Aplasia)."  Significantly, the insert further indicates that "the dose should be adjusted for each patient to achieve and maintain a target hemoglobin not to exceed 12 g/dL."

## 2.     Approval History of Darbepoetin Alfa

33.     Darbepoetin alfa (Aranesp)[1] is manufactured, distributed, and marketed by Amgen.  In September 2001, darbepoetin alfa was first licensed for the treatment

---

[1] Aranesp and epoetin alfa are essentially the same erythropoietin molecules, with a single difference in their glycosylation pattern.  Glycosylation, the adding of a polysaccharide (in the case of Aranesp, a sialic acid molecule) to a protein, is a post-translational modification, *i.e.*, one that occurs after the protein is produced within

of anemia associated with chronic renal failure, including patients on dialysis (End Stage Renal Disease) and patients not on dialysis. Since that time, the license has been expanded to include the following additional indications:

- Treatment of anemia associated with cancer chemotherapy (July 2002).

Additional changes to the label have followed:

- New dosing regimen (40,000 U/kg weekly) for the treatment of anemia associated with cancer chemotherapy (June 2004).
- Revisions to Warnings and Precautions to include information regarding effects on thrombotic events and tumor promotion (December 2004).
- Revisions to Warnings and Adverse reactions to include information regarding pure red cell aplasia (October 2005).

34. The July 2002 expansion for Aranesp for the treatment of anemia associated with cancer chemotherapy was based on data provided by Amgen upon a demonstration of a significant reduction in the proportion of patients transfused during chemotherapy during week five (5) through the end-of-treatment.

35. Amgen has not licensed or otherwise divided its U.S. and European marketing interests in Aranesp.

---

cells. Amgen found that the presence of sialic acid residues on the erythropoietin molecule altered the molecule's half-life. Aranesp has one more sialic acid residue than Epogen, and consequently a half-life approximately three times longer than Epogen. Both drugs have similar pharmacodynamic effects and toxicology profiles, however, the longer half-life of Aranesp conveys an advantage in that it can be administered less frequently than epoetin alfa. Although Amgen sought to market Aranesp as a new drug therapy in order to access higher Medicare reimbursement rates, both the FDA and CMS refused to recognize the drug as a new therapy. CMS then calculated a conversion factor to approximately define equivalent doses of Aranesp and Epogen, which effectively halved the initially proposed reimbursement rate per microgram for Aranesp.

### 3.   The 2004 Approval of a Weekly Dose of Epoetin Alfa

36.    In 2004, product labeling was expanded to include a new, weekly dosing regimen for the treatment of anemia in patients with cancer receiving chemotherapy.  The approval was based on the results of a randomized, double-blind, placebo-controlled study conducted by the North Central Cancer Trial Group in which 344 patients receiving myelosuppressive chemotherapy were randomized to epoetin alfa 40,000 IU weekly or placebo for 16 weeks.  Randomization was stratified by center, primary tumor type (lung/breast/other), concurrent radiotherapy (yes/no), and baseline hemoglobin (<9 vs. $\geq$9 g/dL).  Epoetin alfa/placebo doses adjusted to maintain hemoglobin of 13-15 g/dL.

37.    There were a sizeable number of patients who withdrew from the study prematurely.  The reasons for withdrawal were variable; however, more patients withdrew in the epoetin arm for hemoglobin levels above 15 g/dL.  The results, based on multiple analyses, utilizing different imputations for patients who withdrew from study prior to a transfusion event, showed a consistent effect on reduction in the proportion of patients requiring transfusions in the epoetin alfa treated arm.

38.    In summary, the FDA approval history makes clear:  (1) that ESAs have not been approved for use in treating anemia caused by cancer (as opposed to anemia caused by chemotherapy treatment), and (ii) that ESAs should not be prescribed at dose levels targeting hemoglobin levels in excess of 12 g/dL.

## C.   The Deceptive Promotion of EPO for Unproven/Unsafe Uses

39.    Not content with its earnings from the foregoing approved uses, Amgen engaged in a fraudulent scheme designed to increase sales of EPO through the deceptive promotion of unsubstantiated and unsafe off-label uses of these drugs.  Indeed, while concealing or minimizing the results of tests showing higher incidents of heart attacks and death from use of its products, Amgen made misleading statements in press releases, CME presentations, physician brochures, and other

marketing materials about the efficacy of EPO for a variety of off-label uses.  These statements include, *inter alia*, the following:

40.   On May 21, 2002, Amgen issued a press release entitled, "Aranesp Studies Explore Potential of New Anemia Treatment Paradigms."  In this release, the Company commented on clinical data from four Aranesp studies presented at the 38th annual meeting of the American Society of Clinical Oncology, which Amgen stated "suggest[ed] new potential dosing approaches for treating anemia in patients with cancer."  According to the press release, one of these studies, by Smith, *et al.* ("the Smith Study"), evaluated the effectiveness of Aranesp in treating chronic anemia of cancer not associated with chemotherapy or radiation therapy.

41.   A critical fact concerning the Smith Study was omitted from Amgen's press release, however: the study was not the work of independent researchers.  To the contrary, the study was designed and financed by Amgen and presented at a conference sponsored by Amgen.  Indeed, one of the authors of the study, A. Fleishman, was an Amgen employee.  Not surprisingly, the study concluded that Aranesp was safe and effective in treating anemia of cancer, and concluded that Aranesp "may offer advantages to cancer patients with anemia not receiving chemotherapy."  A later iteration of the Smith Study, published in 2003, would be critical in Amgen's procurement of the "accepted" listing in the USP-DI for Aranesp as a treatment for anemia of cancer.

42.   The USP-DI is a database that plays a significant role in drug reimbursement.  The USP-DI Volume 1, Drug Information for the Health Care Professional database is a widely consulted source of drug information.  It purports to set forth medically accepted uses for generic and brand name drug products.  USP-DI is named in federal, and some state, statutes as a resource for unlabeled drug uses, patient consultation, and development of drug utilization review criteria under Medicaid.

43.     As detailed herein, Amgen submitted the Smith Study and other studies to USP-DI in order to obtain a listing in that compendium describing Aranesp as an accepted treatment for anemia of cancer based on the Smith Study, among others, even though Amgen knew that the Smith Study and the others being submitted were not unbiased.

44.     Amgen repeatedly resorted to this model – issuing press releases touting the positive results of Amgen-controlled and financed studies announced at Amgen-sponsored medical conferences – to promote the widespread use of Aranesp.  On December 6, 2003, Amgen issued a press release entitled, "New Data Suggest Aranesp® Benefits Patients Suffering From Anemia of Cancer, Who Are Not Receiving Chemotherapy."  The release announced that "interim data" from a multi-center study presented at the annual meeting of the American Society of Hematology demonstrated that Aranesp was effective in treating anemia in cancer patients not undergoing chemotherapy.  Once again, however, the press release did not disclose that the referenced study ("the Katz Study") was being financed and controlled by Amgen; that an Amgen employee, Danica Katz, was one of the study's authors; or that Amgen was a sponsor of the American Society of Hematology's annual meeting.

45.     Six months later, on June 6, 2004, Amgen announced the final results of the Katz Study in a press release entitled, "Study Results Demonstrate the Activity of Aranesp In Treating Anemia In Cancer Patients Not Receiving Chemotherapy." According to the press release, the final results of the study confirmed that Aranesp was effective in treating anemia in cancer patients not undergoing chemotherapy. This press release also failed to disclose Amgen's connection to the study.

46.     Amgen's strategy of subsidizing seemingly independent research and publicly announcing the predictable positive results at medical forums and in press releases had the desired effect.  According to the December 6, 2003 press release, data from the Katz Study "formed the basis for the acceptance of Aranesp administered every two weeks in the treatment of anemia of cancer" by the

1    influential USP-DI.  Upon information and belief, the Katz Study was used to

2    provide dosing data for the USP-DI listing, while the Smith Study was used to

3    provide more general therapeutic findings to back the listing.

4          47.    Having secured the USP-DI's acceptance of Aranesp as a treatment for

5    anemia of cancer, Amgen proceeded with even more vigor to deceptively promote

6    Aranesp for this use.  On July 6, 2005, Amgen issued a press release entitled,

7    "Interim Data Suggest Major Response with Aranesp® in Anemic Patients with

8    Myelodysplastic Syndromes (MDS)," which announced new interim data from a

9    Phase 2 study evaluating the use of 500 mcg of Aranesp every three weeks to treat

10   anemia in patients with a bone marrow disorder known as myelodysplastic

11   syndromes ("MDS").  This data was presented at the 17th International Symposium

12   of the Multinational Association of Supportive Care in Cancer in Geneva.  In this

13   announcement, the Company, quoting Janice Gabrilove, M.D., professor of

14   medicine, hematology, and medical oncology at Mount Sinai School of Medicine,

15   New York and the study's lead investigator, stated that "[t]he majority of MDS

16   patients develop clinically significant anemia during the course of their disease,

17   which often leads to fatigue and increased red blood cell transfusions," and "[i]n this

18   study, low risk MDS patients receiving Aranesp every three weeks, who had no prior

19   erythropoietic therapy, exhibited an overall response of 77 percent, increased

20   hemoglobin levels and improvements in patient reported fatigue."  Once again,

21   Amgen's press release did not disclose that it was a sponsor of this study.

22         48.    In addition, Amgen began promoting Aranesp for treatment of anemia

23   in patients suffering from heart failure, another significant patient market.  On

24   September 2, 2005, Amgen issued a press release entitled, "Amgen Announces

25   Initiation of Phase 3 Trial to Evaluate the Impact of Treating Anemia with

26   Darbepoetin Alfa in Patients with Heart Failure to Reduce Mortality and

27   Hospitalization," announcing that Amgen would initiate a Phase 3 trial to evaluate

28   the effect of anemia treatment with Aranesp on morbidity and mortality in patients

- 16 -

1    with heart failure.  The press release quoted Dr. William Dere, Amgen's chief

2    medical officer, as stating that Amgen's decision to proceed with its Phase 3 trial

3    "was driven both by results from epidemiological studies, as well as by [the

4    Company's] recently completed Phase 2 pilot studies of anemia treatment in heart

5    failure patients which provided ... encouraging results."  The press release further

6    emphasized the enormous profit potential of such an additional approved use for

7    Aranesp, observing that over 23 million people worldwide suffer from heart failure.

8         49.    On December 11, 2005, Amgen issued a press release entitled,

9    "Updated Interim Aranesp(R) Phase 2 Data Suggest Major Response in Anemic

10   Patients with Myelodysplastic Syndrome (MDS); Patients with Bone Marrow

11   Disorder Also Showed Improvements in Hemoglobin Levels and Fatigue," which

12   updated the interim data from the Phase 2 study announced on July 6, 2005.  In this

13   release, Amgen reported that low-risk MDS patients receiving Aranesp every three

14   weeks, who had no prior erythropoietic therapy, exhibited an overall response of 70

15   percent, increased hemoglobin levels, and improvements in patient-reported fatigue.

16   The data was presented at the American Society of Hematology 47th Annual

17   Meeting in Atlanta, which was sponsored in part by Amgen.

18        50.    On March 13, 2006, Amgen issued a press release entitled "New Phase

19   2 Data Suggest Treatment of Anemia with Aranesp(R) (Darbepoetin Alfa) May

20   Provide Clinical Benefits in Heart Failure Patients – Amgen's Phase 3 RED-HF(TM)

21   Trial Will Evaluate the Clinical Effect of Treating Anemia in Patients with

22   Symptomatic Heart Failure."  In this press release, Amgen reported results presented

23   at the 2006 American College of Cardiology Scientific Session that treating anemia

24   with Aranesp in patients with symptomatic heart failure was well-tolerated,

25   effectively raised hemoglobin, and improved patients' symptoms as measured by the

26   Kansas City Cardiomyopathy Questionnaire.

27        51.    On May 31, 2006, Amgen issued a press release entitled, "Amgen

28   Oncology Highlights Upcoming Data Presentations at the American Society of

Clinical Oncology Annual Meeting; Clinical Data to be Presented on Four

Investigational Targeted Cancer Therapies." According to the press release, one of

the cancer therapies being investigated was the administration of Aranesp to treat

anemia associated with MDS. The release quoted Amgen's chief medical officer,

Dr. Willard Dere, as stating: "We are very excited to present new data on multiple

agents from our robust pipeline of investigational targeted therapies."

52.     On June 3, 2006, the Company issued a press release entitled, "Interim

Phase 2 Aranesp® Data Suggest Major Response after 27/28 Weeks of Treatment for

Anemia in Patients with Myelodysplastic Syndromes (MDS) – Results of One of the

Largest MDS Studies to Date Show Both Previously Treated and ESA-Naive

Patients Responded to Aranesp Treatment." The press release, which contained

updated data, indicated that these patients who had not previously received an

erythropoiesis-stimulating agent showed a major response of 59 percent, increased

hemoglobin levels, and improvements in patient-reported fatigue. These updated

interim data were presented at the 42nd Annual Meeting of the American Society of

Clinical Oncology in Atlanta, which was sponsored by Amgen. Again, by quoting

the study's lead investigator, Amgen continued to portray the use of EPO for this

purpose in a positive light, stating that "[t]hese results, from one of the largest MDS

studies to date, are consistent with those observed at 13 weeks and provide evidence

for the potential use of every-three-week dosing of Aranesp in MDS patients to reach

target hemoglobin, reduce the need for blood transfusions and improve patient

reported outcomes."

53.     On June 19, 2006, Amgen issued a press release entitled, "Final Results

of Phase 2 Clinical Trial Program Suggest Treatment of Anemia with Aranesp®

(Darbepoetin Alfa) May Decrease Risk of Hospitalization and All-Cause Mortality

in Heart Failure Patients with Anemia, Based on a Prespecified Pooled Analysis:

Results Validate Amgen's Phase 3 RED-HF Trial to Address Unmet Medical Need."

According to this release, the final results of Amgen's Phase 2 study of the

effectiveness of Aranesp in treating anemia in patients with heart failure revealed that Aranesp was well-tolerated and effective.

**D.    Amgen Improperly Uses Third Parties To Deceptively Promote Off-Label Uses of EPO to Both Physicians and to the Public**

54.    In addition to the foregoing, Amgen funded third-party entities – among them the National Anemia Action Council ("NAAC") and CancerCare – that provided educational materials, CME information, and physician brochures which promoted off-label uses of EPO.  Each organization operates under the guise of education, improvement in treatment quality, and/or support.  However, both play a pivotal role in the off-label marketing of EPO by acting as a mobilized marketing force endorsing off-label uses.

**1.    Amgen Used the National Anemia Action Council To Deceptively Promote Unsafe and Unsubstantiated  Uses of EPO to Physicians**

55.    NAAC's mission statement indicates that it "is dedicated to raising the awareness of healthcare professionals and the public regarding the prevalence, symptoms, consequences, and undertreatment of anemia."  NAAC claims that it "has reached a consensus that anemia is underdiagnosed and undertreated [and] has identified anemia as a public health concern that requires concerted attention and action."  Its efforts in combating anemia include attempting to:

- [R]aise awareness of health care professionals and the public regarding the prevalence, symptoms, consequences, and undertreatment of anemia.
- Develop a cross-specialty database of scientific evidence showing anemia to be a serious condition.
- Identify knowledge gaps.
- Stimulate more research and new treatment approaches.
- Improve anemia identification, treatment, and patient outcomes.

56.    Amgen has been one of the sponsors of NAAC since at least 2002.  As stated in a 2004 article published in the WASHINGTON POST, Amgen "supports all the projects of the NAAC through an unrestricted educational grant," and "more than a third of the council's members are paid consultants or speakers for Amgen."

57.    During the relevant period, information NAAC made available to physicians repeatedly highlighted preliminary data and research suggesting the use of EPO for treatment of anemia of cancer.  One brochure available to physicians on NAAC's website was funded by an unrestricted educational grant from Amgen and entitled *Anemia: A Hidden Epidemic*.  It repeatedly points to studies suggesting that use of EPO for treatment of anemia has beneficial effects.

58.    For example, the brochure, "designed to be an in-office handbook for primary care and specialty medical practitioners who may be seeing patients with undiagnosed anemia," contained a subchapter entitled "Anemia & Cancer," which falsely asserted that "findings of a number of studies have demonstrated reduced transfusion requirements and improved [quality of life] when the anemia of cancer is treated with epoetin."

59.    A second subchapter of the same brochure entitled, "Anemia & Cardiovascular Disease," emphasized preliminary studies showing that treatment of anemia in chronic heart failure patients with EPO resulted in beneficial effects.  Use of EPO for chronic heart failure is not an FDA-approved use of EPO.  As Jerome P. Kassirer, M.D. stated in an article discussing the close relationship between Amgen and NAAC and the effects of NAAC's discussion of EPO studies, entitled, "These Two Make Quite A Team," "[i]t takes little imagination for any reader to draw the obvious conclusion: treat with epoetin."

60.    In addition to providing physicians with materials on its website, NAAC also distributes "AnemiaAlert" e-mails to healthcare providers.  Like the materials available on NAAC's website, the "AnemiaAlert" e-mails distributed during the relevant period continually pointed to studies and preliminary data suggesting that

- 20 -

EPO was effective in treating anemia of cancer. One such alert from September 2004 highlighted an article suggesting that off-label use of EPO may be beneficial in treating critically ill patients by decreasing hospital stays and reducing the need for transfusions.

61.     The "AnemiaAlert" e-mails also provided doctors with information concerning upcoming CMEs. One such alert from September 2006 provided information for the CME, "Anemia: A Hidden Epidemic in Primary Care," led by NAAC's President, Allen Nissenson, and President Elect, Lodovico Balducci. The physician handbook, available on NAAC's website, and discussed above, bears nearly the identical name as the CME, and was written by one of the CME's leaders, Allen Nissenson. As indicated above, this brochure contained extensive coverage of studies suggesting that EPO was beneficial for many uses, including anemia of cancer.

### 2.     Amgen Used CancerCare To Deceptively Promote Uses of EPO to the Public and to Physicians

62.     CancerCare, founded in 1944, purports to be a national nonprofit organization that provides free professional support services to anyone affected by cancer, *i.e.*, "people with cancer, caregivers, children, loved ones, and the bereaved." CancerCare collaborates with corporations to become "cause-related" marketing partners and sponsors. According to CancerCare's website, Amgen is one of its "most committed supporters, having funded a wide range of educational and support services for cancer patients and their loved ones." Of particular significance is Amgen's sponsorship of "Connect telephone," a program designed to provide "telephone workshops, online/telephone support groups, and web outreach campaigns – on topics such as improving the chemotherapy experiences, treatment side effects, and symptom management."

63.     These programs were a vehicle through which Amgen was able, by deception, to promote off-label, unsafe uses of EPO. For example, an information

- 21 -

booklet, which stated it was made possible in part by Amgen Oncology, and which was based on an August 2005 Telephone Education Workshop conducted by CancerCare, responded to one patient's question regarding cancer-caused fatigue by stating that taking EPO helps people "with cancer-related anemia feel more energetic and less fatigued." EPO has not been approved to effectively treat cancer-related anemia.

64. A booklet made available on CancerCare's website entitled, "*Coping with Side Effects*," included a subsection discussing anemia management. This subsection highlighted a study suggesting that the use of Aranesp to treat acute myeloid leukemia resulted in patients feeling "marked relief from fatigue after treatment." EPO has not been proven to be effective in the treatment of anemia in MDS patients as the FDA has not approved it for such use.

### 3. Promoting EPO Uses in a Deceptive Fashion Via Continuing Medical Education

65. The Accreditation Council for Continuing Medical Education ("ACCME") is a nonprofit organization, which establishes rules that govern continuing medical education ("CME"). According to the preamble to ACCME's *2004 Updated ACCME Standards for Commercial Support*, "the purpose of continuing medical education (CME) is to facilitate life-long learning among physicians so that their practices may reflect the best medical care for their patients." Most states require that doctors partake in a minimum number of CME credit hours as a requisite to maintaining their medical licenses. Given this requirement, CMEs provide doctors with the opportunity to keep abreast of developments in the various medical fields.

66. Historically, the majority of CMEs were paid for by universities and medical associations. However, during the last decade this has drastically changed. According to the most recent data available from ACCME, "drug industry financing of continuing medical education has nearly quadrupled since 1998, $302 million to

1  $1.2 billion." Today, nearly half of all CMEs are paid for by drug companies.

2  Although ACCME asserts that commercial support has significantly enhanced the

3  ability of the CME in fulfilling its purpose, ACCME does recognize that

4  "commercial support has the potential to introduce commercial bias that threatens the

5  integrity of the CME enterprise." This concern was echoed in a NEW YORK TIMES

6  article entitled, *Diagnosis: Conflict of Interest*, in which the author asserts that since

7  so much of what doctors are taught is determined by pharmaceutical companies,

8  "crucial information about potential drug dangers is played down, to the detriment of

9  patient care."

10      67.    Similarly, in a report released in April 2007 prepared by the staff of the

11  United States Senate Committee on Finance ("Committee"), the Committee stated

12  that since CMEs had become a multi-billion dollar business "it seem[ed] unlikely

13  that this sophisticated industry would spend such large sums on an enterprise but for

14  the expectation that the expenditures will be recouped by increased sales." The

15  Committee went on to state that the off-label promotion of drugs through educational

16  grants represents the greatest threat in the CME context.

17      68.    Amgen has financed and/or sponsored CMEs where off-label uses of

18  EPO were deceptively promoted. For example, one online CME entitled, *Advances*

19  *in the Treatment of Myelosuppression ("MDS") and Anemia*, sponsored by an

20  unrestricted educational grant from Amgen, asserted that the use of darbepoetin alfa,

21  *i.e.*, Aranesp, in patients with MDS suffering from anemia resulted in patient

22  improvement. Use of darbepoetin alfa by patients with MDS-induced anemia is an

23  off-label use and has not been proven as effective for such treatment.

24      69.    Likewise, in several CMEs sponsored by unrestricted educational grants

25  from Amgen, the course materials repeatedly obscured the line between proven and

26  unproven uses of EPO. For example, one CME entitled, *Diagnosis and Management*

27  *of Anemia in Long-Term Care*, the course materials indicated that since "the

28  introduction of EPO to treat anemia in chronic kidney disease in patients, the

1   treatment of anemia has been revolutionized." This statement is false and

2   misleading, evidenced in part by the FDA's refusal to approve such use. The

3   materials go on to indicate the variety of different contexts in which EPO

4   purportedly had been shown to increase hemoglobin levels, which included

5   circumstances in which the use of EPO was not FDA-approved, including treatment

6   of MDS patients and patients with anemia of chronic disease.

7   70.   Similarly, in a CME entitled, *Management of Febrile Neutropenia and*

8   *Anemia in Chemotherapy Patients*, which was supported by an unrestricted

9   educational grant from Amgen, the presenter repeatedly referred to both anemia of

10   cancer and treatment-related anemia during the discussion, and indicated that the use

11   of EPO in these contexts should be considered. The faculty presenter also indicated

12   that EPO agents could be used in patients with MDS. The use of EPO in patients

13   with anemia of cancer (as opposed to chemotherapy-induced anemia), and in patients

14   with MDS, have not been proven to be effective and/or safe and were not among the

15   FDA-approved uses of EPO.

16   **E.   Failure To Disclose Safety and Effectiveness Issues**

17   71.   Amgen engaged in this scheme of deception in part by concealing or

18   minimizing the results of tests showing higher incidents of heart attacks, strokes,

19   tumor growth, and death associated with off-label uses of EPO. Indeed, despite

20   publicly touting EPO as beneficial and safe, Amgen was well aware of, but failed to

21   disclose, several adverse study results relating to EPO.

22   72.   For example, in 2003, Amgen's licensee, Johnson & Johnson,

23   sponsored a study investigating the effects of epoetin alfa on the quality of life of

24   anemia patients with non-small cell lung cancer, a use of EPO that was not FDA-

25   approved. However, the study was closed prematurely when 70 patients enrolled in

26   the study receiving EPO died in half the time of patients in the study receiving a

27   placebo. Amgen did not disclose the results of this Johnson & Johnson study, which

28

- 24 -

1   had been shared with Amgen in the ordinary course, until 2007, when the results

2   appeared in the March 20, 2007 issue of the JOURNAL OF ONCOLOGY.

3       73.    Likewise, in 2003, the Breast Cancer Erythropoietin Survival Trial

4   ("BEST") was terminated prematurely by a data safety monitoring committee

5   because of the poor overall survival in the target population.  The study, which was

6   intended to evaluate the effect on breast cancer patients, most whom did not have

7   anemia, when their hemoglobin levels were maintained in the range of 12g/dL to

8   14g/dL with epoetin alfa, concluded that maintaining hemoglobin levels at this target

9   range resulted in decreased overall survival.

10      74.    In addition to its awareness of these adverse study results, Amgen was

11  also informed during an FDA Advisory Committee meeting on May 4, 2004, that

12  FDA scientists in their review of applications for drugs of the same class as EPO,

13  had observed shorter overall survival, shorter progression-free survival, and an

14  increased incidence of thrombotic and cardiovascular events in patient groups being

15  treated with drugs of the same class as EPO.  During the Advisory Committee

16  meeting, a presentation was given by Dr. Harvey Luksenburg, M.D., Medical

17  Officer, FDA's Division of Therapeutic Biological Oncology Products, a clinical

18  reviewer tasked with the review of studies on erythropoietin drugs, in which he

19  stated:

> Now, two large randomized studies in cancer patients on
> chemotherapy plus or minus EPO have shown *shorter
> overall survival, shorter progression-free survival,* and an
> increased incidence of thrombotic and cardiovascular
> events in the groups assigned to receive erythropoietins.
>
>                ***
>
> Now, the goals of my talk are four-fold.  First of all, I'll try
> to give some justification of *why the FDA feels that the
> safety issues observed with EPREX and NeoRecormon, the
> non-U.S.-licensed EPOs, may also apply to U.S.-licensed
> products.*  In addition, I will review results of trials with
> EPREX and NeoRecormon, the non-U.S.-licensed
> products, regarding the safety concerns.  Thirdly, I will

> review data available regarding safety from trials of
> EPOGEN/Procrit and Aranesp, the U.S.-licensed trials, and
> finally will try to come to agreement on the design of
> future studies regarding these safety issues.
>
> ***
>
> Now, the FDA *considers all these products members of the*
> *same product class, and, thus, these evolving safety issues*
> *are assumed to apply to all products* unless adequate and
> well-controlled trials demonstrate otherwise.

(emphasis added).

75.     Then, in 2006, a study to determine whether Aranesp could be effective in curing head and neck cancer by causing more oxygen to get to tumors, thereby making radiation therapy more effective, concluded that patients who received the drug were 10% more likely to see their tumors grow.  Although Amgen was made aware of the results of this study in December 2006, it failed to disclose them, and the results of the study were not publicly disclosed until February 2007, when they were published in a periodical called "The Cancer Letter."

76.     Despite the fact that the foregoing test results demonstrated that EPO was ineffective and carried significant safety risks, including increased incidents of heart attacks, strokes, accelerated tumor growth, and death (which increased as the level of hemoglobin in the blood increased) when used for the off-label purposes being touted by Amgen, these results were concealed or minimized by Amgen in order to sustain the significant profits Amgen was realizing from off-label sales of EPO.

**F.     Amgen Conceals and Denies the Truth About the Dangers of its Products**

77.     Despite Amgen's assertion in a December 4, 2006 press release that it "only promotes the use of Epogen and Aranesp consistent with the FDA label," Amgen continued its efforts to stimulate off-label use of its drugs by deceptively touting positive preliminary study results relating to off-label EPO use, while

1   concealing the increased incidents of heart attacks and deaths in earlier studies of the

2   same proposed uses.

3         78.   For example, only five days later, on December 9, 2006, the Company

4   issued a press release entitled, "New Phase 2 Data Show Promise of Aranesp®

5   Treatment for Anemia of Cancer – Monthly Aranesp Treatment Improved

6   Hematopoietic Response In Cancer Patients Not Receiving Chemotherapy or

7   Radiation Therapy."  According to the press release, cancer "patients receiving

8   Aranesp were nearly three times more likely to achieve a hematopoietic response

9   than patients receiving a placebo."  The press release also minimized any adverse

10   results observed in the study, stating that although four patients in the study had

11   experienced serious thromboembolic events, "the number and type of adverse events

12   were consistent with those previously observed in patients receiving Aranesp."  The

13   press release quoted the study's lead investigator, David H. Gordon, M.D., clinical

14   professor, University of Texas Health Science, who presented the results at the

15   American Society of Hematology 48th annual meeting in Orlando, Florida, as

16   stating:  *"[T]he results suggest that this may be a potential treatment option for*

17   *such patients."*

18   **G.   Amgen Is Forced to Admit EPO's True Health Risks**

19         79.   In January 2007, Amgen informed the FDA of the results of a 989

20   patient, multi-center, double-blind, randomized, placebo-controlled study of Aranesp

21   in anemic cancer patients who are not receiving chemotherapy.  The study results

22   provided to the FDA show Aranesp did not reduce the need for red blood cell

23   transfusions and showed an increase in mortality in patients receiving Aranesp

24   compared to those receiving placebo (hazard ratio 1.25; 95% confidence interval:

25   1.04, 1.51).

26         80.   On January 25, 2007, Amgen issued a press release announcing its

27   fourth quarter 2006 and full year 2006 financial results in which it also commented

28   on its initial analysis of Phase 3 results of its study of the effectiveness of Aranesp in

treating patients with anemia of cancer.  The press release acknowledged that "there [had been] no statistically significant difference in the frequency of transfusions in the population receiving placebo injections as opposed to those receiving Aranesp," but that there had been "a statistically significant increased risk of death in the Aranesp-treated group."  However, the press release went on to state that "the overall safety profile did not identify any other unexpected safety concerns," and sought to minimize the adverse findings by emphasizing that the patients in the study had "an especially grave prognosis" and that the study had not been designed as "a survival study" and so the effects of "imbalances in potentially important prognostic factors" could not be excluded.

81.    In February 2007, the FDA was notified of the final results of a double-blind, placebo controlled study to evaluate whether use of Epogen – a drug closely related to Aranesp – in anemic non-small cell lung cancer patients not on chemotherapy improved their quality of life.  Though the plan was to enroll 300 patients, the study was closed to accrual in December 2003 after enrolling only 70 patients because its data monitoring committee found higher mortality in those treated with epoetin alfa.  Median time to death in those treated with epoetin alfa was 68 days and significantly shorter than the median time to death of 131 days in those treated with placebo.

82.    On February 16, 2007, "The Cancer Letter" publicly revealed the adverse results, set forth above, of the October 2006 study relating to the effectiveness of Aranesp in treating patients with head and neck cancer.  Amgen's failure to promptly disclose these adverse results was roundly criticized.  For example, Adam Feuerstein, senior writer for TheStreet.com noted in his February 24, 2007 "Biotech Mailbag" column that he "was troubled by Amgen's less-than-speedy disclosure of the Danish study of Aranesp in patients with head and neck cancer," and that investors were questioning "why ... anyone [would] wish to invest at this point in a company that willfully withheld information from investors."

83. As a result of The Cancer Letter's February 16, 2007 exposé, Amgen hastily convened an analyst conference call that same day, wherein Amgen's chief executive, Kevin Sharer, admitted during the conference call that "in retrospect, the results should have been disclosed."

84. On February 27, 2007, it was widely reported that a meta-analysis of clinical trial data had shown a statistically significant increase in the risk of death to cancer patients who were administered these drugs. According to this meta-analysis, cancer patients who were given Amgen's ESAs faced an increased risk of death on the order of approximately 10 percent.

85. These belated disclosures had the immediate, adverse affect on off-label sales of EPO that Amgen had so long sought to avoid. Aranesp was swiftly removed from the USP-DI as an accepted treatment for anemia of cancer. A February 23, 2007, Associated Press article entitled, "Amgen Drug Comes Off Drug List for 1 Use – Amgen's Aranesp Taken Off Key Drug List for Use Against Anemia of Cancer," observed that the de-listing of Aranesp as a treatment for anemia of cancer "could prompt insurers to drop or reduce coverage for that use," and stated that "Amgen Chief Executive Kevin Sharer [had] recently said this off-label use could account for as much as 10 percent of Aranesp sales," which totaled $4.1 billion in 2006. In its form 10-K filed February 23, 2008, covering the period ending December 31, 2007, Amgen admitted that the revelations about the safety of Aranesp and Epogen had "resulted in a large unexpected reduction in revenue for the products, in particular Aranesp sales in the U.S. supportive cancer care segment."

86. Predictably, after the publishers of USP-DI in February 2007 de-listed Aranesp as an accepted treatment for anemia of cancer, Medicare carriers, beginning with Noridian Administrative Services, and private payors including Blue Cross Blue Shield of California, began denying coverage for such treatment within their regions.

87. On March 9, 2007, the FDA mandated a "black box" warning for the off-label use of EPO. In the FDA alert relating to the new prescribing information

- 29 -

1    contained in the "black box" warning, the medical community was finally and

2    clearly told about the serious risk of death from the off-label use of Amgen's

3    products.  The alert described the new "black box" warnings to be added to

4    Aranesp's and Epogen's label, stating:

5            Analyses of four new studies in patients with cancer
     found a higher chance of serious and life-threatening side

6    effects and/or death with the use of ESAs....  All ESAs
     have the same mechanism of action.  As a result, FDA

7    believes these new concerns apply to all ESAs and is re-
     evaluating how to safely use this product class.  FDA and

8    Amgen, the manufacturer of Aranesp, Epogen and Procrit,
     have changed the full prescribing information for these

9    drugs.  The new product labeling includes a new boxed
     warning, updated warnings, and a change to the dosage and

10   administration sections for all ESAs.

11   Changes to the prescribing information for the ESAs
     (Aranesp, Epogen and Procrit) are summarized here:

12   

13   *A New Boxed Warning providing the following
     information:*

14   

15   •   *Avoid serious cardiovascular and arterial and
         venous thromboembolic events by using the lowest*

16   *dose of [Aranesp /EPOGEN/PROCRIT] that will
     gradually raise the hemoglobin concentration to*

17   *the lowest level sufficient to avoid the need for
     blood transfusion*

18   

19   •   *[Aranesp /EPOGEN/PROCRIT] and other ESAs
         increased the risk for death and for serious*

20   *cardiovascular events when dosed to achieve a
     target a hemoglobin of greater than 12 g/dL*

21   

22   •   *Use of ESAs to achieve a target hemoglobin of 12
         g/dL or greater in cancer patients:*

23   

24         •  *shortened the time to tumor progression in
             patients with advanced head and neck cancer*

25   *receiving radiation therapy;*

26   

27         •  *shortened overall survival and increased
             deaths attributed to disease progression in*

28

> *patients with metastatic breast cancer receiving chemotherapy;*
>
> - *increased the risk of death in patients with active malignant disease not under treatment with chemotherapy or radiation therapy.* ESAs are not indicated for this patient population.

- Patients treated before surgery with epoetin alfa to reduce allogenic red blood cell transfusions had a higher incidence of deep venous thrombosis. Aranesp is not approved for this indication.

***Additional Warnings about increased mortality, cardiovascular events, tumor progression and uncontrolled hypertension***

- Increased ***Mortality*** and Cardiovascular Events – the warnings now describes the results of new studies showing an increased incidence of thrombotic events in patients with chronic renal failure, cancer patients on chemotherapy, and surgical candidates.

- Potential for Tumor Growth Progression – A new subsection in Warnings describes the new ***data*** and emphasizes the evidence for increased rate of tumor progression.

- Hypertension - this subsection advises against the use of ESAs in patients with uncontrolled ***hypertension***, and describes the risks to and guidance for managing controlled hypertensive patients.

***Recommendations and Considerations***

Physicians and other healthcare professionals should consider the following when using ESAs:

*** 

***For cancer patients:***

- **Use of an *ESA* in anemic cancer patients who are not on chemotherapy *offered no benefit and may shorten the time to death*.**

- ESAs are not FDA approved to treat anemia in cancer patients not receiving chemotherapy

- There is a potential risk of shortening the time to tumor progression or disease-free survival

- ESAs are administered only to avoid red blood cell transfusions in cancer patients. ***ESAs do not improve the outcome of cancer treatment*** and do not alleviate fatigue or increase energy.

***

(emphasis added).

88.     The most shocking revelation contained in the FDA alert was the results of the December 2003 study of the effects of epoetin alfa on the quality of life of anemia patients with non-small cell lung cancer, noted above, which was conducted by Johnson & Johnson, Amgen's licensee.  As stated above, the preliminary results of the study indicated that patients receiving EPO died in half the time of patients given placebos, and as a result, the study was cut short.  According to this March 2007 alert, the FDA was first notified of this 2003 study in February 2007, and was still awaiting receipt of the complete study results.

89.     Next, in response to the FDA's black box warning, on May 14, 2007, CMS announced a proposed plan to limit coverage of EPO due to safety concerns.

90.     Following a 30-day public comment period, on July 30, 2007, CMS issued its National Coverage Decision Memorandum for Use of Erythropoieses Stimulating Agents in Cancer and Related Neoplastic Conditions (the "Decision Memorandum").  The Decision Memorandum establishes ESA coverage, with restrictions, for Medicare and other government beneficiaries who are treated for chemotherapy-induced anemia.  The Decision Memorandum also concluded that ESA treatment was not reasonable and necessary for certain clinical conditions, including:

- Any anemia in cancer or cancer treatment patients due to folate deficiency, B-12 deficiency, iron deficiency, hemolysis, bleeding, or bone marrow fibrosis;
- Anemia associated with the treatment of acute and chronic myelogenous leukemias, or erythroid cancers;
- Anemia of cancer not related to cancer treatment;
- Any anemia associated only with radiotherapy;
- Prophylactic use to prevent chemotherapy-induced anemia;
- Prophylactic use to reduce tumor hypoxia;
- Patients with erythropoietin-type resistance due to neutralizing antibodies; and
- Anemia due to cancer treatment if patients have uncontrolled hypertension.

Thereafter, on January 14, 2008, the Decision Memorandum was added to CMS's Medicare National Coverage Determinations Manual.

91.     The troubling meta-analysis referenced above, together with other scientific research on ESA safety, were among the matters discussed on March 13, 2008, when an FDA Advisory Committee (the Oncologic Disease Advisory Committee ("ODAC")) met to discuss whether to impose further restrictions on the use of ESA products, including those marketed by Amgen, with cancer patients.  At the March 2008 meeting, the ODAC recommended: that ESAs not be used by patients with either breast cancer or head and neck cancer because the evidence of a risk for shortened survival was strongest for those types of tumors; that ESAs not be used by patients being treated with the intent of curing their cancers; and that patients be made to sign informed consent forms before they are administered the drugs.

## V.    DEFENDANT AMGEN CARRIED OUT ITS SCHEME THROUGH THE USE OF AN ILLEGAL ENTERPRISE

92.    As described above, in furtherance of its fraudulent scheme, Amgen promoted EPO for the purpose of expanding the patient population to whom these drugs could be marketed even though, at all relevant times, Amgen knew, but failed to disclose, the existence of serious adverse test results regarding EPO when used for such purposes.  Indeed, as set forth above, adverse study results were withheld despite the FDA's expressed concerns relating to EPO's safety as a result of the reduced survival rates that had been observed in patients treated with erythropoietin drugs generally, which were discussed with Amgen during a May 2004 meeting.

93.    As a direct and foreseeable result of Defendant's fraudulent scheme as alleged herein, including Amgen's non-disclosures and misrepresentations regarding EPO's safety and effectiveness for various uses, Plaintiffs and other Class members paid millions of dollars in claims relating to dangerous and unproven uses of these drugs.

94.    Amgen's scheme to defraud was carried out through the use of an illegal enterprise.  Amgen and other members of the enterprise have participated in the enterprise's affairs through a pattern of racketeering activity consisting of multiple acts of mail and wire fraud.  These predicate acts of racketeering activity were related to each other in furtherance of the scheme described above and amounted to continuing racketeering activity and, therefore, constitute a pattern of racketeering through which the Defendant has violated 18 U.S.C. § 1962(c).

A.    The Fraudulent Marketing Enterprise

95.    The False Marketing Enterprise is an ongoing organization which has existed continuously since at least as early as 2002.  Amgen is associated with this enterprise.

96.    The purpose of the False Marketing Enterprise was to profit from the fraudulent marketing and sale of EPO and to extract excessive and illegal payments

1    from Plaintiffs and Class members.  The structure of the False Marketing Enterprise

2    includes the following:  (a) Amgen's funding of NAAC and financial contributions

3    to CancerCare for the purpose of promoting off-label uses of EPO to the medical

4    community through educational and CME materials, physician brochures and/or

5    websites; (b) Amgen's control over NAAC and CancerCare by virtue of their

6    financial dependence on Amgen, and by virtue of the fact that Amgen's paid

7    consultants and speakers are members of NAAC's organization; (c) the operation of

8    NAAC and CancerCare as purportedly independent organizations devoted to

9    education and improvement in quality of treatment; (d) Amgen's financing and/or

10    sponsorship of CMEs where widespread use of EPO were promoted; and

11    (e) Amgen's financing and control of studies promoting use of EPO.  Amgen and the

12    other False Marketing Enterprise participants associate with, participate in, and

13    control the affairs of the False Marketing Enterprise.

14          97.    The members of the False Marketing Enterprise have participated in the

15    operation and management of the False Marketing Enterprise in at least the

16    following ways:  (a) Amgen funds and exercises control over NAAC, Cancer Care,

17    and certain CMEs for the purpose of promoting the off-label use of EPO; (b) Amgen

18    provides preliminary research and data regarding the purported benefits of off-label

19    use of EPO to NAAC for use in its educational and CME materials, physician

20    handbooks/brochures, and on its website, and to CancerCare for use on its website

21    and in CMEs sponsored by it and in the instructional and course materials thereof;

22    (c) NAAC and CancerCare use the preliminary research and data regarding the

23    purported benefits of off-label use of EPO in their educational, CME, and physician

24    brochures and/or on their respective websites; (d) Amgen finances and/or sponsors

25    CMEs which are used, *inter alia*, to promote the off-label use of EPO; and (e) the

26    members of the False Marketing Enterprise operate and manage the enterprise by

27    coordinating their respective roles in the fraudulent marketing of EPO for off-label

28    use.

98.    While Amgen and the other participants are members of the False Marketing Enterprise, they have an existence that is separate and distinct from the Enterprise. The False Marketing Enterprise oversees, coordinates, and facilitates the commission of predicate offenses.

**B.    Pattern of Racketeering Activity**

99.    As alleged above, the False Marketing Enterprise is separate and distinct from the patterns of racketeering activity in which they engage. The members of the enterprise share a common purpose, and the enterprise is continuing and has a structure for decision-making, oversight, coordination, and facilitation of the predicate acts. Amgen asserted control over this association-in-fact enterprise, and used its position of control over the entities to ensure that EPO was fraudulently and unlawfully promoted. The enterprise successfully and fraudulently promoted EPO for dangerous off-label uses and obtained excessive payments from payors, including Plaintiffs and Class members, on claims for reimbursement submitted to them for the unsafe off-label uses described herein.

100.    The pattern of racketeering activity includes numerous acts of mail and wire fraud in furtherance of Amgen's fraudulent scheme, including the use of the United States mails and wires, to disseminate marketing materials such as press releases, educational and CME materials, and/or physician handbooks/brochures, which Amgen and the other participants in the False Marketing Enterprise utilized to falsely promote off-label uses and doses of EPO, as well as correspondence, contracts, and agreements between the members of each of the enterprises. In addition, claims were sent to Plaintiffs and Class members through the mails for payment of EPO for the aforementioned unsafe purposes.

101.    The enterprise operates on a nationwide basis and utilizes interstate communications including the United States mail and wire across state lines. The activities of the enterprise are national in scope and have a substantial impact upon interstate commerce.

**C.    Injury**

102.    As a result of Amgen's scheme as detailed above, Plaintiffs and other Class members were required to pay claims for reimbursement for EPO for unsafe uses.  Amgen's misrepresentations and omissions were necessary to encourage the use of EPO for such uses.  This scheme proximately caused the Plaintiffs and the Class to pay for reimbursement of EPO for unsafe and unproven purposes.  As a result, Plaintiffs and Class members have been injured in fact and lost money, business or property by this scheme and the overt acts of mail and wire fraud detailed above.

**D.    Fraudulent Concealment**

103.    Amgen has affirmatively and fraudulently concealed its unlawful scheme and course of conduct from Plaintiffs and the Class.  Plaintiffs and Class members had no knowledge of Amgen's scheme detailed above and could not reasonably have discovered that Amgen's representations were false or that it had concealed information and materials until shortly before the filing of this Complaint. Moreover, as Amgen engaged in a conspiracy with the members of the False Marketing Enterprise as detailed above, that scheme continued until the last overt act of the conspiracy took place, when Amgen finally publicly admitted the true facts detailed herein.  In fact, the scope and extent of this conspiracy has still been not fully revealed.

104.    Accordingly, any applicable statutes of limitations have been tolled with respect to any claims Plaintiffs have brought as a result of the wrongful conduct alleged herein.

**VI.    ADDITIONAL WRONGFUL CONDUCT**

105.    Amgen also sought to profit from increased sales of EPO by promoting through wasteful dispensing the intravenous administration of EPO to treat anemia in kidney dialysis patients (which resulted in significantly more usage than

subcutaneous administration) as a safer route of administration, even though this route of administration had the predictable and consistent effect of achieving dangerously high hemoglobin levels of 13g/dL or above. This promotion led directly to the extraction of excessive and illegal payments from Plaintiffs and Class members. To effect its scheme, Amgen enlisted the aid of dialysis providers, including DaVita, Inc. ("DaVita") and Fresenius Medical Care Holdings, Inc. d/b/a Fresenius Medical Care North America ("Fresenius"). Further, to increase profit, Amgen also entered into incentive agreements with DaVita and Fresenius.

106. DaVita is a Delaware corporation headquartered at 601 Hawaii Street, El Segundo, California 90245. DaVita is a leading provider of dialysis services in the United States for patients suffering from chronic kidney failure, also known as end stage renal disease. As of December 31, 2006, DaVita operated or provided administrative services to approximately 1,300 outpatient dialysis centers located in 42 states and the District of Columbia, serving approximately 103,000 patients. Of the 1,300 for-profit dialysis facilities operated by DaVita in 2006, 153 were located within the State of California. DaVita also provides acute inpatient dialysis services in approximately 770 hospitals and related laboratory services. DaVita's net operating revenues for the years ended December 31, 2006, 2005, and 2004 were $4.880 billion, $2.973 billion, and $2.177 billion, respectively. DaVita achieved EPO revenues of $1.16 billion in 2006 from one or more drug supply contracts with Amgen. Upon information and belief, the contracts were negotiated and executed in California, and the arrangements to pay incentives and rebates for the excessive dispensing of EPO occurred in California. DaVita received 35% of its 2006 revenues from reimbursements from commercial payors, including Plaintiffs and the Class, while 65% came from government sources, including the California Medi-Cal program. DaVita received subpoenas in 2004, 2005, and 2006 from federal prosecutors, to produce documents relating to its suspect relationships with pharmaceutical companies, financial relationships with physicians and joint ventures,

1   and certain patient records relating to the administration and billing of EPO. In

2   addition, in 2004, DVA Renal Healthcare, a division of DaVita, was fined $310

3   million and placed under a five-year corporate integrity agreement. The fine was

4   imposed as a result of a Department of Justice investigation of DaVita's Medicare

5   and Medicaid billing practices, and issues involving physicians and pharmaceutical

6   manufacturers.

7          107.   Fresenius is a New York corporation headquartered at 920 Winter Street

8   Waltham, MA 02451. Fresenius is a wholly owned subsidiary of Fresenius Medical

9   Care AG & Co. KGaA, located in Bad Homburg, Germany. Fresenius operates for-

10   profit dialysis services in over 1,100 Company-owned and controlled facilities in the

11   United States, including locations within the State of California. Revenues for the

12   years ended December 31, 2006, 2005, and 2004 were $6.026 billion, $4.578 billion,

13   and $4.250 billion. Upon information and belief, Amgen paid incentives and rebates

14   to Fresenius from its headquarters in California. Epogen, supplied under contract

15   with Amgen, accounted for approximately 21% of total revenue for Fresenius for the

16   year ended December 31, 2006. Fresenius, its parent, subsidiaries, and predecessors

17   received subpoenas in 2004, 2005, and 2006 from federal prosecutors, in connection

18   with civil and criminal investigations, to produce documents relating to suspect

19   relationships with pharmaceutical companies, financial relationships with physicians

20   and joint ventures, and certain patient records relating to the administration and

21   billing of EPO.

22          108.   DaVita's and Fresenius's SEC filings reveal that their profitability could

23   be materially impacted by a change in the utilization of EPO or failure to earn the

24   drug rebates and other incentives provided by Amgen.

25          109.   DaVita's SEC Form 10-K for the year ended December 31, 2006,

26   indicates that its profitability is dependent upon its relationship with Amgen.

27   According to the 10-K, the administration of EPO accounts for approximately 25%

28   of DaVita's dialysis revenue, and Amgen is DaVita's sole supplier of EPO.

According to the Form 10-K, DaVita has "entered into an agreement with Amgen to provide for EPO pricing for a fixed time period that includes potential discounts depending upon the achievement of certain clinical and other criteria," as well as "specific rebates and incentives." DaVita's Form 10-K acknowledges that "[c]hanges in EPO pricing" or "[f]ailure to qualify for discounts or meet or exceed the targets and earn the specified rebates and incentives [available under its contract with Amgen] could have a material adverse effect on [DaVita's] earnings and cash flow." According to Gary Lieberman, an analyst at Stanford Group Company, the administration of EPO is responsible for 44 percent of DaVita's earnings before interest, taxes, depreciation and amortization.

110.   Fresenius's SEC Form 20-F for the fiscal year ended December 31, 2006, indicates that its profitability is also heavily dependent on its relationship with Amgen. According to Fresenius's 2006 Form 20-F, "[r]eimbursement and revenue from the administration of erythropoietin, or EPO, accounted for approximately 21% of total revenue in [the company's] North America segment for the year ended December 31, 2006." In addition, Fresenius's Form 20-F acknowledges that "a change in the utilization of EPO could materially reduce [its] revenue and operating profit."

111.   Amgen, through contractual arrangements, including financial incentives tied to promotion and use of EPO for unsafe purposes, promoted intravenous administration of EPO to kidney dialysis patients, even though this route of administration had the predictable and consistent effect of achieving hemoglobin levels of 13 g/dL or above – an unsafe use of these drugs. Amgen further promoted intravenous administration of EPO through false statements regarding the necessity of intravenous administration of EPO to dialysis patients, on the basis that subcutaneous injections resulted in greater risk of pure red cell aplasia.

112.   With respect to its deceptive promotion of the intravenous administration of EPO as a safer route of administration, in November 2005, Amgen

1   issued a "Dear Health Care Professional" letter in which it sought to inform the

2   health care community about updates to Aranesp's product prescribing information.

3   In the letter, Amgen warned health care providers of the risk of pure red cell aplasia

4   in patients treated with Aranesp, and significantly, the letter notes that reports of pure

5   red cell aplasia were "predominantly in patients with [chronic renal failure] receiving

6   Aranesp by subcutaneous administration."  Amgen issued this deceptive letter

7   despite its awareness of a 2005 Johnson & Johnson study that demonstrated that

8   subcutaneous administration of EPO was not the primary cause of increased

9   incidences of pure red cell aplasia during the last decade.  Rather, as Amgen knew,

10  these increased incidences had been found to be largely attributable to the

11  contamination of the drug from uncoated rubber syringe stoppers during the

12  dispensing and administration of EPO.  In fact, Amgen disclosed in its Canadian

13  version of this letter that out of approximately 1.4 million patients that had been

14  treated with Aranesp, a mere "two cases of antibody-meditated pure red cell aplasia

15  (PRCA) [were] reported and confirmed associated with Aranesp® in patients who

16  have not received other recombinant erythropoietins."  Thus, although less profitable

17  to Amgen and its for-profit dialysis cohorts, subcutaneous administration of EPO did

18  not present a significantly greater risk of pure red cell aplasia.  Conversely,

19  intravenous administration, although more profitable to Amgen, risked raising

20  hemoglobin levels in patients to dangerously high levels in excess of 10 to 12 grams

21  per deciliter of blood.

22          113.   In addition, in its March 13, 2006 press release, discussed in Section

23  IV.C. above, Amgen continued to promote the misconception that it was safer for

24  patients on dialysis to receive Aranesp intravenously rather than through smaller

25  doses received subcutaneously.  In the "Important Safety Information" section at the

26  end of this and later press releases, Amgen stated that pure red cell aplasia "has been

27  reported predominately in patients with chronic renal failure (CRF) receiving

28  Aranesp by subcutaneous administration."

- 41 -

114.   On October 24, 2006, the BOSTON GLOBE published an article entitled, "Some See Profiteering In Clinics' Use of Drugs – US may spend $537m needlessly," which revealed that although "[a]bout 95 percent of the nation's 325,000 dialysis patients receive Epogen intravenously … studies have shown dialysis clinics could use 30 percent less if it was administered subcutaneously – injected beneath the skin" because "Epogen remains in the body longer when injected, requiring a lower dose."

115.   Then, on November 16, 2006, a NEW ENGLAND JOURNAL OF MEDICINE article announced that the use of epoetin alfa to reach a target hemoglobin level of 13.5g/dL, as compared with a target of 11.3g/dL, in patients with chronic kidney disease resulted in increased patient risk and zero improvement in patient quality of life.  Indeed, the end result of the study was a composite of death, myocardial infarction, hospitalization for congestive heart failure, and stroke.

116.   In response to this report, Amgen issued a press release on December 4, 2006, entitled, "Amgen Responds to Reports About Use and Safety of EPOGEN and Aranesp in CKD Anemia Therapy."  Notwithstanding its knowledge of the numerous adverse study results described above, Amgen sought to stem any adverse effect on its lucrative income stream from off-label uses of EPO that might result from these reports, and in the press release stated that:

> Hemoglobin maintenance is difficult and physicians are not necessarily acting inappropriately when patients' hemoglobin levels temporarily exceed the FDA label target range.
>
> CMS reimbursement guidelines are consistent with the FDA labeling policy and allow doctors to provide patients with the best possible care.
>
> Changes to current guidelines should be approached judiciously and based on the rigorous review of data and patient care.

117.   DaVita also promoted the intravenous administration of EPO to its kidney dialysis patients, for instance, on its website, where it posted an article by Dr. Robert Lynn, "Common drugs prescribed for dialysis patients," which states that "[m]ost patients with anemia due to chronic kidney disease who are not yet on dialysis will receive it as an injection – directly under the skin.  Most patients with renal failure on hemodialysis will get the hormone during each treatment by intravenous injection into the return dialysis tubing."

118.   Fresenius likewise has a long history of promoting such usage of EPO. For example, in 2002 the Department of Health & Human Services, Office of Inspector General ("OIG") audited Fresenius's Massachusetts offices.  The audit found that in a sample of just 200 claims submitted to Medicare, 14 involved the administration of more EPO than called for by the label.  Another 9 claims were found to lack sufficient documentation to support the amount of EPO.  Further, the overdosing did not come from the physician's order but stemmed from Fresenius's implementation:

> One claim billed for 104,000 units of EPO totaling $832 and the treatment forms indicate the provider's staff administered 104,000 units of EPO; however, based on the physician's order the EPO dose was to be reduced 20 percent to 6,400 units per treatment if the hemoglobin was greater than 12.  The patient's hemoglobin was 13.5 prior to the claim period and remained greater than 12 throughout the month.  Therefore, the patient's EPO dosage should have decreased 20 percent to 6,400 units per treatment for all 13 treatments in the month.  Therefore, we are questioning 20,800 units of EPO totaling $166.

119.   According to the U.S. Attorney in St. Louis, the government has received information that Fresenius was filing improper claims for End Stage Renal Disease services to Medicare beneficiaries.  Pursuant to 18 U.S.C. § 3486, the United States issued an administrative subpoena to Fresenius on or about April 30, 2005. Regarding Epogen, that subpoena sought general information concerning Fresenius's policies and practices concerning the administration of Epogen to patients at its

- 43 -

1    clinics.  The time frame for production included documents and materials prepared

2    up through the date of compliance, namely April 30, 2005.

3       120.   While waiting for Fresenius to produce the documents requested by the

4    first administrative subpoena, the U.S. Attorney's Office ("USAO") also conducted a

5    preliminary review of Fresenius's Medicare claims for Epogen, using information

6    directly obtained from the Medicare program.  The results of that review became

7    available to the United States late in 2005.  The review showed that Fresenius had

8    submitted a significant number of claims to Medicare for Epogen on behalf of

9    beneficiaries whose hematocrit levels were above 37.5% on a rolling average basis,

10   37.5% being the current high end of the target range set forth in Medicare's End

11   Stage Renal Disease reimbursement rules regarding the administration of Epogen.

12      121.   Based on the information gained through its preliminary review of

13   Fresenius's Medicare claim history, the USAO issued a second subpoena to

14   Fresenius on or about March 10, 2006.

15      122.   The United States is now investigating whether Fresenius failed to

16   follow its own internal protocols, repeatedly overdosed patients with excessive

17   Epogen, in violation of Medicare's reimbursement rules, and therefore submitted

18   false claims for Epogen to the Medicare program.

19      123.   The government has asserted that its investigation of Fresenius has a

20   reasonable basis.  For example, Fresenius has an unusual claims history, with the

21   number of patients receiving high doses of Epogen growing every year while the

22   total number of patients serviced by Fresenius has not grown as rapidly.  The

23   government asserts that Fresenius's medical records for patients receiving Epogen

24   sometimes have disturbing patterns, with large doses of Epogen being administered

25   while the patient's hematocrit range greatly exceeded the suggested target hematocrit

26   range of 33 to 37.5.  Numerous studies have suggested there may be health problems

27   for dialysis patients with high hematocrits and high Epogen dosages.  According to

28   the government, "[a]lthough the investigation is not complete, these are troubling

billing patterns that raise both financial program integrity and beneficiary health concerns. More Epogen® dosages may create more revenue from the Medicare program, but not improved patient outcomes."

124. In order to boost EPO sales, and as part of its scheme to fraudulently promote the intravenous administration of EPO, Amgen provided anemia management training and support to dialysis centers without charge. This was part of a package of services that Amgen hoped would boost EPO use including at off-label doses and would switch patients from subcutaneous dosing to intravenous dosing, which costs more. The relationship between Amgen's actions and the promotion of EPO use is chronicled in a *qui tam* complaint versus Renal Care Group ("RCG") (now owned by Fresenius), where the relator alleges:

> RCG has also violated 42 U.S.C. §§ 1320a-7a & 7b in that:
>
> a.       At all relevant times hereto, Amgen has provided anemia management training and support to RCG staff without charge.
>
> b.       Through its relationship with Amgen, RCG's per-patient EPO usage has increased significantly, without a corresponding increase in clinical outcomes. Cost of EPO per treatment has also increased.
>
> c.       In return for RCG's purchases of EPO, Amgen also provides RCG with clinical and sales staff at no charge and expends significant funds entertaining clinic staff and physicians.
>
> d.       The anemia management training, clinical and sales staff, and entertainment funds provided to RCG by Amgen constitute prohibited in-kind remuneration under 42 U.S.C. §§ 1320a-7a & -7b because it is provided in exchange for RCG's purchase of EPO, for which RCG is reimbursed by Medicare.

125. Moreover, in furtherance of its unlawful scheme to maximize profits by encouraging increased usage of EPO, RCG regularly compelled its Medical Directors to switch patients from subcutaneous dosing to intravenous dosing. This is

1 significant because subcutaneous dosing requires approximately 20% less EPO than

2 intravenous dosing for the same clinical outcome.  As a result of this scheme, RCG

3 further bolstered its profits with Medicare footing the bill.  *See Williams v. Renal*

4 *Care Group*, Civil Action 4:05-cv-985 (E.D. Mo.).

5     126.   On information and belief, Amgen has similar arrangements with other

6 dialysis centers which have resulted in an increase in unsafe uses.

7     127.   Indeed, the large for-profit dialysis providers, including DaVita and

8 Fresenius, administer EPO more often by IV than non-profit dialysis providers, and

9 also use larger doses and target higher hemoglobin levels than non-profit centers.

10     128.   An American Medical Association article entitled, "Dialysis Facility

11 Ownership and Epoetin Dosing in Patients Receiving Hemodialysis," indicates that

12 large, for-profit chain dialysis centers, including DaVita and Fresenius, use larger

13 EPO doses.  More specifically, the authors' results indicate that "[c]ompared with

14 patients in nonprofit dialysis facilities (n=28 1999), patients in larger for-profit

15 dialysis chain facilities (n=106116) were consistently administered the highest doses

16 of epoetin regardless of anemia status."  The authors concluded that dialysis facility

17 organizational status and ownership are associated with variation in epoetin dosing.

18 According to the article, "different epoetin dosing patterns suggest that large for-

19 profit chain facilities used larger dose adjustment and targeted higher hematocrit

20 levels."  The authors further noted that their findings suggest "that reimbursement

21 policy and clinical performance measures may provide incentives for dialysis

22 facilities, in particular, for-profit facilities."

23     129.   Along the same lines, an article in the *American Journal of Kidney*

24 *Diseases*, entitled "Factors Influencing Route of Administration for Epoetin

25 Treatment among Hemodialysis Patients in the United States," which published the

26 results of a study designed to examine the factors associated with route of epoetin

27 administration in hemodialysis patients, indicated that the subcutaneous route of

28 administration was most widely used by providers not affiliated with chains, and in

- 46 -

1    hospital-based and not-for-profit freestanding units.  The study concluded that

2    physician decision making for epoetin administration route is influenced primarily

3    by type of ownership and financial incentives, and that the for-profit chains were less

4    likely to use the subcutaneous administration route, which can decrease doses and is

5    thus an opportunity for cost savings.

6         130.   Similarly, the "US Renal Data System Annual Data Report" indicates

7    that Fresenius and DaVita patients are the most likely to overshoot target

8    hemoglobin levels as compared to patients of other dialysis providers.  The report

9    concludes from this that hemoglobin variations are thus seemingly related, in part, to

10   dialysis center actions rather than non-treatable biological phenomenon.  In addition

11   to Fresenius and DaVita treating patients who are the most likely to overshoot

12   hemoglobin levels, these centers are also among those that use the highest dosing

13   levels of EPO.  According to the report, the fact that some dialysis centers are able to

14   control hemoglobin levels more successfully indicates the success of their anemia

15   management protocols.

16        131.   Tellingly, in a BOSTON GLOBE article entitled, "Some See Profiteering

17   in Clinics' Use of Drug," one Fresenius patient, James Roberts, stated that the "the

18   staff at the Fresenius clinic where he receives Epogen was reluctant to reduce his

19   doses."  According to Roberts, he is "their cash cow."

20        132.   As a result of these abuses and the revelations following the publication

21   of The Cancer Letter, discussed above, on July 20, 2007, CMS announced that it will

22   reduce by 50 percent the reported ESA dosage used by dialysis facilities for which

23   payment will be made if the facility reports that the beneficiary's hemoglobin has

24   exceeded 13 g/dL for three consecutive months including the current billed month.

25        133.   Furthermore, at a December 2007 hearing of the House Ways and

26   Means Committee, the committee's then-chairman noted federal data showing that

27   an estimated 40% of dialysis patients treated with EPO have hemoglobin levels

28

above the target of 12.  The prescribing behavior that led to these levels was caused in part by Amgen's promotion, "educational," and financing efforts.

### VII.   AMGEN'S UNLAWFUL SCHEME CAUSED PLAINTIFFS AND CLASS MEMBERS TO PAY CLAIMS FOR EPOGEN AND ARANESP PRESCRIBED FOR UNSAFE AND UNPROVEN USES

134.   During the Class Period, Plaintiffs and other Class members paid hundreds of millions, if not billions, of dollars in claims for EPO prescribed for unsafe and unproven uses as a result of the illegal schemes alleged herein, resulting in Plaintiffs and Class members paying for prescriptions that were unnecessary and/or posed serious health risks to their members.

135.   Plaintiffs and Class members are ultimately responsible for the payment of EPO prescriptions as payors of prescription benefit plans that pay on behalf of their participants either part of or the entire purchase price of prescribed medications.

136.   As a result of this responsibility, third-party payors, such as certain of the Class members, rely on Pharmacy Benefit Managers to assess the clinical safety, efficacy, and cost effectiveness of a drug before including that drug on a "formulary" or list of drugs that have been approved for coverage by the third-party payor.

137.   In addition, the listing for Aranesp as an accepted treatment for anemia of cancer led directly to Medicare reimbursement for the drug for off-label use.  The health care industry often follows Medicare's lead in reimbursement coverage and the listing of Aranesp for anemia of cancer resulted in third-party acceptance of such use, which in turn led to reimbursement for Medicare co-pays and supplemental payment by the Plaintiffs and Class members.

138.   Amgen, either directly or indirectly, received payments from Plaintiffs and Class members resulting from the off-label uses of EPO, directly resulting in increased sales.

139.   Amgen, as result of its scheme of concealing and misrepresenting the serious safety risks of EPO and deceptively promoting unsafe, unproven, and

1    unnecessary uses, succeeded in causing physicians to prescribe EPO for such uses

2    without knowledge of these risks, foreseeably and directly resulting in Plaintiffs and

3    Class members paying for prescriptions that were unnecessary and/or posed serious

4    health risks to their members.

## VIII. CLASS ACTION ALLEGATIONS

6        140.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P.

7    23(a), (b)(2), and (b)(3), and/or (c)(4), seeking damages and equitable relief,

8    including disgorgement and restitution, on behalf of the Class.

9        141.    The Class consists of

10           All persons or entities that paid for EPO when EPO was
administered for anemia of cancer and/or heart failure
11           and/or for treatment of cancer (the "Fraudulent Marketing
Class"); and
12

13           All persons or entities that paid for EPO when EPO was
administered through intravenous administration and/or at
14           dosages that achieved a hemoglobin of 13g/dL and above
(the "Kidney Dialysis Subclass").
15

16       142.    The Class Period is May 21, 2002 through March 9, 2007.

17       143.    Excluded from the Class are governmental entities.

18       144.    Plaintiffs reserve the right to modify the class definition based on

19   discovery.

20       145.    Upon information and belief, thousands of Class members suffered

21   monetary injury as a result of Amgen's deceptive and fraudulent scheme to obtain

22   payments for the unnecessary, unsafe, and off-label use of EPO.  The members of the

23   Class are so numerous and dispersed throughout the United States that joinder of all

24   members is impracticable.

25       146.    The factual and legal issues involving Amgen's scheme are common to

26   all members of the Class and are based upon a common course of misconduct which

27   caused injury to Plaintiffs and all members of the Class. These issues include:

28

- Whether Defendant engaged in a pattern of racketeering activity including mail and wire fraud;
- Whether Defendant participated in a RICO enterprise;
- Whether Defendant made false representations and/or material omissions in promoting use of EPO and failed to adequately warn of the adverse effects of EPO;
- Whether Defendant engaged in unfair, deceptive, or illegal conduct in violation of California unfair competition and false advertising laws;
- Whether Defendant engaged in a fraudulent scheme involving misrepresentations and omissions regarding the efficacy and safety of EPO when used for off-market purposes;
- Whether Defendant's RICO misconduct proximately caused injuries to Plaintiffs and the Fraudulent Marketing Class; and
- Whether Defendant's misconduct under §17200 and §17500 proximately caused injuries to Plaintiffs and the Class.

147.   Plaintiffs will fairly and adequately protect the interests of the Class, as required by Rule 23(a)(4).  Plaintiffs have retained counsel competent and experienced in class action lawsuits, and have no interests antagonistic to or in conflict with those of the Class.  Plaintiffs and their counsel will vigorously prosecute this action on behalf of the Class.

148.   Defendant, by its fraudulent scheme in violation of RICO and California's consumer and false advertising laws, obtained excessive payments from health benefit providers, including Plaintiffs, for ineffective, unsafe, and unnecessary treatment of patients with EPO and have acted on grounds generally applicable to the Class under Rule 23(b)(2), causing Defendant to be unjustly enriched at the expense of the Class, so that equitable relief, including disgorgement, is appropriate.

149.   Questions of law and facts involving Defendant's common fraudulent scheme and course of conduct predominate over any questions affecting only individual members as required by Rule 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because the damages suffered by individual members of the Class are too small to warrant the initiation of individual actions.  Adjudication of this controversy through a class action will avoid the possibility of inconsistent and possibly conflicting adjudications of similar claims that may result from individual actions.  As the claims of Plaintiffs and Class members arise from a common scheme, and the injuries to Plaintiffs and Class members were caused by the common scheme, the case is manageable as a class action.  Alternatively, to the extent that one or more claims are determined to be unmanageable as a result of individual issues, the common issues are properly certified under Rule 23(c)(4).

## COUNT I

### Violation of 18 U.S.C. § 1962(c) Against Defendant Amgen

150.   Plaintiffs incorporate herein and make a part hereof the allegations in the preceding paragraphs 1 through 104 and 134 through 149 as if fully set forth.

151.   This cause of action for violation of 18 U.S.C. § 1962(c) is brought by Plaintiffs against Amgen in connection with the activities of the False Marketing Enterprise.

152.   As set forth above, Amgen and the other participants in the False Marketing Enterprise have conducted or participated in conducting the affairs of the False Marketing Enterprise through a pattern of racketeering activity.

153.   As a direct and proximate result, Plaintiffs and members of the Class have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.  Specifically, Plaintiffs and members of the Class have been injured in their business or property by paying for EPO for unsafe,

1   unproven and unsubstantiated purposes, which they would not have done absent

2   Amgen's and the other participants' unlawful conduct.

3   154.   Accordingly, Amgen is liable to Plaintiffs and the Class for three times

4   their actual damages as proven at trial, plus interest and attorneys' fees.

**COUNT II**

**Violation of the California UCL, Business & Professions Code §17200, *et seq.***

**(as to Amgen's "Fraudulent Marketing" Conduct")**

8   155.   Plaintiffs incorporate herein and make a part hereof the allegations

9   contained in the preceding paragraphs 1 through 104 and 134 through 154 as if fully

10  set forth.

11  156.   Defendant's acts and practices detailed above, including the deceptive

12  promotion, marketing and distribution of EPO, which occurred in significant part in

13  California, constitutes unlawful, unfair, and fraudulent business acts and practices

14  under the UCL.   Such acts and practices included:

(a)   Fostering the belief in the medical community of unproven and
      false safety and efficacy for various uses of ESAs;

(b)   Marketing and promoting use of the drugs for unsafe, unproven
      and unsubstantiated uses; and

(c)   The concealment of adverse study results, and the selective and
      unbalanced disclosure of positive test results.

21  157.   Defendant's scheme also violates the UCL as a "fraudulent" business

22  practice, in that it was likely to deceive persons into believing such off-label uses

23  were safe and effective when they were not and consequently Plaintiffs and the Class

24  being required to pay for such use.   Such conduct also constitutes an "unfair"

25  business act or practice in that the gravity of the consequences of such conduct

26  outweighed any benefit therefrom considering the reasonably available alternatives,

27  and is tethered to a policy to only use such products for proper authorized purposes.

28

158. Plaintiffs' claims involve questions of common and general interest as provided under Cal. Code. Civ. P. § 382.

159. Plaintiffs and the Class members suffered injury in fact in the form of increased payments for EPO that would not have occurred absent the scheme as described above. Plaintiffs have suffered losses of money and property as a result of the commission of unlawful, fraudulent and unfair business practices as detailed above. Plaintiffs and members of the Class are therefore entitled to bring this claim to recover restitution and disgorgement of profits made at their expense, attorneys fees and costs pursuant to the common fund and substantial benefit doctrines and C.C.P. Section 1021.5, and injunctive or declaratory relief as may be available.

**COUNT III**

**Violation of the California FAL, Business & Professions Code § 17500, *et seq.***

**(as to Amgen's "Fraudulent Marketing" Conduct)**

160. Plaintiffs incorporate herein and make a part hereof the allegations contained in the preceding paragraphs 1 through 104 and 134 through 159 as if fully set forth.

161. Defendant violated California's FAL because the scheme detailed above involved the making, either directly or indirectly, of deceptive, untrue, and misleading promotional and advertising statements designed either in whole or in part to encourage the use of EPO for ineffective, unsafe, and off-label uses. This misconduct was instigated and controlled by Amgen from its headquarters in California and caused injuries to Plaintiffs and Class members in California and throughout the United States. Amgen knew that the promotional statements and advertising materials it disseminated either directly or indirectly regarding the propriety, safety and legitimacy of such off-label uses and promoting and encouraging such use were untrue, deceptive or misleading.

162.   Defendant's unlawful and deceptive conduct in terms of engaging in untrue and misleading advertising included, *inter alia*:

(a)   Fostering the false belief through misleading promotional and advertising materials as detailed above that EPO was safe and effective for various uses and at doses exceeding the FDA approved label;

(b)   Selectively presenting positive test results in press releases that were designed either in whole or in part to encourage or not dissuade the use of EPO while concealing the true safety hazards of EPO.

163.   The scheme as detailed herein resulted in Plaintiffs and the Class suffering injury in fact and a loss of money or property in the form of increased payments for EPO, which loss would not have occurred nor such monies paid absent the deceptive, untrue and misleading advertising and promotional materials disseminated by Amgen as described above.

164.   Plaintiffs and members of the Class are therefore entitled to bring this claim to recover restitution and disgorgement of profits made at their expense, attorneys fees and costs pursuant to the common fund and substantial benefit doctrines and C.C.P. Section 1021.5, and injunctive or declaratory relief as may be available.

**COUNT IV**

**Violation of the California UCL, Business & Professions Code §17200, *et seq.***

**(as to Amgen's "Kidney Dialysis" Conduct")**

165.   Plaintiffs incorporate herein and make a part hereof the allegations contained in the preceding paragraphs 1 through 164 as if fully set forth.

166.   Defendant's acts and practices detailed above, including the deceptive promotion, marketing and distribution of EPO, which occurred in significant part in

California, constitutes unlawful, unfair, and fraudulent business acts and practices under the UCL.  Such acts and practices included:

    (a)    Fostering the belief in the medical community of false safety and efficacy regarding the administratiou route of its ESAs;

    (b)    Marketing and promoting use of intravenous administration of the drugs and the resulting overdosing; and

    (c)    The concealment of study results regarding the safety of administration routes of its ESAs.

167.  Defendant violated the UCL through the creation of lucrative business partnerships and contracts, which through enormous financial incentives and rebates, deceptively encouraged a pattern and practice of overdosing patients and subjecting them to unsafe, off-label uses of EPO.  Such conduct violates numerous laws, including RICO and the FAL.

168.  Defendant's scheme also violates the UCL as a "fraudulent" business practice, in that it was likely to deceive persons into believing that intravenous administration was more safe when instead it resulted in overdosing of patients and consequently Plaintiffs and the Class being required to pay for such use.  Such conduct also constitutes an "unfair" business act or practice in that the gravity of the consequences of such conduct outweighed any benefit therefrom considering the reasonably available alternatives, and is tethered to a policy to only use such products for proper authorized purposes.

169.  Plaintiffs' claims involve questions of common and general interest as provided under Cal. Code. Civ. P. § 382.

170.  Plaintiffs and the Class members suffered injury in fact in the form of increased payments for EPO that would not have occurred absent the scheme as described above. Plaintiffs have suffered losses of money and property as a result of the commission of unlawful, fraudulent and unfair business practices as detailed above. Plaintiffs and members of the Class are therefore entitled to bring this claim

1   to recover restitution and disgorgement of profits made at their expense, attorneys

2   fees and costs pursuant to the common fund and substantial benefit doctrines and

3   C.C.P. Section 1021.5, and injunctive or declaratory relief as may be available.

### OTHER COUNTS

4

5      171.   Solely for the purpose of preserving Plaintiffs' right to appeal the

6   Court's December 19, 2008 Order (the "Order") dismissing the Complaint, Plaintiffs

7   reallege and incorporate by reference the following counts and related allegations of

8   Plaintiffs' Consolidated Class Action Complaint, filed July 2, 2008: Count I (RICO

9   18 U.S.C. § 1962(c) against Amgen), Count II (RICO 18 U.S.C. § 1962(c) against

10  Amgen, DaVita and Fresenius), Count III (§17200), and Count IV (§17500).

11  Because Plaintiffs are asserting these claims solely to preserve their appeal rights and

12  because Plaintiffs assert no additional claims or facts regarding DaVita and Fresenius

13  that were not addressed by the Order, Plaintiffs acknowledge that the Order

14  addresses these claims and that no additional answer or response by DaVita or

15  Fresenius is required.

### PRAYER FOR RELIEF

16

17     WHEREFORE, Plaintiffs demand judgment on behalf of themselves and Class

18  members as follows:

19     A.    Awarding Plaintiffs actual and treble damages against Amgen in an

20  amount to be determined at trial, together with prejudgment interest at the maximum

21  rate allowable by law;

22     B.    Ordering that restitution and disgorgement of profits be made to

23  Plaintiffs and Class members as a result of Amgen's illegal conduct;

24     C.    Ordering that an accounting be made by Amgen of the wrongfully

25  obtained payments and profits;

26     D.    Awarding Plaintiffs and Class members the costs of this suit, including

27  reasonable attorneys' fees and other disbursements;

28

1        E.    Enjoining Amgen from continuing the illegal and deceptive activities

2  alleged herein; and

3        F.    Awarding Plaintiffs and Class members such other and further relief as

4  this Court may deem just and proper.

5  DATED:  February 24, 2009.

WHATLEY DRAKE & KALLAS, LLC

By ___Edith M Kallas/MM___

    Edith M. Kallas
    Joe R. Whatley, Jr.
    Deborah Clark-Weintraub
    Lili R. Sabo
1540 Broadway, 37th Floor
New York, NY  10036
Telephone:  (212) 447-7070
Facsimile:  (212) 447-7077

Co-Lead Counsel for All Plaintiffs and
Attorneys for Plaintiff
Sheet Metal Workers National Health Fund
and Glenn Randle, Trustee, Individually and
on Behalf of All Other Similarly Situated


HAGENS BERMAN SOBOL SHAPIRO LLP

By ___Steve W Berman/MM___

    Steve W. Berman
    Robert F. Lopez
1301 Fifth Avenue, Suite 2900
Seattle, Washington  98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594

Co-Lead Counsel for All Plaintiffs and
Attorneys for Plaintiff
United Food & Commercial Workers Central
Pennsylvania & Regional Health & Welfare
Fund

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HENNIGAN, BENNETT & DORMAN LLP
Roderick G. Dorman
Mieke K. Malmberg
865 S. Figueroa Street, Suite 2900
Los Angeles, CA  90017
Telephone:  (213) 694-1200
Facsimile:  (213) 694-1234

Liaison Counsel for All Plaintiffs

LOWEY DANNENBERG
   COHEN & HART, P.C.
Gerald Lawrence, Jr.
Peter D. St. Phillip, Jr.
White Plains Plaza
One North Broadway
White Plains, NY 10601-2310
Telephone:  (914) 997-0500
Facsimile:  (914) 997-0035

Attorneys for Plaintiff United Food &
Commercial Workers Central Pennsylvania
Regional Health and Welfare Fund

MILLER LAW LLC
Marvin A. Miller
Lori A. Fanning
115 South LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  (312) 332-3400
Facsimile:  (312) 676-2676

Attorneys for Plaintiff Painters District
Council No. 30 Health & Welfare Fund

JACOBS BURNS ORLOVE
   STANTON & HERNANDEZ
Brandon M. Anderson
Joseph M. Burns
122 South Michigan Avenue, Suite 1720
Chicago, IL 60603-6145
Telephone: (312) 372-1646
Facsimile:  (312) 580-7175

Attorneys for Painters District Council No. 30
Health & Welfare Fund

- 58 -

FINKELSTEIN THOMPSON LLP
Tracy D. Rezvani
The Duvall Foundry
1050 30th Street, N.W.
Washington, DC 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090

Attorneys for Plaintiffs
Ironworkers Local Union No. 68 and
Participating Employers Health and Welfare
Funds;
Ironworkers Local Union No. 399 and
Participating Employers Health and Welfare
Funds;
Ironworkers District Council of Philadelphia
and Vicinity Benefit and Pension Plan


BARNOW AND ASSOCIATES, P.C.
Ben Barnow
One N. LaSalle Street
Suite 4600
Chicago, IL 60602
Telephone: (312) 621-2000
Facsimile: (312) 641-5504

Attorneys for Plaintiffs
Ironworkers Local Union No. 68 and
Participating Employers Health and Welfare
Funds;
Ironworkers Local Union No. 399 and
Participating Employers Health and Welfare
Funds;
Ironworkers District Council of Philadelphia
and Vicinity Benefit and Pension Plan


SHELLER P.C.
Stephen A. Sheller
Brian J. McCormick
1528 Walnut Street, 3rd Floor
Philadelphia, PA 19102
Telephone: (215) 790-7300
Facsimile: (215) 546-0942

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attorneys for Plaintiffs
Ironworkers Local Union No. 68 and
Participating Employers Health and Welfare
Funds;
Ironworkers Local Union No. 399 and
Participating Employers Health and Welfare
Funds;
Ironworkers District Council of Philadelphia
and Vicinity Benefit and Pension Plan

HARRY R. BLACKBURN AND
ASSOCIATES
Harry R. Blackburn
208 Kings Highway South
Cherry Hill, NJ 08034
Telephone: (856) 795-5758

Attorneys for Plaintiffs
Ironworkers Local Union No. 68 and
Participating Employers Health and Welfare
Funds;
Ironworkers Local Union No. 399 and
Participating Employers Health and Welfare
Funds;
Ironworkers District Council of Philadelphia
and Vicinity Benefit and Pension Plan

SOMMERS SCHWARTZ, P.C.
Jason J. Thompson
Henri O. Harmon
2000 Town Center, Suite 900
Southfield, MI 48075
Telephone: (248) 355-0300
Facsimile: (248) 746-4001

Attorneys for Plaintiff Kenneth Ross,
Commissioner Offices of Financial and
Insurance Services for the State of Michigan

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ZIMMERMAN REED
Timothy J. Becker
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844

Attorneys for Plaintiff Kenneth Ross,
Commissioner Offices of Financial and
Insurance Services for the State of Michigan


BRANSTETTER STRANCH
  & JENNINGS PLLC
J. Gerard Stranch, IV
227 Second Avenue North, 4th Floor
Nashville, TN 37201
Telephone: (615) 254-8801
Facsimile: (615) 250-3937

Attorneys for Plaintiff
Sheet Metal Workers National Health Fund
and Glenn Randle, Trustee, Individually and
on Behalf of All Others Similarly Situated


ROSNER & MANSFIELD, LLP
Alan M. Mansfield
10085 Carroll Canyon Rd., Suite 100
San Diego, CA 92131
Telephone: (858) 348-1005
Facsimile: (858) 348-1150

Attorneys for Plaintiff Sheet Metal Workers
National Health Fund and Glenn Randle,
Trustee, Individually and on Behalf of All
Others Similarly Situated

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOK, PORTUNE & LOGOTHETIS
David M. Cook
22 West 9th Street
Cincinnati, OH  45202
Telephone:  (513) 721-0444
Facsimile:  (513) 721-1178
Attorneys for Plaintiff
Sheet Metal Workers National Health Fund
and Glenn Randle, Trustee Individually and
on Behalf of All Other Similarly Situated

EYSTER KEY TUBB ROTH
   MIDDLETON & ADAMS, LLP
Nicholas B. Roth
402 East Moulton Street
P.O. Box 1607
Decatur, AL  35602
Telephone:  (256) 353-6761
Facsimile:  (256) 353-6767

Attorneys for Plaintiff
Sheet Metal Workers National Health Fund
and Glenn Randle, Trustee Individually and
on Behalf of All Other Similarly Situated

GILBERT & SACKMAN
Robert A. Cantore
3699 Wilshire Boulevard, Suite 1200
Los Angeles, CA  90010-2732
Telephone:  (323) 938-3000
Facsimile:  (323) 937-9139

Attorneys for Plaintiff
Sheet Metal Workers National Health Fund
and Glenn Randle, Trustee Individually and
on Behalf of All Other Similarly Situated

1

**JURY DEMAND**

2

Plaintiffs hereby demand a trial by jury on all causes of action so triable.

3

DATED: February 23, 2009.

4

WHATLEY DRAKE & KALLAS, LLC

5

By _Edith M Kallas /MM_

6

Edith M. Kallas
Joe R. Whatley, Jr.

7

Deborah Clark-Weintraub
Lili R. Sabo

8

1540 Broadway, 37th Floor

9

New York, NY 10036
Telephone: (212) 447-7070

10

Facsimile: (212) 447-7077

11

Co-Lead Counsel for All Plaintiffs and

12

Attorneys for Plaintiff
Sheet Metal Workers National Health Fund

13

and Glenn Randle, Trustee, Individually and

14

on Behalf of All Other Similarly Situated

15

16

HAGENS BERMAN SOBOL SHAPIRO LLP

17

By _Steve W Berman/MM_

18

Steve W. Berman
Robert F. Lopez

19

1301 Fifth Avenue, Suite 2900

20

Seattle, Washington 98101
Telephone: (206) 623-7292

21

Facsimile: (206) 623-0594

22

Co-Lead Counsel for All Plaintiffs and

23

Attorneys for Plaintiff
United Food & Commercial Workers Central

24

Pennsylvania & Regional Health & Welfare
Fund

25

26

27

28

- 63 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HENNIGAN, BENNETT & DORMAN LLP
Roderick G. Dorman
Mieke K. Malmberg
865 S. Figueroa Street, Suite 2900
Los Angeles, CA  90017
Telephone:  (213) 694-1200
Facsimile:  (213) 694-1234

Liaison Counsel for All Plaintiffs

LOWEY DANNENBERG
   COHEN & HART, P.C.
Gerald Lawrence, Jr.
Peter D. St. Phillip, Jr.
White Plains Plaza
One North Broadway
White Plains, NY 10601-2310
Telephone:  (914) 997-0500
Facsimile:  (914) 997-0035
Attorneys for Plaintiff United Food &
Commercial Workers Central Pennsylvania
Regional Health and Welfare Fund

MILLER LAW LLC
Marvin A. Miller
Lori A. Fanning
115 South LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  (312) 332-3400
Facsimile:  (312) 676-2676

Attorneys for Plaintiff Painters District
Council No. 30 Health & Welfare Fund

JACOBS BURNS ORLOVE
   STANTON & HERNANDEZ
Brandon M. Anderson
Joseph M. Burns
122 South Michigan Avenue, Suite 1720
Chicago, IL 60603-6145
Telephone: (312) 372-1646
Facsimile: (312) 580-7175

Attorneys for Painters District Council No. 30
Health & Welfare Fund

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FINKELSTEIN THOMPSON LLP
Tracy D. Rezvani
The Duvall Foundry
1050 30th Street, N.W.
Washington, DC  20007
Telephone:  (202) 337-8000
Facsimile:  (202) 337-8090

Attorneys for Plaintiffs
Ironworkers Local Union No. 68 and
Participating Employers Health and Welfare
Funds;
Ironworkers Local Union No. 399 and
Participating Employers Health and Welfare
Funds;
Ironworkers District Council of Philadelphia
and Vicinity Benefit and Pension Plan


BARNOW AND ASSOCIATES, P.C.
Ben Barnow
One N. LaSalle Street
Suite 4600
Chicago, IL  60602
Telephone: (312) 621-2000
Facsimile: (312) 641-5504

Attorneys for Plaintiffs
Ironworkers Local Union No. 68 and
Participating Employers Health and Welfare
Funds;
Ironworkers Local Union No. 399 and
Participating Employers Health and Welfare
Funds;
Ironworkers District Council of Philadelphia
and Vicinity Benefit and Pension Plan


SHELLER P.C.
Stephen A. Sheller
Brian J. McCormick
1528 Walnut Street, 3rd Floor
Philadelphia, PA 19102
Telephone:  (215) 790-7300
Facsimile:  (215) 546-0942

Attorneys for Plaintiffs

- 65 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ironworkers Local Union No. 68 and
Participating Employers Health and Welfare
Funds;
Ironworkers Local Union No. 399 and
Participating Employers Health and Welfare
Funds;
Ironworkers District Council of Philadelphia
and Vicinity Benefit and Pension Plan

HARRY R. BLACKBURN AND
ASSOCIATES
Harry R. Blackburn
208 Kings Highway South
Cherry Hill, NJ 08034
Telephone: (856) 795-5758

Attorneys for Plaintiffs
Ironworkers Local Union No. 68 and
Participating Employers Health and Welfare
Funds;
Ironworkers Local Union No. 399 and
Participating Employers Health and Welfare
Funds;
Ironworkers District Council of Philadelphia
and Vicinity Benefit and Pension Plan

SOMMERS SCHWARTZ, P.C.
Jason J. Thompson
Henri O. Harmon
2000 Town Center, Suite 900
Southfield, MI  48075
Telephone:  (248) 355-0300
Facsimile:  (248) 746-4001

Attorneys for Plaintiff Kenneth Ross,
Commissioner Offices of Financial and
Insurance Services for the State of Michigan

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ZIMMERMAN REED
Timothy J. Becker
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Telephone:  (612) 341-0400
Facsimile:  (612) 341-0844

Attorneys for Plaintiff Kenneth Ross,
Commissioner Offices of Financial and
Insurance Services for the State of Michigan

BRANSTETTER STRANCH
  & JENNINGS PLLC
J. Gerard Stranch, IV
227 Second Avenue North, 4th Floor
Nashville, TN  37201
Telephone:  (615) 254-8801
Facsimile:  (615) 250-3937

Attorneys for Plaintiff
Sheet Metal Workers National Health Fund
and Glenn Randle, Trustee, Individually and
on Behalf of All Others Similarly Situated

ROSNER & MANSFIELD, LLP
Alan M. Mansfield
10085 Carroll Canyon Rd., Suite 100
San Diego, CA  92131
Telephone:  (858) 348-1005
Facsimile:  (858) 348-1150

Attorneys for Plaintiff Sheet Metal Workers
National Health Fund and Glenn Randle,
Trustee, Individually and on Behalf of All
Others Similarly Situated

COOK, PORTUNE & LOGOTHETIS
David M. Cook
22 West 9th Street
Cincinnati, OH  45202
Telephone:  (513) 721-0444
Facsimile:  (513) 721-1178
Attorneys for Plaintiff
Sheet Metal Workers National Health Fund
and Glenn Randle, Trustee Individually and
on Behalf of All Other Similarly Situated

EYSTER KEY TUBB ROTH
    MIDDLETON & ADAMS, LLP
Nicholas B. Roth
402 East Moulton Street
P.O. Box 1607
Decatur, AL  35602
Telephone:  (256) 353-6761
Facsimile:  (256) 353-6767

Attorneys for Plaintiff
Sheet Metal Workers National Health Fund
and Glenn Randle, Trustee Individually and
on Behalf of All Other Similarly Situated

GILBERT & SACKMAN
Robert A. Cantore
3699 Wilshire Boulevard, Suite 1200
Los Angeles, CA  90010-2732
Telephone:  (323) 938-3000
Facsimile:  (323) 937-9139

Attorneys for Plaintiff
Sheet Metal Workers National Health Fund
and Glenn Randle, Trustee Individually and
on Behalf of All Other Similarly Situated

**PROOF OF SERVICE**

I declare as follows:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 865 South Figueroa Street, Suite 2900, Los Angeles, California 90017.

On **February 24, 2009**, I served the foregoing document described as **PLAINTIFFS' CORRECTED AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** on the interested parties in this action follows:

☐    by transmitting via facsimile the documents listed above to the fax number set forth below on this date. This transmission was reported as complete without error by a transmission report issued by the facsimile machine upon which the said transmission was made immediately following the transmission.

☒    by placing the document listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☒    by electronic transmission. I caused the document(s) listed above to be transmitted by electronic mail to the individuals on the service list as set forth below.

☐    by placing the document listed above in a sealed envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a _____ agent for Delivery.

☐    by personally delivering the document listed above to the persons at the address set forth below.

**SEE ATTACHED SERVICE LIST**

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postal meter date is more than one day after date of deposit for mailing in affidavit.

Executed on **February 24, 2009** at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Sylvia A. Berson

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

1

## SERVICE LIST

2

**(via electronic mail and First Class mail)**      **(via First Class mail)**

3       Barbara Wrubel                                      Philip N. Yannella
        barbara.wrubel@skadden.com                          Robert A. Limbacher

4       Mark S. Cheffo                                      Will W. Sachse
        mark.cheffo@cheffo.com                              Dechert LLP

5       Sheila L. Birnbaum                                  Cira Center
        sheila.birnbaum@skadden.com                         2929 Arch Street

6       Skadden, Arps, Slate, Meagher and Flom LLP          Philadelphia, PA 19104-2808

7       Four Times Square                                   *Attorneys for Defendant Amgen Inc.*
        New York, NY 10036-6522

8       *Attorneys for Defendant Amgen Inc.*

9       **(via electronic mail and First Class mail)**      **(via First Class mail)**

10      Darrel J. Hieber                                    Ronni E. Fuchs
        darrel.hieber@skadden.com                           Dechert LLP

11      Skadden, Arps, Slate, Meagher and Flom LLP          902 Carnegie Center, Suite 500
        300 South Grand Avenue, Suite 3400                  Princeton, NJ 08540-6531

12      Los Angeles, CA 90071-3144                          *Attorneys for Defendant Amgen Inc.*

13      *Attorneys for Defendant Amgen Inc.*

14      ## COURTESY COPY SENT TO THE FOLLOWING VIA FIRST CLASS MAIL:

15      Charles E. Weir                                     Jeffrey E. Stone
        Thomas A. Ryan                                      McDermott Will & Emery

16      McDermott Will & Emery                              227 West Monroe Street
        2049 Century Park East, 38th Floor                  Chicago, IL 60606-5096

17      Los Angeles, CA 90067-3218                          *Attorneys for DaVita Inc.*

18      *Attorneys for  DaVita Inc.*

19      Mark W. Pearlstein                                  Sekret T. Sneed
        McDermott Will & Emery                              Sonnenschein Nath & Rosenthal LLP

20      28 State Street                                     601 South Figueroa Street, Suite 2500
        Boston, MA 02109-1775                               Los Angeles, CA 90017-5704

21      *Attorneys for DaVita Inc.*                         *Attorneys for Fresenius Medical Care Holdings*

22                                                          *Inc, dba Fresenius Medical Care North America*

23      Dand H. Stern
        Christian Edward Dodd

24      Jesse J. Contreras

25      Winston & Strawn LLP
        333 S. Grand Avene

26      Los Angeles, CA  90071
        *Attorneys for  Fresenius Medical Care Holdings*

27      *Inc, dba Fresenius Medical Care North America*

28

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA