# EXHIBIT A



WHATLEY DRAKE & KALLAS, LLC
Edith M. Kallas (*pro hac vice*)
ekallas@wdklaw.com
Joe R. Whatley, Jr. (*pro hac vice*)
jwhatley@wdklaw.com
Deborah Clark-Weintraub (*pro hac vice*)
dweintraub@wdklaw.com
Lili R. Sabo (*pro hac vice*)
lsabo@wdklaw.com
1540 Broadway, 37th Floor
New York, NY 10036
Tel.: (212) 447-7070
Fax: (212) 447-7077

HAGENS BERMAN SOBOL
  SHAPIRO LLP
Steve W. Berman (*pro hac vice*)
steve@hbsslaw.com
Robert F. Lopez (*pro hac vice*)
robl@hbsslaw.com
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Tel.: (206) 623-7292
Fax: (206) 623-0594

*Co-Lead Counsel for Plaintiffs*
*(Additional Counsel Listed on Signature Page)*

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| In re: EPOGEN AND ARANESP OFF-LABEL MARKETING AND SALES PRACTICES LITIGATION | Case No. 08-ML-01934 PSG (AGRx) |
| SHEET METAL WORKERS NATIONAL HEALTH FUND; UNITED FOOD AND COMMERCIAL WORKERS CENTRAL PENNSYLVANIA & REGIONAL HEALTH & WELFARE FUND; PAINTERS DISTRICT COUNCIL NO. 30 | Judge: Hon. Philip S. Gutierrez <br> **PLAINTIFFS' CORRECTED AMMENDED CONSOLIDATED CLASS ACTION** |

Exhibit A
Page 3

| | | |
|---|---|---|
| 1 | HEALTH & WELFARE FUND; | ) **COMPLAINT** |
| 2 | IRONWORKERS LOCAL UNION NO. 68 AND PARTICIPATING EMPLOYERS | ) |
| 3 | HEALTH & WELFARE FUNDS; IRONWORKERS LOCAL UNION NO. | ) **DEMAND FOR JURY TRIAL** |
| 4 | 399 AND PARTICIPATING EMPLOYERS HEALTH AND | ) |
| 5 | WELFARE FUNDS; IRONWORKER DISTRICT COUNCIL OF | ) |
| 6 | PHILADELPHIA AND VICINITY | ) |
| 7 | BENEFIT AND PENSION PLAN; KENNETH ROSS, COMMISSIONER, | ) |
| 8 | OFFICES OF FINANCIAL & INSURANCE SERVICES FOR THE | ) |
| 9 | STATE OF MICHIGAN, | ) |
| 10 | ~~This document relates to:~~ | ) |
| 11 |                        Plaintiffs, | ) |
| 12 |           vs. | ) |
| 13 | AMGEN, INC., | ) |
| 14 |                        Defendant. | ) |
| 15 | ~~ALL ACTIONS~~ | ) |

~~**PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**~~

2

**TABLE OF CONTENTS**

PAGE

I.      SUMMARY AND OVERVIEW................................................................1

II.     JURISDICTION AND VENUE..............................................................6̶4

III.    THE PARTIES ........................................................................................6̶5

IV.     BACKGROUND ..................................................................................1̶1̶8

        A.      ~~Regulatory Framework        11~~

        B.      ~~Background of ESAs   15~~_____8

        ~~C.~~ B. FDA Approval and Marketing of Epogen and Aranesp.......................1̶5̶9

                1.      Approval History of Epoetin Alfa .......................................1̶5̶9

                2.      Approval History of Darbepoetin Alfa.................................1̶8̶11

                3.      The 2004 Approval of a Weekly Dose of Epoetin Alfa .......1̶9̶13

        ~~D.~~ C. The Deceptive Promotion of EPO for ~~Off-Label~~Unproven/Unsafe Uses............1̶9̶13

        ~~E.~~ D. Amgen Improperly Uses Third Parties To Deceptively Promote Off-Label Uses
                of EPO to Both Physicians and to the Public ........................................2̶6̶19

                1.      Amgen Used the National Anemia Action Council To
                        ~~Improperly~~Deceptively Promote ~~Off-Label~~Unsafe and
                        Unsubstantiated Uses of EPO to Physicians.....................2̶6̶19

                2.      Amgen Used CancerCare To ~~Improperly~~Deceptively Promote
                        ~~Off-Label~~ Uses of EPO to the Public and to Physicians ......................2̶8̶21

                3.      Promoting EPO Uses in a Deceptive Fashion Via Continuing Medical
                        Education ..................................................................2̶9̶22

        ~~F.~~ E. Failure To Disclose ~~31~~ Safety and Effectiveness Issues.................................24

        ~~G.~~ F. Amgen Conceals and Denies the Truth About the Dangers of its Products.........3̶4̶26

        ~~H.~~ G. Amgen Is Forced to Admit EPO's True Health Risks..................................3̶5̶27

V.      DEFENDANT AMGEN CARRIED OUT ITS SCHEME THROUGH THE USE OF
        ~~TWO SEPARATE~~AN ILLEGAL ENTERPRISES 4̶2̶ 34

        A.      The ~~Off-Label~~Fraudulent Marketing Enterprise....................................4̶3̶34

        B.      ~~The Kidney Dialysis Enterprise        44~~C.   Pattern of Racketeering Activity
                5̶1̶36

        ~~D.~~ C. Injury ..................................................................................5̶2̶37

        ~~E.~~ D. Fraudulent Concealment ...............................................................5̶2̶37

VI.    ~~DEFENDANTS'~~ Additional Wrongful Conduct ............................................. 37

VII.    AMGEN'S UNLAWFUL SCHEME CAUSED PLAINTIFFS AND CLASS
        MEMBERS TO PAY CLAIMS FOR EPOGEN AND ARANESP PRESCRIBED
        FOR UNSAFE, ~~OFF-LABEL~~ AND UNPROVEN USES ............................................ ~~52~~48

~~VII.~~ VIII. CLASS ACTION ALLEGATIONS ..................................................... ~~53~~49

COUNT I  Violation of 18 U.S.C. § 1962(c) Against Defendant Amgen .............................. ~~55~~51

COUNT II  Violation of the ~~18 U.S.C. § 1962(c) Against Defendants Amgen, DaVita, and
          Fresenius       56~~ California UCL, Business & Professions Code § 17200, *et seq.* (as
          to Amgen's "Fraudulent Marketing" Conduct")       52

COUNT III  Violation of the California ~~UCL, Business & Professions Code § 17200,
           et seq.  57COUNT IV  Violation of the California~~ FAL, Business & Professions Code
           § 17500,
           ~~et seq.  58~~ *et seq.* (as to Amgen's "Fraudulent Marketing" Conduct) 53

COUNT IV  Violation of the California UCL, Business & Professions Code § 17200, *et seq.*
          (as to Amgen's "Kidney Dialysis" Conduct") ............................................. 54

OTHER COUNTS ............................................................................................ 56

PRAYER FOR RELIEF ................................................................................ ~~59~~56

JURY DEMAND ....................................................................................... ~~60~~63

2

1.    Plaintiffs, by and through their respective attorneys, hereby allege <u>as follows based</u> upon knowledge with respect to facts concerning themselves and, as to all other matters, upon information and belief based upon the investigation of counsel, as follows:

<div align="center">

### I. <u>I.</u>SUMMARY AND OVERVIEW

</div>

2.    This is a nationwide class action brought against Defendants Amgen Inc. ("Amgen"), ~~DaVita, Inc. ("DaVita") and Fresenius Medical Care Holdings, Inc. d/b/a Fresenius Medical Care North America ("Fresenius") (collectively, "Defendants"~~) for violation of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and California law, including the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL"), and the False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* ("FAL").

3.    From at least 2002 until March 9, 2007, ~~Defendants~~<u>Amgen</u> engaged in a massive scheme to defraud Plaintiffs and the Class (defined below) and substantially increase sales of Epogen (epoetin alfa) and Aranesp (darbepoetin alfa) (sometimes jointly referred to as "EPO") by ~~unlawfully~~<u>falsely</u> promoting the use of these drugs for unsafe purposes and at dangerous dosages ~~not specified on the drugs' Food and Drug Administration ("FDA") approved labels (i.e., off-label promotion).~~<u>.</u>

4.    Amgen, the largest biotechnology company in the world, manufactures and sells EPO. EPO belongs to a class of drugs known as erythropoiesis-stimulating agents ("ESAs"), which encourage the creation of oxygen-carrying red blood cells. EPO has been approved by the FDA for the treatment of anemia in patients on chemotherapy or the treatment of patients suffering from chronic kidney disease at doses sufficient to boost the level of hemoglobin to 10 to 12 grams per deciliter of blood. In 2006, worldwide sales of Aranesp alone were over $4 billion, and combined with annual sales of Epogen ($2.511 billion), constituted nearly one half of the Company's total sales for all drugs. ~~Defendants DaVita and Fresenius, for-profit dialysis chains that dominate the dialysis industry, earn substantial revenues from administering EPO supplied by Amgen to dialysis patients.~~

5.    As set forth more fully herein, ~~defendant Amgen, acting in concert with certain non-party entities funded by it, including the National Anemia Action Counsel ("NAAC") and CancerCare, sought~~<u>Amgen</u><u>sought</u> to expand the patient population to whom these drugs could be

1   prescribed and increase its profits by ~~illegally~~falsely promoting EPO for ~~unapproved and~~ unsafe

2   off-label uses. ~~Defendant~~ Amgen accomplished this, *inter alia,* through its participation in the affairs

3   of an association-in-fact enterprise consisting of Amgen, NAAC, and CancerCare (the

4   "~~Off-Label~~False Marketing Enterprise"). Through a series of misstatements and/or omissions

5   contained in press releases, Continuing Medical Education ("CME") presentations, physician

6   brochures, and other marketing materials, the participants in the ~~Off-Label~~False Marketing

7   Enterprise ~~unlawfully~~deceptively promoted the following unsubstantiated and unsafe ~~off-label~~ uses

8   of EPO: (i) to treat cancer-induced anemia ("anemia of cancer"), as distinct from anemia due to the

9   effect of concomitantly administered chemotherapy; ~~and~~ (ii) to treat anemia in patients suffering

10  from heart failure; and (iii) to treat cancer itself, such as breast cancer and head and neck cancer.

11  Further, as a result of Amgen's misstatements and/or omissions, Amgen was able to secure the listing

12  of Aranesp for the treatment of anemia of cancer in the ~~influential~~ United States Pharmacopeia-Drug

13  Information ("USP-DI"), the authoritative industry reference guide for on-label and off-label uses of

14  prescription drugs.

15         6.    Unbeknownst to Plaintiffs and Class members, however, all the while Amgen was

16  promoting EPO for these ~~off-label~~unsafe and unproven uses, it knew of, but did not disclose, the

17  existence of serious adverse test results ~~which demonstrated~~demonstrating that EPO is ineffective

18  and carries significant safety risks, including increased incidents of heart attacks, strokes, accelerated

19  tumor growth, and death (which increase as the level of hemoglobin in the blood increases) when

20  used for the off-label purposes described above. Amgen also failed to disclose in press releases

21  touting purportedly positive results of certain preliminary studies of these off-label uses that the

22  studies were actually financed and controlled by Amgen.

23         ~~7.    In addition to the foregoing, defendant Amgen, acting in concert with defendants~~

24  ~~DaVita and Fresenius, engaged in a related scheme to boost Defendants' profits from EPO by~~

25  ~~unlawfully promoting the intravenous administration of EPO to treat anemia in kidney dialysis~~

26  ~~patients (which resulted in significantly more usage than subcutaneous administration), even though~~

27  ~~this route of administration had the effect of achieving a dangerously high hemoglobin level of~~

28  ~~13g/dL or above. Defendants accomplished this through their participation in the affairs of an~~

2

1  ~~association-in-fact enterprise consisting of Amgen, DaVita, and Fresenius (the "Kidney Dialysis~~

2  ~~Enterprise"). Specifically, Amgen entered into drug supply contracts with DaVita and Fresenius that~~

3  ~~provided volume-based discounts and other incentives for increased use of EPO (which meant~~

4  ~~greater profits for Defendants). In addition, Amgen repeatedly emphasized that intravenous~~

5  ~~administration of EPO to dialysis patients was preferred (as stated in the FDA-approved label) due to~~

6  ~~the purported significantly greater risk of pure red cell aplasia resulting from administration by~~

7  ~~injection.~~

8  ~~8.     In fact, however, unambiguous results from a 2005 Johnson & Johnson study known~~

9  ~~to Amgen indicated that increased incidents of pure red cell aplasia resulting from subcutaneous~~

10  ~~EPO administration were largely attributable to the contamination of the drug from uncoated rubber~~

11  ~~syringe stoppers during the dispensing and administration process, rather than the route of~~

12  ~~administration. Thus, although less profitable to Defendants, subcutaneous administration of EPO~~

13  ~~did not present a significantly greater risk of pure red cell aplasia. Conversely, intravenous~~

14  ~~administration, although more profitable to Defendants, risked raising hemoglobin levels in patients~~

15  ~~to dangerously high levels in excess of 10 to 12 grams per deciliter of blood.~~

16  <u>7.</u>     ~~9.~~ The ~~Off-Label~~<u>False</u> Marketing ~~Enterprise's and the Kidney Dialysis~~ Enterprise's

17  activities had the desired effect. In 2006, Amgen's sales of Aranesp in the U.S. alone surged 33

18  percent compared to the prior year. According to Amgen's Executive Vice President of Worldwide

19  Sales and Marketing, George Morrow, nearly $500 million of Aranesp sales were attributable to

20  off-label use for treatment of anemia of cancer, <u>procured through false and misleading statements</u>

21  <u>and omissions,</u> and the vast majority of these sales were in the ~~U.S~~<u>United States</u>.

22  <u>8.</u>     ~~10.~~ Even after adverse study results relating to ~~off-label use~~<u>use</u> of EPO were publicly

23  disclosed in or about December 2006, Amgen minimized the dangers and continued to tout

24  purportedly positive preliminary study results relating to ~~off-label~~ use of EPO. It was not until

25  January 25, 2007, that Amgen finally disclosed the results of a study of patients with anemia of

26  cancer, which demonstrated that Aranesp was not only ineffective in treating this patient population,

27  but had caused increased incidents of death in patients. Then, on February 16, 2007, a publication

28  called "The Cancer Letter" published an article about the results of an October 2006 study known to

3

1   Amgen regarding Aranesp's effectiveness in treating patients with head and neck cancer, which had

2   been closed early due to increased mortality rates.  Faced with this devastating revelation, Amgen's

3   chief executive belatedly admitted that "in retrospect, the results should have been disclosed."

4        9.   11. As a result of these belated disclosures, the USP-DI delisted Aranesp as an

5   accepted treatment for anemia of cancer.  Then, on March 9, 2007, the FDA mandated a "black box"

6   warning for the off-label use of EPO.  The new black box warnings cautioned that use of ESAs to

7   achieve a target hemoglobin of 12 g/dL or greater in cancer patients (1) "shortened the time to tumor

8   progression in patients with advanced head and neck cancer receiving radiation therapy;" (2)

9   "shortened overall survival and increased deaths attributed to disease progression in patients with

10  metastatic breast cancer receiving chemotherapy;" and (3) "increased the risk of death in patients

11  with active malignant disease not under treatment with chemotherapy or radiation therapy." The

12  FDA further warns ed in its Information for Healthcare Professionals that "[u]se of an ESA in anemic

13  cancer patients who are not on chemotherapy offered no benefit and may shorten the time to death."

14  In addition, the new black box warning reported that ESAs "increased the risk for death and for

15  serious cardiovascular events when dosed to achieve a target hemoglobin of greater than 12g/dL."

16       10.   12. Next, on May 14, 2007, the Centers for Medicare & Medicaid Services ("CMS")

17  announced a proposed plan to limit coverage of EPO due to safety concerns.  A final national

18  coverage determination was issued by CMS on July 30, 2007, which provides coverage only for

19  cancer patients with chemotherapy-induced anemia. Furthermore, CMS also announced on July 20,

20  2007, that it will reduce by 50 percent the reported ESA dosage used by dialysis facilities for which

21  payment will be made if the facility reports that the beneficiary's hemoglobin has exceeded 13 g/dL

22  for three consecutive months including the current billed month.

23       11.   13. Not surprisingly, once the life-threatening results of off-label use of EPO became

24  public, U.S. sales of Aranesp dropped 14% in the first financial quarter of 2007, compared to the

25  fourth quarter of 2006, and continued to drop throughout 2007.  This financial setback was exactly

26  what Amgen sought to prevent through its concealment and minimization of test results showing

27  higher incidents of heart attacks, strokes, tumor growth, and death from off-label use of its products.

28

4

1    12.    14. As a direct and foreseeable result of the ~~wrongful~~false and ~~illegal~~deceptive

2    marketing of EPO ~~for off-label uses, Defendants,~~ Defendant caused Plaintiffs and the Class (defined

3    below) to pay hundreds of millions, if not billions, of dollars for the drugs that were purchased ~~for~~

4    ~~off-label use,~~ even though at all relevant times, Defendants knew, but failed to disclose, that these

5    drugs were ineffective and dangerous in such applications. ~~The proposed class (the "Class") consists~~

6    ~~of all persons and entities that paid any portion of the purchase price of Epogen and Aranesp, when~~

7    ~~prescribed for purposes not specified on the FDA-approved labels for these drugs between May 21,~~

8    ~~2002 through March 9, 2007 (the "Class Period").~~

9    <center>~~II.~~ **II. JURISDICTION AND VENUE**</center>

10    13.    15. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 for claims

11    arising under RICO, 18 U.S.C. § 1962, and has supplemental jurisdiction for the remaining claims

12    pursuant to 28 U.S.C. § 1367.  Diversity jurisdiction is also conferred over this class action pursuant

13    to the Class Action Fairness Act of 2005, Pub. L. 109-2, § 7, 119 Stat. 13 ("CAFA").  The CAFA

14    amended 28 U.S.C. § 1332 to add subsection (d) which, as here, confers diversity jurisdiction upon

15    this Court because various members of the Class are citizens from a state different from the

16    ~~Defendants'~~Defendant's states and the aggregate amount in controversy exceeds five million dollars

17    ($5,000,000).  It is appropriate to apply the California UCL and FAL to protect a nationwide class

18    because the wrongdoing alleged herein occurred in significant part in California, and ~~two of the~~

19    ~~Defendants have their~~the Defendant has its principal place of business within the state.  The Court

20    has personal jurisdiction over the Defendants because Amgen ~~and DaVita have their~~has its principal

21    places of business within California, and the ~~conspiracy and~~ misconduct ~~by Fresenius~~ occurred in

22    significant part in California.

23    14.    16. Venue is proper in this District under 28 U.S.C. § 1391 because the Defendants

24    engaged in a substantial amount of the misconduct alleged in this Complaint within this District.

25    Additionally, a substantial part of the interstate trade and commerce involved, and the violations

26    were effected, in part, within this District.

27    <center>~~III.~~ **III. THE PARTIES**</center>

28

<center>5</center>

15.   ~~17.~~ Plaintiff Sheet Metal Workers National Health Fund is a welfare plan as that term is defined in the Employee Retirement Income Security Act ("ERISA") at 29 U.S.C. § 1002(1) and provides post-retirement health benefits to approximately 17,000 retired members of the Sheet Metal Workers International Association.  The post-retirement health benefit consists of a supplemental Medicare wraparound commonly referred to as SMW+.  The benefit is designed to offer supplemental health coverage to retired or disabled sheet metal workers and their spouses, and participants who qualify must be enrolled for traditional Medicare benefits.  The SMW+ coverage supplements the coverage provided by Medicare, but does not pay for or supplement non-traditional Medicare benefits.

16.   ~~18.~~ The Sheet Metal Workers National Health Fund is governed by a Board of Trustees, and Glenn Randle serves as the Chairman of the Board of Trustees.  The Fund is administered in Goodlettsville, Tennessee.

17.   ~~19.~~ The SMW+ program provides benefits for Medicare-covered hospitalizations and medical and surgical benefits, but does not provide coverage for prescription drug benefits or other services which are excluded by Medicare.  The SMW+ plan pays Medicare Part A hospital deductible and co-payments, and the Part B 20% co-payments.  If the Medicare program honors a charge, the Sheet Metal Workers National Health Fund does not adjudicate a claim but pays the appropriate remaining amount which was not paid for by Medicare.  As such, SMW+ supplements Medicare Part A and Part B coverage, and the Sheet Metal Workers National Health Fund merely defers to adjudication of the underlying Medicare claim.  Upon information and belief, during the Class Period, the Sheet Metal Workers National Health Fund paid for EPO ~~under circumstances~~ for uses not specified on its FDA-approved label on behalf of persons receiving the SMW+ benefit.

18.   ~~20.~~ Plaintiff United Food & Commercial Workers Central Pennsylvania & Regional Health & Welfare Fund ("UFCW") is an "employee welfare benefit plan" and an "employee benefit plan" under ERISA, 29 U.S.C. §§ 1002(1), 1002(3), and 1003(a).  As such, UFCW is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d).  UFCW is a not-for-profit trust, sponsored by and administered by a Board of Trustees, and established and maintained to provide comprehensive health care benefits to participant-workers who are employed under various

6

1  collective bargaining agreements, as well as to their dependents.  Its trustees are citizens of

2  Pennsylvania and Maryland, and they maintain a business address in Harrisburg, Pennsylvania.

3  Accordingly, UFCW is a citizen of both Pennsylvania and Maryland.  UFCW's beneficiary members

4  include citizens of the Commonwealth of Pennsylvania.  Upon information and belief, during the

5  Class Period, UFCW paid for its members' uses of EPO ~~under circumstances~~for uses not specified

6  on its FDA-approved label and for which EPO was not proven to be safe or effective.

7       19.  ~~21.~~ Plaintiff Painters District Council No. 30 Health & Welfare Fund ("Painters") is a

8  citizen of Illinois located in St. Charles, Illinois, and is an "employee welfare benefit plan" and an

9  "employee benefit plan" under ERISA, 29 U.S.C. § 1002(1), 1002(3), and 1003(a).  As such,

10  Painters is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d).

11  Painters is a not-for-profit trust, sponsored by and administered by a Board of Trustees, established

12  and maintained to provide comprehensive health care benefits to participant-workers who are

13  employed under various collective bargaining agreements and to their dependents.  Upon

14  information and belief, during the Class Period, Painters paid for its members' uses of EPO ~~under~~

15  ~~circumstances~~for uses not specified on its FDA-approved label and for which EPO was not proven to

16  be safe or effective.

17       20.  ~~22.~~ Plaintiffs Ironworkers Local Union No. 68 and Participating Employers Health

18  and Welfare Funds ("Ironworkers Union 68"), Ironworkers Local Union No. 399 and Participating

19  Employers Health and Welfare Funds ("Ironworkers Union 399"), and Ironworkers District Council

20  of Philadelphia and Vicinity Benefit and Pension Plan ("Ironworkers of Philadelphia") are health and

21  welfare funds located, respectively, in Trenton New Jersey; Westville, New Jersey; and Philadelphia,

22  Pennsylvania.  Upon information and belief, during the Class Period, the foregoing health and

23  welfare funds paid for their members' uses of EPO ~~under circumstances~~for uses not specified on its

24  FDA-approved label and for which EPO was not proven to be safe or effective.

25       21.  ~~23.~~ Plaintiff ~~Linda A. Watters~~Kenneth Ross, Commissioner, Offices of Financial and

26  Insurance Services for the State of Michigan, in ~~her~~his capacity as liquidator of Michigan Health

27  Maintenance Organization Plans, Inc., formerly known as Omnicare Health Plan, Inc. ("Omnicare"),

28  is a Michigan official whose function is to collect and liquidate all assets and liabilities of the former

7

1  private third-party payor Michigan Health Maintenance Organization Plans, Inc., formerly known as

2  Omnicare Health Plan, Inc.  At all times relevant to this complaint, Omnicare was a private

3  third-party payor whose function was to assume the risk of payment of medical and prescription

4  costs on behalf of the participants in its plan.  Upon information and belief, during the Class Period,

5  Omnicare paid for its members' uses of EPO ~~under circumstances~~for uses not specified on its

6  FDA-approved label and for which EPO was not proven to be safe or effective. Pursuant to the

7  Notice of Substitution of Plaintiff Linda A. Watters, filed on October 15, 2008 ( Docket Entry No.

8  65), Plaintiff Kenneth A. Ross was substituted in place and instead of formerly named Plaintiff Linda

9  A. Watters.

10     22.     ~~24.~~ Defendant Amgen is a Delaware corporation headquartered at One Amgen Center

11  Drive, Thousand Oaks, California.  Amgen develops, tests, and markets pharmaceutical drugs,

12  including EPO.  Amgen reported over $13.858 billion in revenues in 2006.  Over $6.632 billion of

13  these revenues were derived from its sales of EPO.  Amgen manufactures Aranesp under an

14  exclusive license by Kirin-Amgen, Inc. ("Kirin-Amgen"), a joint venture between Kirin Brewery

15  Company, Limited ("Kirin Brewery") and Amgen, to market Aranesp in the United States, Europe,

16  Canada, Australia, New Zealand, Mexico, all Central and South American countries and certain

17  countries in Central Asia, North Africa and the Middle East.  Worldwide Aranesp sales for the years

18  ended December 31, 2006, 2005, and 2004 were $4.121 billion, $3.273 billion, and $2.473 billion,

19  respectively.  Amgen also manufactures Epogen under a licensing agreement with Kirin-Amgen for

20  marketing in the United States.  Amgen retained exclusive rights to market Epogen in the United

21  States, for dialysis patients.  Amgen granted the Ortho Pharmaceutical Corporation (which has

22  assigned its rights under the Product License Agreement to Ortho Biotech Products, L.P., a

23  subsidiary of Johnson & Johnson, hereafter referred to as "Ortho Biotech Products, L.P." or

24  "Johnson & Johnson") a license to commercialize epoetin alfa in the United States in all markets

25  other than dialysis.  Epogen sales for the years ended December 31, 2006, 2005, and 2004 were

26  $2.511 million, $2.455 million, and $2.601 million, respectively.

27     ~~25.     Defendant DaVita is a Delaware corporation headquartered at 601 Hawaii Street, El~~

28  ~~Segundo, California 90245.  DaVita is a leading provider of dialysis services in the United States for~~

8

1   patients suffering from chronic kidney failure, also known as end stage renal disease ("End Stage
2   Renal Disease"). As of December 31, 2006, DaVita operated or provided administrative services to
3   approximately 1,300 outpatient dialysis centers located in 42 states and the District of Columbia,
4   serving approximately 103,000 patients. Of the 1,300 for-profit dialysis facilities operated by
5   DaVita in 2006, 153 were located within the State of California. DaVita also provides acute
6   inpatient dialysis services in approximately 770 hospitals and related laboratory services. DaVita's
7   net operating revenues for the years ended December 31, 2006, 2005, and 2004 were $4.880 billion,
8   $2.973 billion, and $2.177 billion, respectively. DaVita achieved EPO revenues of $1.16 billion in
9   2006 from one or more drug supply contracts with Amgen. Upon information and belief, the
10  contracts were negotiated and executed in California, and the arrangements to pay incentives and
11  rebates for the excessive dispensing of EPO occurred in California. DaVita received 35% of its 2006
12  revenues from reimbursements from commercial payors, including Plaintiffs and the Class, while
13  65% came from government sources, including the California Medi-Cal program. DaVita received
14  subpoenas in 2004, 2005, and 2006 from federal prosecutors, to produce documents relating to its
15  suspect relationships with pharmaceutical companies, financial relationships with physicians and
16  joint ventures, and certain patient records relating to the administration and billing of EPO. In
17  addition, in 2004, DVA Renal Healthcare, a division of DaVita, was fined $310 million and placed
18  under a five-year corporate integrity agreement. The fine was imposed as a result of a Department of
19  Justice investigation of DaVita's Medicare and Medicaid billing practices, and issues involving
20  physicians and pharmaceutical manufacturers.

21          26.     Defendant Fresenius is a New York corporation headquartered at 920 Winter Street
22  Waltham, MA 02451. Fresenius is a wholly owned subsidiary of Fresenius Medical Care AG & Co.
23  KGaA, located in Bad Homburg, Germany. Fresenius operates for-profit dialysis services in over
24  1,100 Company-owned and controlled facilities in the United States, including locations within the
25  State of California. Revenues for the years ended December 31, 2006, 2005, and 2004 were $6.026
26  billion, $4.578 billion, and $4.250 billion. Upon information and belief, Amgen paid incentives and
27  rebates to Fresenius from its headquarters in California. Epogen, supplied under contract with
28  Amgen, accounted for approximately 21% of total revenue for Fresenius for the year ended

9

1   December 31, 2006. Fresenius, its parent, subsidiaries, and predecessors received subpoenas in 2004,

2   2005, and 2006 from federal prosecutors, in connection with civil and criminal investigations, to

3   produce documents relating to suspect relationships with pharmaceutical companies, financial

4   relationships with physicians and joint ventures, and certain patient records relating to the

5   administration and billing of EPO.

6   IV. **BACKGROUND**IV.      **BACKGROUND**

7        A.      **Regulatory Framework**

8        27.      In the United States, the marketing and sale of prescription drugs is regulated by the

9   FDA. A manufacturer may distribute a drug only if it is approved by the FDA. 21 U.S.C. § 355(a).

10  In order to secure the FDA's approval, a manufacturer must show that the drug is "safe for use" for

11  "all conditions prescribed, recommended or suggested" on a drug's label. 21 U.S.C. § 355(d). Drug

12  manufacturers, such as Amgen, are required to demonstrate the safety and effectiveness of drugs for

13  specific intended uses through extensive preclinical studies and clinical trials, a process that typically

14  takes years.

15       28.      The FDA also strictly regulates the labeling of drugs that it approves. Pursuant to the

16  Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, and its implementing

17  regulations, 21 C.F.R. § 1.1 *et seq.*, labeling must contain "adequate directions for use." 31 U.S.C. §

18  352(f). "Adequate directions for use" must include a "[s]tatement of all conditions, purposes, or uses

19  for which such drug is intended." 21 C.F.R. § 201.5. "Intended uses" are determined by reference to

20  the objective intent of the persons legally responsible for the labeling of the drug, and "may be shown

21  by ... advertising matter, or oral or written statements by such persons or their representatives," or by

22  "the circumstance that the [drug] is, with the knowledge of such persons or their representatives,

23  offered and used for a purpose for which it is neither labeled nor advertised." 21 C.F.R. § 201.128.

24  "[I]f a manufacturer knows, or has knowledge of facts that would give him notice, that a drug

25  introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than

26  the ones for which he offers it, he is required to provide adequate labeling for such a drug which

27  accords with such other uses to which the article is put." *Id.*

28

1    29.    Labeling must also contain "adequate warnings against use" when taking or
2  administering the drug may be dangerous. 31 U.S.C. § 352(f). "[L]abeling must be revised to
3  include a warning about a clinically significant hazard as soon as there is reasonable evidence of a
4  causal association with a drug; a causal relationship need not have been definitely established." 21
5  C.F.R. § 201.57(e)(6). In addition, a specific warning relating to a non-approved use may be
6  required "if the drug is commonly prescribed for a disease or condition and such usage is associated
7  with a clinically significant risk or hazard." *Id.*

8    30.    A drug that fails to comply with the foregoing regulations is deemed misbranded and
9  may not be distributed in interstate commerce. 21 U.S.C. § 331.

10    31.    All advertisements for an FDA-approved prescription drug must present "a true
11  statement in brief summary" relating to the drug's side effects, contraindications and effectiveness.
12  21 C.F.R. § 202.1(e)(1). Advertisements may not recommend or suggest any unapproved use. 21
13  C.F.R. § 202.1(e)(4).

14    32.    An advertisement does not satisfy the requirement that it present a true statement of
15  information in brief summary relating to side effects, contraindications, and effectiveness if: (i) it is
16  false or misleading with respect to side effects, contraindications, and effectiveness; or (ii) it fails to
17  present a fair balance between information relating to side effects and contraindications and
18  information relating to effectiveness; or (iii) it fails to reveal facts material in the light of its
19  representations or material with respect to consequences that may result from the use of the drug as
20  recommended or suggested in the advertisement. 21 C.F.R. § 202.1 (e)(5).

21    33.    Pursuant to applicable regulations, an advertisement for a prescription drug is false,
22  lacking in fair balance, or otherwise misleading, among other reasons, if it: (i) contains a
23  representation or suggestion, not approved or permitted for use in the labeling, that a drug is useful in
24  a broader range of conditions or patients than has been demonstrated by substantial evidence or
25  substantial clinical experience; (ii) contains favorable information or opinions about a drug
26  previously regarded as valid but which have been rendered invalid by contrary and more credible
27  recent information; or (iii) contains a representation or suggestion that a drug is safer than it has been

28

11

1 demonstrated to be by substantial evidence or substantial clinical experience. 21 C.F.R. §
2 202.1(e)(6).

3     34.    No advertisement concerning a particular prescription drug may be disseminated
4 without the approval of the FDA if the sponsor has received information that has not been widely
5 publicized in medical literature that the use of the drug may cause fatalities or serious damage. 21
6 C.F.R. § 202.1(j)(1)(i). Dissemination of an advertisement not in compliance with this requirement
7 is deemed to be an act that causes the drug to be misbranded in violation of the FDCA.

8     35.    Under the Food and Drug Administration Modernization Act of 1997, if a
9 manufacturer wishes to market or promote an approved drug for additional uses—*i.e.*, uses not listed
10 on the approved label—the manufacturer must resubmit the drug for another series of clinical trials
11 similar to those for the initial approval. 21 U.S.C. § 360aaa(b), (c). Until subsequent approval of the
12 new use has been granted, the unapproved use is considered to be "off-label."

13     36.    "Off-label" refers to the use of an approved drug for any purpose, or in any manner,
14 other than what is described in the drug's labeling. Off-label use includes treating a condition not
15 indicated on the label, treating the indicated condition at a different dose or frequency than specified
16 in the label, or treating a different patient population (*e.g.*, treating a child when the drug is approved
17 to treat adults).

18     37.    Although the FDCA allows a manufacturer to disseminate to health care practitioners
19 and third-party payors written information concerning the safety, effectiveness or benefits of an
20 unapproved use of a drug, 21 U.S.C. § 360aaa(a), the information disseminated must be in the form
21 of an unabridged (i) reprint or copy of an article, peer-reviewed by experts qualified by scientific
22 training or experience to evaluate the safety or effectiveness of the drug, which was published in a
23 scientific or medical journal, which is about a clinical investigation with respect to the drug, and
24 which would be considered scientifically sound by such experts; or (ii) reference publication that
25 includes information about a clinical investigation with respect to the drug or device that would be
26 considered to be scientifically sound by experts qualified by scientific training or experience to
27 evaluate the safety or effectiveness of the drug. 21 U.S.C. § 360aaa-1(a)(1). In addition, the
28 information disseminated may not be false or misleading or pose a significant risk to the public

1    health.  21 U.S.C. § 360aaa-1(a)(2).  Moreover, a manufacturer that disseminates information on

2    unapproved uses to health care practitioners and third-party payors pursuant to these regulations is

3    required to notify the FDA of any additional knowledge the manufacturer obtains on clinical

4    research or other data that relate to the safety or effectiveness of the new use involved.  21 U.S.C. §

5    360aaa-4(a)(2).  The FDCA prohibits the dissemination of information concerning unapproved uses

6    in violation of these provisions.  21 U.S.C. § 331(z).

7        **A.**  ~~B.~~ **Background of ESAs**

8        <u>23.</u>    ~~38.~~ ESAs were first studied and licensed for the treatment of anemia in patients with

9    chronic renal failure in which anemia results primarily from decreased erythropoietin (red blood cell)

10   production by diseased kidneys.  When used in this setting, ESAs may be considered a form of

11   hormone-replacement therapy that is highly successful in reducing the red blood cell transfusion

12   requirements in the majority of patients with chronic renal failure.

13       <u>24.</u>    ~~39.~~ In contrast to the cause of anemia in patients with renal failure, the cause of

14   anemia in patients with cancer is multifactorial and not primarily the result of low erythropoietin

15   levels.  The <u>touted</u> clinical benefit of ESAs in anemic patients with cancer receiving

16   myelosuppressive chemotherapy, ~~which formed the basis for FDA approval,~~ was a reduction in the

17   proportion of patients who require red blood cell transfusions – thus, to the extent ESAs could boost

18   red blood cells, transfusions could be avoided and patients would not be exposed to the risks of

19   transfusions.

20       **B.**   ~~C.~~ **FDA Approval and Marketing of Epogen and Aranesp**

21        **1.     Approval History of Epoetin Alfa**

22       <u>25.</u>    ~~40.~~ Amgen obtained FDA approval in 1989 for Epogen, a recombinant form of

23   erythropoietin.  Erythropoietin is a glycoprotein hormone produced by the kidneys, which regulates

24   red blood cell production.  However, in diseased kidneys erythropoietin levels are decreased, which

25   results in chronic anemia.  An estimated 60% of patients with chronic kidney failure are anemic, and

26   about 80% of these require blood transfusions.  Administration of recombinant human erythropoietin

27   replaces the requirement for transfusion by stimulating the bone marrow to increase red blood cell

28   production.

1    26.    41. As a result of a joint venture program involving Amgen and Kirin Brewery to

2  fund the commercial development of epoetin alfa, Amgen retained U.S. rights to epoetin alfa

3  (branded as Epogen), while Kirin Brewery received Japanese rights to epoetin alfa (branded as

4  ESPO), with Kirin-Amgen retaining all other rights worldwide.  Amgen then licensed, for a 10%

5  sales royalty, all of its European rights and those U.S. rights that do not include the indicated use for

6  chronic renal failure in dialysis patients to the Johnson & Johnson subsidiary Ortho Pharmaceutical

7  Corporation (which in turn assigned its rights under the Product License Agreement to Ortho

8  Biotech).  When marketed by Ortho Biotech, epoetin alfa is branded as Procrit, while in Europe the

9  product is marketed by Janssen-Cilag under the brand name Eprex.

10    27.    42. The FDA-approved indications and usage for epoetin alfa (Epogen/Procrit) are as

11  follows:

12    (a)    treatment of anemia of chronic renal failure patients, including patients on dialysis

13  and patients not on dialysis;

14    (b)    treatment of anemia in zidovudine-treated HIV-infected patients;

15    (c)    treatment of anemia in cancer patients on chemotherapy; and

16    (d)    reduction of allogeneic blood transfusion in surgery patients.

17    28.    43. Additional changes to the label have been:

18    • Addition of a new subsection in Warnings regarding higher mortality with

19      treatment regimens intended to maintain a hemoglobin level of 12-14 g/dL in

20      patients with chronic renal failure (1996).

21    • Revisions to Warnings and Precautions sections to include new information

22      regarding effects on response rate, time to progression, and overall survival in

23      solid tumors (May 2004).

24    • New dosing regimen (40,000 U/kg weekly) for the treatment of anemia associated

25      with cancer chemotherapy (June 2004).

26    • Revisions to Warnings and Adverse reactions to include information regarding

27      pure red cell aplasia (October 2005).

28

<center>14</center>

29. 44. The 1993 expansion to the license for epoetin alfa for the treatment of anemia associated with cancer chemotherapy was based on data provided by Amgen. The basis of approval for epoetin alfa for the expanded indication of treatment of anemia associated with cancer chemotherapy was a demonstration of a reduction in the proportion of patients transfused during chemotherapy during the second and third months of chemotherapy. Because of concern that epoetin alfa could potentially serve as a growth factor for malignant tumors, Amgen agreed to conduct a study, which was designed to rule out a detrimental effect of epoetin alfa on the response rate in patients with limited or extensive stage small cell lung cancer.

30. 45. In 1996, after serious concerns regarding the deaths in patients being dosed at hemoglobin levels higher than 12 g/dL, a new subsection in Warnings, regarding higher mortality with treatment regimens intended to maintain a hemoglobin level of 12-14 g/dL in patients with chronic renal failure, was added to the label for epoetin alfa.

31. 46. The hemoglobin level warning required by the FDA states:

> EPOGEN® and other erythropoieses-stimulating agents (ESAs) increased the risk for death and for serious cardiovascular events in controlled clinical trials when administered to target a hemoglobin of greater than 12 g/dL. There was an increased risk of serious arterial and venous thromboembolic events, including myocardial infarction, stroke, congestive heart failure, and hemodialysis graft occlusion. A rate of hemoglobin rise of greater than 1 g/dL over 2 weeks may also contribute to these risks.

32. 47. Epogen's 2005 FDA-approved package insert regarding dosage and administration of Epogen for patients with chronic renal failure states that "EPOGEN® may be given either as an IV or SC injection. In patients on hemodialysis, the IV route is recommended (see WARNINGS: Pure Red Cell Aplasia)." Significantly, the insert further indicates that "the dose should be adjusted for each patient to achieve and maintain a target hemoglobin not to exceed 12 g/dL."

## 2.    Approval History of Darbepoetin Alfa

15

1    33.    48. Darbepoetin alfa (Aranesp)[1] is manufactured, distributed, and marketed by

2    Amgen.  In September 2001, darbepoetin alfa was first licensed for the treatment of anemia

3    associated with chronic renal failure, including patients on dialysis (End Stage Renal Disease) and

4    patients not on dialysis.  Since that time, the license has been expanded to include the following

5    additional indications:

6        • Treatment of anemia associated with cancer chemotherapy (July 2002).

7    Additional changes to the label have been followed:

8        • New dosing regiment (40,000 U/kg weekly) for the treatment of anemia

9           associated with cancer chemotherapy (June 2004).

10       • Revisions to Warnings and Precautions to include information regarding effects

11          on thrombotic events and tumor promotion (December 2004).

12       • Revisions to Warnings and Adverse reactions to include information regarding

13          pure red cell aplasia (October 2005).

14   34.    49. The July 2002 expansion for Aranesp for the treatment of anemia associated with

15   cancer chemotherapy was based on data provided by Amgen upon a demonstration of a significant

16   reduction in the proportion of patients transfused during chemotherapy during week five (5) through

17   the end-of-treatment.

18   35.    50. Amgen has not licensed or otherwise divided its U.S. and European marketing

19   interests in Aranesp.

20   **3.    The 2004 Approval of a Weekly Dose of Epoetin Alfa**

21

22

23   [1] Aranesp and epoetin alfa are essentially the same erythropoietin molecules, with a single
     difference in their glycosylation pattern. Glycosylation, the adding of a polysaccharide (in the case of
     Aranesp, a sialic acid molecule) to a protein, is a post-translational modification, *i.e.*, one that occurs

24   after the protein is produced within cells. Amgen found that the presence of sialic acid residues on
     the erythropoietin molecule altered the molecule's half-life. Aranesp has one more sialic acid residue

25   than Epogen, and consequently a half-life approximately three times longer than Epogen. Both drugs
     have similar pharmacodynamic effects and toxicology profiles, however, the longer half-life of

26   Aranesp conveys an advantage in that it can be administered less frequently than epoetin alfa.
     Although Amgen sought to market Aranesp as a new drug therapy in order to access higher Medicare

27   reimbursement rates, both the FDA and CMS refused to recognize the drug as a new therapy. CMS
     then calculated a conversion factor to approximately define equivalent doses of Aranesp and Epogen,

28   which effectively halved the initially proposed reimbursement rate per microgram for Aranesp.

16

36.    51. In 2004, product labeling was expanded to include a new, weekly dosing regimen for the treatment of anemia in patients with cancer receiving chemotherapy. The approval was based on the results of a randomized, double-blind, placebo-controlled study conducted by the North Central Cancer Trial Group in which 344 patients receiving myelosuppressive chemotherapy were randomized to epoetin alfa 40,000 IU weekly or placebo for 16 weeks. Randomization was stratified by center, primary tumor type (lung/breast/other), concurrent radiotherapy (yes/no), and baseline hemoglobin (<9 vs. ≥9 g/dL). Epoetin alfa/placebo doses adjusted to maintain hemoglobin of 13-15 g/dL.

37.    52. There were a sizeable number of patients who withdrew from the study prematurely. The reasons for withdrawal were variable; however, more patients withdrew in the epoetin arm for hemoglobin levels above 15 g/dL. The results, based on multiple analyses, utilizing different imputations for patients who withdrew from study prior to a transfusion event, showed a consistent effect on reduction in the proportion of patients requiring transfusions in the epoetin alfa treated arm.

38.    53. In summary, the FDA approval history makes clear: (1) that ESAs have not been approved for use in treating anemia caused by cancer (as opposed to anemia caused by chemotherapy treatment), and (ii) that ESAs should not be prescribed at dose levels targeting hemoglobin levels in excess of 12 g/dL.

**C.    D. The Deceptive Promotion of EPO for Off-Label Unproven/Unsafe Uses**

39.    54. Not content with its earnings from the foregoing approved uses, Amgen engaged in a fraudulent scheme designed to increase sales of EPO through the unlawful deceptive promotion of unsubstantiated and unsafe off-label uses of these drugs. Indeed, while concealing or minimizing the results of tests showing higher incidents of heart attacks and death from use of its products, Amgen made misleading statements in press releases, CME presentations, physician brochures, and other marketing materials about the efficacy of EPO for a variety of off-label uses. These statements include, *inter alia*, the following:

40.    55. On May 21, 2002, Amgen issued a press release entitled, "Aranesp Studies Explore Potential of New Anemia Treatment Paradigms." In this release, the Company commented

1  on clinical data from four Aranesp studies presented at the 38th annual meeting of the American

2  Society of Clinical Oncology, which Amgen stated "suggest[ed] new potential dosing approaches for

3  treating anemia in patients with cancer." According to the press release, one of these studies, by

4  Smith, *et al.* ("the Smith Study"), evaluated the effectiveness of Aranesp in treating chronic anemia

5  of cancer not associated with chemotherapy or radiation therapy.

6      41.  56. A critical fact concerning the Smith Study was omitted from Amgen's press

7  release, however: the study was not the work of independent researchers. To the contrary, the study

8  was designed and financed by Amgen and presented at a conference sponsored by Amgen. Indeed,

9  one of the authors of the study, A. Fleishman, was an Amgen employee. Not surprisingly, the study

10 concluded that ~~Amgen~~Aranesp was safe and effective in treating anemia of cancer, and concluded

11 that Aranesp "may offer advantages to cancer patients with anemia not receiving chemotherapy." A

12 later iteration of the Smith Study, published in 2003, would be critical in Amgen's procurement of

13 the "accepted" listing in the USP-DI for Aranesp as a treatment for anemia of cancer.

14     42.  57. The USP-DI is a database that plays a significant role in drug reimbursement. The

15 USP-DI Volume 1, Drug Information for the Health Care Professional database is a widely consulted

16 source of drug information. It purports to set forth medically accepted uses for generic and brand

17 name drug products. USP-DI is named in federal, and some state, statutes as a resource for unlabeled

18 drug uses, patient consultation, and development of drug utilization review criteria under Medicaid.

19     43.  58. As detailed herein, Amgen submitted the Smith Study and other studies to

20 USP-DI in order to obtain a listing in that compendium~~'s approval for off-label use. That approval~~

21 ~~was obtained~~ describing Aranesp as an accepted treatment for anemia of cancer based on the Smith

22 Study, among others, even though Amgen knew that the Smith Study and the others being submitted

23 were not unbiased.

24     44.  59. Amgen repeatedly resorted to this model – issuing press releases touting the

25 positive results of Amgen-controlled and financed studies announced at Amgen-sponsored medical

26 conferences – to promote ~~off-label~~the widespread use of Aranesp. On December 6, 2003, Amgen

27 issued a press release entitled, "New Data Suggest Aranesp® Benefits Patients Suffering From

28 Anemia of Cancer, Who Are Not Receiving Chemotherapy." The release announced that "interim

<center>18</center>

1    data" from a multi-center study presented at the annual meeting of the American Society of

2    Hematology demonstrated that Aranesp was effective in treating anemia in cancer patients not

3    undergoing chemotherapy.  Once again, however, the press release did not disclose that the

4    referenced study ("the Katz Study") was being financed and controlled by Amgen~; that an Amgen

5    employee, Danica Katz, was one of the study's authors~; or that Amgen was a sponsor of the

6    American Society of Hematology's annual meeting.

7        45.    60. Six months later, on June 6, 2004, Amgen announced the final results of the Katz

8    Study in a press release entitled, "Study Results Demonstrate the Activity of Aranesp In Treating

9    Anemia In Cancer Patients Not Receiving Chemotherapy." According to the press release, the final

10   results of the study confirmed that Aranesp was effective in treating anemia in cancer patients not

11   undergoing chemotherapy.  This press release also failed to disclose Amgen's connection to the

12   study.

13       46.    61. Amgen's strategy of subsidizing seemingly independent research and publicly

14   announcing the predictable positive results at medical forums and in press releases had the desired

15   effect.  According to the December 6, 2003 press release, data from the Katz Study "formed the basis

16   for the acceptance of Aranesp administered every two weeks in the treatment of anemia of cancer"

17   by the influential USP-DI.  Upon information and belief, the Katz Study was used to provide dosing

18   data for the USP-DI listing, while the Smith Study was used to provide more general therapeutic

19   findings to back the listing.

20       47.    62. Having secured the USP-DI's acceptance of Aranesp as a treatment for anemia of

21   cancer, Amgen proceeded with even more vigor to deceptively promote Aranesp for this off-label

22   use.  On July 6, 2005, Amgen issued a press release entitled, "Interim Data Suggest Major Response

23   with Aranesp® in Anemic Patients with Myelodysplastic Syndromes (MDS)," which announced

24   new interim data from a Phase 2 study evaluating the use of 500 mcg of Aranesp every three weeks to

25   treat anemia in patients with a bone marrow disorder known as myelodysplastic syndromes ("MDS").

26   This data was presented at the 17th International Symposium of the Multinational Association of

27   Supportive Care in Cancer in Geneva.  In this announcement, the Company, quoting Janice

28   Gabrilove, M.D., professor of medicine, hematology, and medical oncology at Mount Sinai School

1  of Medicine, New York and the study's lead investigator, stated that "[t]he majority of MDS patients

2  develop clinically significant anemia during the course of their disease, which often leads to fatigue

3  and increased red blood cell transfusions," and "[i]n this study, low risk MDS patients receiving

4  Aranesp every three weeks, who had no prior erythropoietic therapy, exhibited an overall response of

5  77 percent, increased hemoglobin levels and improvements in patient reported fatigue." Once again,

6  Amgen's press release did not disclose that it was a sponsor of this study.

7      48.  63. In addition, Amgen began promoting Aranesp for treatment of anemia in patients

8  suffering from heart failure, another significant patient market.  On September 2, 2005, Amgen

9  issued a press release entitled, "Amgen Announces Initiation of Phase 3 Trial to Evaluate the Impact

10  of Treating Anemia with Darbepoetin Alfa in Patients with Heart Failure to Reduce Mortality and

11  Hospitalization," announcing that Amgen would initiate a Phase 3 trial to evaluate the effect of

12  anemia treatment with Aranesp on morbidity and mortality in patients with heart failure.  The press

13  release quoted Dr. William Dere, Amgen's chief medical officer, as stating that Amgen's decision to

14  proceed with its Phase 3 trial "was driven both by results from epidemiological studies, as well as by

15  [the Company's] recently completed Phase 2 pilot studies of anemia treatment in heart failure

16  patients which provided . . . encouraging results."  The press release further emphasized the

17  enormous profit potential of such an additional approved use for Aranesp, observing that over 23

18  million people worldwide suffer from heart failure.

19      64.   In November 2005, Amgen issued a "Dear Health Care Professional" letter in which

20  it sought to inform the health care community about updates to Aranesp's product prescribing

21  information.  In the letter, Amgen warned health care providers of the risk of pure red cell aplasia in

22  patients treated with Aranesp, and significantly, the letter notes that reports of pure red cell aplasia

23  were "predominantly in patients with [chronic renal failure] receiving Aranesp by subcutaneous

24  administration." Amgen issued this deceptive letter despite its awareness of a 2005 Johnson &

25  Johnson study that demonstrated that subcutaneous administration of EPO was not the primary cause

26  of increased incidences of pure red cell aplasia during the last decade.  Rather, as Amgen knew or

27  recklessly disregarded, these increased incidences had been found to be largely attributable to the

28  contamination of the drug from uncoated rubber syringe stoppers during the dispensing and

1 administration of EPO.  In fact, Amgen disclosed in its Canadian version of this letter that out of

2 approximately 1.4 million patients that had been treated with Aranesp, a mere "two cases of

3 antibody-meditated pure red cell aplasia (PRCA) [were] reported and confirmed associated with

4 Aranesp® in patients who have not received other recombinant erythropoietins."

5      <u>49.</u>    65. On December 11, 2005, Amgen issued a press release entitled, "Updated Interim

6 Aranesp(R) Phase 2 Data Suggest Major Response in Anemic Patients with Myelodysplastic

7 Syndrome (MDS); Patients with Bone Marrow Disorder Also Showed Improvements in Hemoglobin

8 Levels and Fatigue," which updated the interim data from the Phase 2 study announced on July 6,

9 2005.  In this release, Amgen reported that low-risk MDS patients receiving Aranesp every three

10 weeks, who had no prior erythropoietic therapy, exhibited an overall response of 70 percent,

11 increased hemoglobin levels, and improvements in patient-reported fatigue.  The data was presented

12 at the American Society of Hematology 47th Annual Meeting in Atlanta, which was sponsored in

13 part by Amgen.

14      <u>50.</u>    66. On March 13, 2006, Amgen issued a press release entitled "New Phase 2 Data

15 Suggest Treatment of Anemia with Aranesp(R) (Darbepoetin Alfa) May Provide Clinical Benefits in

16 Heart Failure Patients – Amgen's Phase 3 RED-HF(TM) Trial Will Evaluate the Clinical Effect of

17 Treating Anemia in Patients with Symptomatic Heart Failure."  In this press release, Amgen reported

18 results presented at the 2006 American College of Cardiology Scientific Session that treating anemia

19 with Aranesp in patients with symptomatic heart failure was well-tolerated, effectively raised

20 hemoglobin, and improved patients' symptoms as measured by the Kansas City Cardiomyopathy

21 Questionnaire.

22      67.    In addition, in this same press release, Amgen continued to promote the

23 misconception that it was safer for patients on dialysis to receive Aranesp intravenously rather than

24 through smaller doses received subcutaneously.  In the "Important Safety Information" section at the

25 end of this and later press releases, Amgen stated that pure red cell aplasia "has been reported

26 predominately in patients with chronic renal failure (CRF) receiving Aranesp by subcutaneous

27 administration."

28

1  51.  68. On May 31, 2006, Amgen issued a press release entitled, "Amgen Oncology

2  Highlights Upcoming Data Presentations at the American Society of Clinical Oncology Annual

3  Meeting; Clinical Data to be Presented on Four Investigational Targeted Cancer Therapies."

4  According to the press release, one of the cancer therapies being investigated was the administration

5  of Aranesp to treat anemia associated with MDS.  The release quoted Amgen's chief medical officer,

6  Dr. Willard Dere, as stating:  "We are very excited to present new data on multiple agents from our

7  robust pipeline of investigational targeted therapies."

8  52.  69. On June 3, 2006, the Company issued a press release entitled, "Interim Phase 2

9  Aranesp® Data Suggest Major Response after 27/28 Weeks of Treatment for Anemia in Patients

10  with Myelodysplastic Syndromes (MDS) – Results of One of the Largest MDS Studies to Date Show

11  Both Previously Treated and ESA-Naive Patients Responded to Aranesp Treatment." The press

12  release, which contained updated data, indicated that these patients who had not previously received

13  an erythropoiesis-stimulating agent showed a major response of 59 percent, increased hemoglobin

14  levels, and improvements in patient-reported fatigue.  These updated interim data were presented at

15  the 42nd Annual Meeting of the American Society of Clinical Oncology in Atlanta, which was

16  sponsored by Amgen.  Again, by quoting the study's lead investigator, Amgen continued to portray

17  the use of EPO for this purpose in a positive light, stating that "[t]hese results, from one of the largest

18  MDS studies to date, are consistent with those observed at 13 weeks and provide evidence for the

19  potential use of every-three-week dosing of Aranesp in MDS patients to reach target hemoglobin,

20  reduce the need for blood transfusions and improve patient reported outcomes."

21  53.  70. On June 19, 2006, Amgen issued a press release entitled, "Final Results of Phase 2

22  Clinical Trial Program Suggest Treatment of Anemia with Aranesp® (Darbepoetin Alfa) May

23  Decrease Risk of Hospitalization and All-Cause Mortality in Heart Failure Patients with Anemia,

24  Based on a Prespecified Pooled Analysis:  Results Validate Amgen's Phase 3 RED-HF Trial to

25  Address Unmet Medical Need." According to this release, the final results of Amgen's Phase 2 study

26  of the effectiveness of Aranesp in treating anemia in patients with heart failure revealed that Aranesp

27  was well-tolerated and effective.

28  **D.**  E. **Amgen Improperly Uses Third Parties To Deceptively Promote Off-Label Uses of EPO to Both Physicians and to the Public**

22

54. ~~71.~~ In addition to the foregoing, Amgen funded third-party entities – among them the National Anemia Action Council ("NAAC") and CancerCare – that provided educational materials, CME information, and physician brochures which promoted off-label uses of EPO. Each organization operates under the guise of education, improvement in treatment quality, and/or support. However, both play a pivotal role in the off-label marketing of EPO by ~~being~~acting as a mobilized marketing force endorsing off-label uses.

### ~~1.~~ 1. Amgen Used the National Anemia Action Council To ~~Improperly~~ Deceptively Promote ~~Off-Label~~Unsafe and Unsubstantiated Uses of EPO to Physicians

55. ~~72.~~ NAAC's mission statement indicates that it "is dedicated to raising the awareness of healthcare professionals and the public regarding the prevalence, symptoms, consequences, and undertreatment of anemia." NAAC claims that it "has reached a consensus that anemia is underdiagnosed and undertreated [and] has identified anemia as a public health concern that requires concerted attention and action." Its efforts in combating anemia include attempting to:

- [R]aise awareness of health care professionals and the public regarding the prevalence, symptoms, consequences, and undertreatment of anemia.
- Develop a cross-specialty database of scientific evidence showing anemia to be a serious condition.
- Identify knowledge gaps.
- Stimulate more research and new treatment approaches.
- Improve anemia identification, treatment, and patient outcomes.

56. ~~73.~~ Amgen has been one of the sponsors of NAAC since at least 2002. As stated in a 2004 article published in the WASHINGTON POST, Amgen "supports all the projects of the NAAC through an unrestricted educational grant," and "more than a third of the council's members are paid consultants or speakers for Amgen."

57. ~~74.~~ During the relevant period, information NAAC made available to physicians repeatedly highlighted preliminary data and research suggesting ~~that~~ the use of EPO for ~~off-label purposes had beneficial effects, including~~ treatment of anemia of cancer. One brochure available to physicians on NAAC's website was funded by an unrestricted educational grant from Amgen~~,~~ and

23

1 entitled *Anemia: A Hidden Epidemic*,. It repeatedly points to studies suggesting that off-label

2 usesuse of EPO havefor treatment of anemia has beneficial effects.

3     58.    75. For example, the brochure, "designed to be an in-office handbook for primary

4 care and specialty medical practitioners who may be seeing patients with undiagnosed anemia,"

5 contained a subchapter entitled "Anemia & Cancer," which falsely asserted that "findings of a

6 number of studies have demonstrated reduced transfusion requirements and improved [quality of life]

7 when the anemia of cancer is treated with epoetin." The use of EPO for anemia of cancer, as opposed

8 to chemotherapy-induced anemia, is an off-label EPO use.

9     59.    76. A second subchapter of the same brochure entitled, "Anemia & Cardiovascular

10 Disease," emphasized preliminary studies showing that treatment of anemia in chronic heart failure

11 patients with EPO resulted in beneficial effects.  Use of EPO for chronic heart failure is not an

12 FDA-approved use of EPO.  As Jerome P. Kassirer, M.D., stated in an article discussing the close

13 relationship between Amgen and NAAC and the effects of NAAC' s discussion of EPO studies,

14 entitled, "These Two Make Quite A Team," "[i]t takes little imagination for any reader to draw the

15 obvious conclusion: treat with epoetin."

16     60.    77. In addition to providing physicians with materials on its website, NAAC also

17 distributes "AnemiaAlert" e-mails to healthcare providers.  Like the materials available on NAAC's

18 website, the "AnemiaAlert" e-mails distributed during the relevant period continually pointed to

19 studies and preliminary data suggesting that EPO was effective in treating off-label

20 conditionsanemia of cancer.  One such alert from September 2004 highlighted an article suggesting

21 that off-label use of EPO may be beneficial in treating critically ill patients by decreasing hospital

22 stays and reducing the need for transfusions.

23     61.    78. The "AnemiaAlert" e-mails also provided doctors with information concerning

24 upcoming CMEs. One such alert from September 2006 provided information for the CME, "Anemia:

25 A Hidden Epidemic in Primary Care," led by NAAC's President, Allen Nissenson, and President

26 Elect, Lodovico Balducci.  The physician handbook, available on NAAC's website, and discussed

27 above, bears nearly the identical name as the CME, and was written by one of the CME's leaders,

28

24

1  Allen Nissenson.  As indicated above, this brochure contained extensive coverage of studies

2  suggesting that EPO was beneficial for off-labelmany uses, including anemia of cancer.

3     **2.**  **Amgen Used CancerCare To ImproperlyDeceptively Promote Off-Label**

4       **Uses of EPO to the Public and to Physicians**

5     62.  79.CancerCare, founded in 1944, purports to be a national nonprofit organization that

6  provides free professional support services to anyone affected by cancer, *i.e.*, "people with cancer,

7  caregivers, children, loved ones, and the bereaved." CancerCare collaborates with corporations to

8  become "cause-related" marketing partners and sponsors.  According to CancerCare's website,

9  Amgen is one of its "most committed supporters, having funded a wide range of educational and

10  support services for cancer patients and their loved ones." Of particular significance is Amgen's

11  sponsorship of "Connect telephone," a program designed to provide "telephone workshops,

12  online/telephone support groups, and web outreach campaigns – on topics such as improving the

13  chemotherapy experiences, treatment side effects, and symptom management."

14     63.  80.These programs were a vehicle through which Amgen was able, by deception, to

15  promote off-label, unsafe uses of EPO.  For example, an information booklet, which stated it was

16  made possible in part by Amgen Oncology, and which was based on an August 2005 Telephone

17  Education Workshop conducted by CancerCare, responded to one patient's question regarding

18  cancer-caused fatigue by stating that taking EPO helps people "with cancer-related anemia feel more

19  energetic and less fatigued." EPO has not been approved by the FDA to effectively treat

20  cancer-related anemia.

21     64.  81.A booklet made available on CancerCare's website entitled, "*Coping with Side*

22  *Effects*," included a subsection discussing anemia management.  This subsection highlighted a study

23  suggesting that the use of Aranesp to treat acute myeloid leukemia resulted in patients feeling

24  "marked relief from fatigue after treatment."  EPO is not FDA-approved forhas not been proven to be

25  effective in the treatment of anemia in MDS patients as the FDA has not approved it for such use.

26     **3.**  **Promoting EPO Uses in a Deceptive Fashion Via Continuing**

     **Medical Education**

27     65.  82.The Accreditation Council for Continuing Medical Education ("ACCME") is a

28  nonprofit organization, which establishes rules that govern continuing medical education ("CME").

1   According to the preamble to ACCME's *2004 Updated ACCME Standards for Commercial Support*,

2   "the purpose of continuing medical education (CME) is to facilitate life-long learning among

3   physicians so that their practices may reflect the best medical care for their patients." Most states

4   require that doctors partake in a minimum number of CME credit hours as a requisite to maintaining

5   their medical licenses.  Given this requirement, CMEs provide doctors with the opportunity to keep

6   abreast of developments in the various medical fields.

7        66.   83. Historically, the majority of CMEs were paid for by universities and medical

8   associations.  However, during the last decade this has drastically changed.  According to the most

9   recent data available from ACCME, "drug industry financing of continuing medical education has

10  nearly quadrupled since 1998, $302 million to $1.2 billion." Today, nearly half of all CMEs are paid

11  for by drug companies.  Although ACCME asserts that commercial support has significantly

12  enhanced the ability of the CME in fulfilling its purpose, ACCME does recognize that "commercial

13  support has the potential to introduce commercial bias that threatens the integrity of the CME

14  enterprise." This concern was echoed in a NEW YORK TIMES article entitled, *Diagnosis: Conflict of*

15  *Interest*, in which the author asserts that since so much of what doctors are taught is determined by

16  pharmaceutical companies, "crucial information about potential drug dangers is played down, to the

17  detriment of patient care."

18       67.   84. Similarly, in a report released in April 2007 prepared by the staff of the United

19  States Senate Committee on Finance ("Committee"), the Committee stated that since CMEs had

20  become a multi-billion dollar business "it seem[ed] unlikely that this sophisticated industry would

21  spend such large sums on an enterprise but for the expectation that the expenditures will be recouped

22  by increased sales." The Committee went on to state that the off-label promotion of drugs through

23  educational grants represents the greatest threat in the CME context.

24       68.   85. Amgen has financed and/or sponsored CMEs where off-label uses of EPO were

25  deceptively promoted.  For example, one online CME entitled, *Advances in the Treatment of*

26  *Myelosuppression ("MDS") and Anemia*, sponsored by an unrestricted educational grant from

27  Amgen, asserted that the use of darbepoetin alfa, *i.e.*, Aranesp, in patients with MDS suffering from

28

1 anemia resulted in patient improvement.  Use of darbepoetin alfa by patients with MDS-induced

2 anemia is an off-label use and has not been proven as effective for such treatment.

3     69. 86. Likewise, in several CMEs sponsored by unrestricted educational grants from

4 Amgen, the course materials repeatedly obscured the line between onproven and off-labelunproven

5 uses of EPO.  For example, one CME entitled, *Diagnosis and Management of Anemia in Long-Term*

6 *Care*, the course materials indicated that since "the introduction of EPO to treat anemia in chronic

7 kidney disease in patients, the treatment of anemia has been revolutionized." This statement is false

8 and misleading, evidenced in part by the FDA's refusal to approve such use. The materials go on to

9 indicate the variety of different contexts in which EPO purportedly had been shown to increase

10 hemoglobin levels, which included circumstances in which the use of EPO was not FDA-approved,

11 including treatment of MDS patients and patients with anemia of chronic disease.

12     70. 87. Similarly, in a CME entitled, *Management of Febrile Neutropenia and Anemia in*

13 *Chemotherapy Patients*, which was supported by an unrestricted educational grant from Amgen, the

14 presenter repeatedly referred to both anemia of cancer and treatment-related anemia during the

15 discussion, and indicated that the use of EPO in these contexts should be considered.  The faculty

16 presenter also indicated that EPO agents could be used in patients with MDS.  The use of EPO in

17 patients with anemia of cancer (as opposed to chemotherapy-induced anemia), and in patients with

18 MDS, have not been proven to be effective and/or safe and were not among the FDA-approved uses

19 of EPO.

20     **E.** **F. Failure To Disclose Safety and Effectiveness Issues**

21     71. 88. DefendantAmgen engaged in this scheme whileof deception in part by concealing

22 or minimizing the results of tests showing higher incidents of heart attacks, strokes, tumor growth,

23 and death associated with these off-label uses of EPO.  Indeed, despite publicly touting EPO as

24 beneficial and safe, Amgen was well aware of, but failed to disclose, several adverse study results

25 relating to EPO.

26     72. 89. For example, in 2003, Amgen's licensee, Johnson & Johnson, sponsored a study

27 investigating the effects of epoetin alfa on the quality of life of anemia patients with non-small cell

28 lung cancer, a use of EPO that was not FDA-approved.  However, the study was closed prematurely

1   when 70 patients enrolled in the study receiving EPO died in half the time of patients in the study

2   receiving a placebo.  Amgen did not disclose the results of this Johnson & Johnson study, which had

3   been shared with Amgen in the ordinary course, until 2007, when the results appeared in the March

4   20, 2007 issue of the JOURNAL OF ONCOLOGY.

5        <u>73.</u>  90.-Likewise, in 2003, the Breast Cancer Erythropoietin Survival Trial ("BEST") was

6   terminated prematurely by a data safety monitoring committee because of the poor overall survival

7   in the target population.  The study, which was intended to evaluate the effect on breast cancer

8   patients, most whom did not have anemia, when their hemoglobin levels were maintained in the

9   range of 12g/dL to 14g/dL with epoetin alfa, concluded that maintaining hemoglobin levels at this

10   target range resulted in decreased overall survival.

11        <u>74.</u>  91.-In addition to its awareness of these adverse study results, Amgen was also

12   informed during an FDA Advisory Committee meeting on May 4, 2004, that FDA scientists in their

13   review of applications for drugs of the same class as EPO, had observed shorter overall survival,

14   shorter progression-free survival, and an increased incidence of thrombotic and cardiovascular

15   events in patient groups being treated with drugs of the same class as EPO.  During the Advisory

16   Committee meeting, a presentation was given by Dr. Harvey Luksenburg, M.D., Medical Officer,

17   FDA's Division of Therapeutic Biological Oncology Products, a clinical reviewer tasked with the

18   review of studies on erythropoietin drugs, in which he stated:

> Now, two large randomized studies in cancer patients on chemotherapy plus or minus EPO have shown *shorter overall survival, shorter progression-free survival,* and an increased incidence of thrombotic and cardiovascular events in the groups assigned to receive erythropoietins.
>
>           ***
>
> Now, the goals of my talk are four-fold.  First of all, I'll try to give some justification of *why the FDA feels that the safety issues observed with EPREX and NeoRecormon, the non-U.S.-licensed EPOs, may also apply to U.S.-licensed products.*  In addition, I will review results of trials with EPREX and NeoRecormon, the non-U.S.-licensed products, regarding the safety concerns.  Thirdly, I will review data available regarding safety from trials of EPOGEN/Procrit and Aranesp, the U.S.-licensed trials, and finally will try to come to agreement on the design of future studies regarding these safety issues.
>
>           ***

> Now, the FDA *considers all these products members of the same*
> *product class, and, thus, these evolving safety issues are assumed to*
> *apply to all products* unless adequate and well-controlled trials
> demonstrate otherwise.

(emphasis added).

75. 92. Then, in 2006, a study to determine whether Aranesp could be effective in curing head and neck cancer by causing more oxygen to get to tumors, thereby making radiation therapy more effective, concluded that patients who received the drug were 10% more likely to see their tumors grow. Although Amgen was made aware of the results of this study in December 2006, it failed to disclose them, and the results of the study were not publicly disclosed until February 2007, when they were published in a periodical called "The Cancer Letter."

76. 93. Despite the fact that the foregoing test results demonstrated that EPO was ineffective and carried significant safety risks, including increased incidents of heart attacks, strokes, accelerated tumor growth, and death (which increased as the level of hemoglobin in the blood increased) when used for the off-label purposes being touted by Amgen, these results were concealed or minimized by Amgen in order to sustain the significant profits Amgen was realizing from off-label sales of EPO.

94.   Furthermore, in order to sell more of its product, Amgen also has promoted doses of Aranesp and Epogen higher than those necessary to bring hemoglobin levels to 12 g/dL in kidney dialysis patients, even though the drug's FDA-approved label only supported dosing to 12 g/dL. In so doing, the defendant has ignored data from studies showing that such dosing could be dangerous to patients.

95.   At a December hearing of the House Ways and Means Committee, the committee's then-chairman noted federal data showing that an estimated 40% of dialysis patients treated with EPO have hemoglobin levels above the target of 12. Such prescribing behavior was caused in part by Amgen's promotion, "educational," and financing efforts.

**F.**   G. Amgen**Amgen Conceals and** Denies the Truth About the Dangers of its Products

96.   On October 24, 2006, the BOSTON GLOBE published an article entitled, "Some See Profiteering In Clinics' Use of Drugs — US may spend $537m needlessly," which revealed that

29

1  although "[a]bout 95 percent of the nation's 325,000 dialysis patients receive Epogen

2  intravenously... studies have shown dialysis clinics could use 30 percent less if it was administered

3  subcutaneously—injected beneath the skin" because "Epogen remains in the body longer when

4  injected, requiring a lower dose."

5       97.   Then, on November 16, 2006, a NEW ENGLAND JOURNAL OF MEDICINE article

6  announced that the use of epoetin alfa to reach a target hemoglobin level of 13.5g/dL, as compared

7  with a target of 11.3g/dL, in patients with chronic kidney disease resulted in increased patient risk

8  and zero improvement in patient quality of life. Indeed, the end result of the study was a composite

9  of death, myocardial infarction, hospitalization for congestive heart failure, and stroke.

10       98.   In response to this report, Amgen issued a press release on December 4, 2006, entitled,

11  "Amgen Responds to Reports About Use and Safety of EPOGEN and Aranesp in CKD Anemia

12  Therapy." Notwithstanding its knowledge of the numerous adverse study results described above,

13  Amgen sought to stem any adverse effect on its lucrative income stream from off-label uses of EPO

14  that might result from these reports, and in the press release cautioned that:

15          Hemoglobin maintenance is difficult and physicians are not
    necessarily acting inappropriately when patients' hemoglobin levels
16  temporarily exceed the FDA label target range.

17          CMS reimbursement guidelines are consistent with the FDA
    labeling policy and allow doctors to provide patients with the best
18  possible care.

19          Changes to current guidelines should be approached
    judiciously and based on the rigorous review of data and patient care.
20

21      <u>77.</u>   99. Moreover, despite<u>Despite</u> Amgen's assertion in this<u>a December 4, 2006</u> press

22  release that it "only promotes the use of Epogen and Aranesp consistent with the FDA label," Amgen

23  continued its efforts to stimulate off-label use of its drugs by deceptively touting positive preliminary

24  study results relating to off-label EPO use, while concealing the increased incidents of heart attacks

25  and deaths in earlier studies of the same proposed uses.

26      <u>78.</u>   100. For example, only five days later, on December 9, 2006, the Company issued a

27  press release entitled, "New Phase 2 Data Show Promise of Aranesp® Treatment for Anemia of

28  Cancer – Monthly Aranesp Treatment Improved Hematopoietic Response In Cancer Patients Not

1  Receiving Chemotherapy or Radiation Therapy." According to the press release, cancer "patients

2  receiving Aranesp were nearly three times more likely to achieve a hematopoietic response than

3  patients receiving a placebo." The press release also minimized any adverse results observed in the

4  study, stating that although four patients in the study had experienced serious thromboembolic

5  events, "the number and type of adverse events were consistent with those previously observed in

6  patients receiving Aranesp." The press release quoted the study's lead investigator, David H. Gordon,

7  M.D., clinical professor, University of Texas Health Science, who presented the results at the

8  American Society of Hematology 48th annual meeting in Orlando, Florida, as stating:  *"[T]he*

9  *results suggest that this may be a potential treatment option for such patients."*

10      **G.**      H. Amgen Is Forced to Admit EPO's True Health Risks

11      79.   101. In January 2007, Amgen informed the FDA of the results of a 989 patient,

12  multi-center, double-blind, randomized, placebo-controlled study of Aranesp in anemic cancer

13  patients who are not receiving chemotherapy.  The study results provided to the FDA show Aranesp

14  did not reduce the need for red blood cell transfusions and showed an increase in mortality in patients

15  receiving Aranesp compared to those receiving placebo (hazard ratio 1.25; 95% confidence interval:

16  1.04, 1.51).

17      80.   102. On January 25, 2007, Amgen issued a press release announcing its fourth quarter

18  2006 and full year 2006 financial results in which it also commented on its initial analysis of Phase 3

19  results of its study of the effectiveness of Aranesp in treating patients with anemia of cancer.  The

20  press release acknowledged that "there [had been] no statistically significant difference in the

21  frequency of transfusions in the population receiving placebo injections as opposed to those

22  receiving Aranesp," but that there had been "a statistically significant increased risk of death in the

23  Aranesp-treated group." However, the press release went on to state that "the overall safety profile

24  did not identify any other unexpected safety concerns," and sought to minimize the adverse findings

25  by emphasizing that the patients in the study had "an especially grave prognosis" and that the study

26  had not been designed as "a survival study" and so the effects of "imbalances in potentially important

27  prognostic factors" could not be excluded.

28

31

81.   ~~103.~~ In February 2007, the FDA was notified of the final results of a double-blind, placebo controlled study to evaluate whether use of Epogen – a drug closely related to Aranesp – in anemic non-small cell lung cancer patients not on chemotherapy improved their quality of life. Though the plan was to enroll 300 patients, the study was closed to accrual in December 2003 after enrolling only 70 patients because its data monitoring committee found higher mortality in those treated with epoetin alfa.  Median time to death in those treated with epoetin alfa was 68 days and significantly shorter than the median time to death of 131 days in those treated with placebo.

82.   ~~104.~~ On February 16, 2007, "The Cancer Letter" publicly revealed the adverse results, set forth above, of the October 2006 study relating to the effectiveness of Aranesp in treating patients with head and neck cancer.  Amgen's failure to promptly disclose these adverse results was roundly criticized.  For example, Adam Feuerstein, senior writer for TheStreet.com noted in his February 24, 2007 "Biotech Mailbag" column that he "was troubled by Amgen's less-than-speedy disclosure of the Danish study of Aranesp in patients with head and neck cancer," and that investors were questioning "why . . . anyone [would] wish to invest at this point in a company that willfully withheld information from investors."

83.   ~~105.~~ As a result of t~~T~~he Cancer Letter's February 16, 2007 exposé, Amgen hastily convened an analyst conference call that same day, wherein Amgen's chief executive, Kevin Sharer, admitted during the conference call that "in retrospect, the results should have been disclosed."

84.   ~~106.~~ On February 27, 2007, it was widely reported that a meta-analysis of clinical trial data had shown a statistically significant increase in the risk of death to cancer patients who were administered these drugs.  According to this meta-analysis, cancer patients who were given Amgen's ESAs faced an increased risk of death on the order of approximately 10 percent.

85.   ~~107.~~ These belated disclosures had the immediate, adverse ~~effect~~affect on off-label sales of EPO that Amgen had so long sought to avoid.  Aranesp was swiftly removed from the USP-DI as an accepted treatment for anemia of cancer.  A February 23, 2007, Associated Press article entitled, "Amgen Drug Comes Off Drug List for 1 Use – Amgen's Aranesp Taken Off Key Drug List for Use Against Anemia of Cancer," observed that the ~~delisting~~de-listing of Aranesp as a treatment for anemia of cancer "could prompt insurers to drop or reduce coverage for that use," and

1  stated that "Amgen Chief Executive Kevin Sharer [had] recently said this off-label use could account

2  for as much as 10 percent of Aranesp sales," which totaled $4.1 billion in 2006.  In its form 10-K

3  filed February 23, 2008, covering the period ending December 31, 2007, Amgen admitted that the

4  revelations about the safety of Aranesp and Epogen had "resulted in a large unexpected reduction in

5  revenue for the products, in particular Aranesp sales in the U.S. supportive cancer care segment."

6      86.   108. Predictably, after the publishers of USP-DI in February 2007 de-listed Aranesp

7  as an accepted treatment for anemia of cancer, Medicare carriers, beginning with Noridian

8  Administrative Services, and private payors including Blue Cross Blue Shield of California, began

9  denying coverage for such treatment within their regions.

10      87.   109. On March 9, 2007, the FDA mandated a "black box" warning for the off-label

11  use of EPO.  In the FDA alert relating to the new prescribing information contained in the "black

12  box" warning, the medical community was finally and clearly told about the serious risk of death

13  from the off-label use of Amgen's products.  The alert described the new "black box" warnings to be

14  added to Aranesp's and Epogen's label, stating:

> Analyses of four new studies in patients with cancer found a
> higher chance of serious and life-threatening side effects and/or death
> with the use of ESAs....  All ESAs have the same mechanism of action.
> As a result, FDA believes these new concerns apply to all ESAs and is
> re-evaluating how to safely use this product class.  FDA and Amgen,
> the manufacturer of Aranesp, Epogen and Procrit, have changed the
> full prescribing information for these drugs.  The new product labeling
> includes a new boxed warning, updated warnings, and a change to the
> dosage and administration sections for all ESAs.
>
> Changes to the prescribing information for the ESAs (Aranesp,
> Epogen and Procrit) are summarized here:
>
> *A New Boxed Warning providing the following information:*
>
> - *Avoid serious cardiovascular and arterial and venous*
>   *thromboembolic events by using the lowest dose of [Aranesp*
>   */EPOGEN/PROCRIT] that will gradually raise the*
>   *hemoglobin concentration to the lowest level sufficient to*
>   *avoid the need for blood transfusion*
>
> - *[Aranesp /EPOGEN/PROCRIT] and other ESAs increased*
>   *the risk for death and for serious cardiovascular events when*
>   *dosed to achieve a target a hemoglobin of greater than 12*
>   *g/dL*
>
> - *Use of ESAs to achieve a target hemoglobin of 12 g/dL or*
>   *greater in cancer patients:*

- *shortened the time to tumor progression in patients with advanced head and neck cancer receiving radiation therapy;*

- *shortened overall survival and increased deaths attributed to disease progression in patients with metastatic breast cancer receiving chemotherapy;*

- *increased the risk of death in patients with active malignant disease not under treatment with chemotherapy or radiation therapy.*
  ESAs are not indicated for this patient population.

- Patients treated before surgery with epoetin alfa to reduce allogenic red blood cell transfusions had a higher incidence of deep venous thrombosis. Aranesp is not approved for this indication.

**Additional Warnings about increased mortality, cardiovascular events, tumor progression and uncontrolled hypertension**

- Increased *Mortality* and Cardiovascular Events – the warnings now describes the results of new studies showing an increased incidence of thrombotic events in patients with chronic renal failure, cancer patients on chemotherapy, and surgical candidates.

- Potential for Tumor Growth Progression – A new subsection in Warnings describes the new *data* and emphasizes the evidence for increased rate of tumor progression.

- Hypertension - this subsection advises against the use of ESAs in patients with uncontrolled *hypertension*, and describes the risks to and guidance for managing controlled hypertensive patients.

**Recommendations and Considerations**

Physicians and other healthcare professionals should consider the following when using ESAs:

\*\*\*

**For cancer patients:**

- **Use of an *ESA* in anemic cancer patients who are not on chemotherapy *offered no benefit and may shorten the time to death.***

- ESAs are not FDA approved to treat anemia in cancer patients not receiving chemotherapy

- There is a potential risk of shortening the time to tumor progression or disease-free survival

34

Exhibit A
Page 40

- • ESAs are administered only to avoid red blood cell transfusions in cancer patients. ***ESAs do not improve the outcome of cancer treatment*** and do not alleviate fatigue or increase energy.

   \*\*\*

(emphasis added).

88.   ~~110.~~ The most shocking revelation contained in the FDA alert was the results of the December 2003 study of the effects of epoetin alfa on the quality of life of anemia patients with non-small cell lung cancer, noted above, which was conducted by Johnson & Johnson, Amgen's licensee. As stated above, the preliminary results of the study indicated that patients receiving EPO died in half the time of patients given placebos, and as a result, the study was cut short. According to this March 2007 alert, the FDA was first notified of this 2003 study in February 2007, and was still awaiting receipt of the complete study results.

89.   ~~111.~~ Next, in response to the FDA's black box warning, on May 14, 2007, CMS announced a proposed plan to limit coverage of EPO due to safety concerns.

90.   ~~112.~~ Following a 30-day public comment period, on July 30, 2007, CMS issued its National Coverage Decision Memorandum for Use of Erythropoieses Stimulating Agents in Cancer and Related Neoplastic Conditions (the "Decision Memorandum"). The Decision Memorandum establishes ESA coverage, with restrictions, for Medicare and other government beneficiaries who are treated for chemotherapy-induced anemia. The Decision Memorandum also concluded that ESA treatment was not reasonable and necessary for certain clinical conditions, including:

- • Any anemia in cancer or cancer treatment patients due to folate deficiency, B-12 deficiency, iron deficiency, hemolysis, bleeding, or bone marrow fibrosis;
- • Anemia associated with the treatment of acute and chronic myelogenous leukemias, or erythroid cancers;
- • Anemia of cancer not related to cancer treatment;
- • Any anemia associated only with radiotherapy;
- • Prophylactic use to prevent chemotherapy-induced anemia;
- • Prophylactic use to reduce tumor hypoxia;
- • Patients with erythropoietin-type resistance due to neutralizing antibodies; and

35

1          • Anemia due to cancer treatment if patients have uncontrolled hypertension.

2    Thereafter, on January 14, 2008, the Decision Memorandum was added to CMS's Medicare National

3    Coverage Determinations Manual.

4          91.    113. The troubling meta-analysis referenced, above, together with other scientific

5    research on ESA safety, were among the matters discussed on March 13, 2008, when an FDA

6    Advisory Committee (the Oncologic Disease Advisory Committee ("ODAC")) met to discuss

7    whether to impose further restrictions on the use of ESA products, including those marketed by

8    Amgen, with cancer patients.  At the March 2008 meeting, the ODAC recommended: that ESAs not

9    be used by patients with either breast cancer or head and neck cancer because the evidence of a risk

10   for shortened survival was strongest for those types of tumors; that ESAs not be used by patients

11   being treated with the intent of curing their cancers; and that patients be made to sign informed

12   consent forms before they are administered the drugs.

**V. V. DEFENDANT AMGEN CARRIED OUT ITS SCHEME THROUGH
THE USE OF TWO SEPARATEAN ILLEGAL ENTERPRISES**

14
15        92.    114. As described above, in furtherance of its fraudulent scheme, Amgen promoted

16   EPO for the purpose of expanding the patient population to whom these drugs could be marketed

17   even though, at all relevant times, Amgen knew, but failed to disclose, the existence of serious

18   adverse test results regarding EPO when used for such off-label purposes.  Indeed, as set forth above,

19   adverse study results were withheld despite the FDA's expressed concerns relating to EPO's safety

20   as a result of the reduced survival rates that had been observed in patients treated with erythropoietin

21   drugs, generally, which were discussed with Amgen during a May 2004 meeting.

22        93.    115. As a <u>direct and foreseeable</u> result of Defendants'Defendant's fraudulent scheme

23   as alleged herein, including Amgen's non-disclosures and misrepresentations regarding EPO's

24   safety and effectiveness for off-label uses, patients, healthcare providers, formulary decision-makers,

25   and third-party payors were lulled into believing that EPO could be safely prescribed for off-label

26   use, andvarious uses, Plaintiffs and other Class members paid millions of dollars in claims relating to

27   dangerous off-labeland unproven uses of these drugs.

28        94.    116. Amgen's scheme to defraud was carried out through the use of two separatean

     illegal enterprises.  Amgen and others in each of these enterprisesother members of the enterprise

<center>36</center>

1 | have participated in the enterprise's affairs through a pattern of racketeering activity consisting of

2 | multiple acts of mail and wire fraud.  These predicate acts of racketeering activity were related to

3 | each other in furtherance of the scheme described above and amounted to continuing racketeering

4 | activity and, therefore, constitute a pattern of racketeering through which ~~Defendants have~~the

5 | Defendant has violated 18 U.S.C. § 1962(c).

6 | ~~117.   Two association-in-fact enterprises exist (a) The Off-Label~~**A. The Fraudulent** **Marketing**

**Enterprise** ~~consisting of (i) Amgen; (ii) NAAC; and (iii) CancerCare, and (b) The Kidney~~

7 | ~~Dialysis Enterprise consisting of (i) Amgen; (ii) DaVita; and (iii) Fresenius.~~

8 | A.      ~~The Off-Label Marketing Enterprise~~

9 | 95.     ~~118.~~The ~~Off-Label~~False Marketing Enterprise ~~(sometimes referred to as the~~

10 | ~~"OLME")~~ is an ongoing organization which has existed continuously since at least as early as 2002.

11 | ~~The Defendant~~Amgen is associated with this enterprise ~~is Amgen.  Amgen is sometimes referred to~~

12 | ~~as the "OLME Defendant.",~~

13 | 96.     ~~119.~~The purpose of the ~~Off-Label~~False Marketing Enterprise was to profit from the

14 | ~~unlawful~~fraudulent marketing and sale of EPO ~~for off-label use~~and to extract excessive and illegal

15 | payments from Plaintiffs and Class members.  The structure of the ~~Off-Label~~False Marketing

16 | Enterprise includes the following:  (a) Amgen's funding of NAAC and financial contributions to

17 | CancerCare for the purpose of promoting off-label uses of EPO to the medical community through

18 | educational and CME materials, physician brochures and/or websites; (b) Amgen's control over

19 | NAAC and CancerCare by virtue of their financial dependence on Amgen, and by virtue of the fact

20 | that Amgen's paid consultants and speakers are members of NAAC's organization; (c) the operation

21 | of NAAC and CancerCare as purportedly independent organizations devoted to education and

22 | improvement in quality of treatment; (d) Amgen's financing and/or sponsorship of CMEs where

23 | ~~off-label uses~~widespread use of EPO were promoted; and (e) Amgen's financing and control of

24 | studies promoting ~~off-label uses~~use of EPO.  Amgen and the other ~~Off-Label~~False Marketing

25 | Enterprise participants associate with, participate in, and control the affairs of the ~~Off-Label~~False

26 | Marketing Enterprise.

27 | 97.     ~~120.~~The members of the ~~Off-Label~~False Marketing Enterprise have participated in

28 | the operation and management of the ~~Off-Label~~False Marketing Enterprise in at least the following

1   ways:  (a) Amgen funds and exercises control over NAAC, Cancer Care, and certain CMEs for the

2   purpose of promoting the off-label use of EPO; (b) Amgen provides preliminary research and data

3   regarding the purported benefits of off-label use of EPO to NAAC for use in its educational and CME

4   materials, physician handbooks/brochures, and on its website, and to CancerCare for use on its

5   website and in CMEs sponsored by it and in the instructional and course materials thereof; (c) NAAC

6   and CancerCare use the preliminary research and data regarding the purported benefits of off-label

7   use of EPO in their educational, CME, and physician brochures and/or on their respective websites;

8   (d) Amgen ~~uses~~ finances and/or sponsors CMEs which are used, *inter alia*, to promote the off-label

9   use of EPO; and (e) the members of the ~~OLME~~False Marketing Enterprise operate and manage the

10   enterprise by coordinating their respective roles in the ~~unlawful~~fraudulent marketing of EPO for

11   off-label use.

12       98.    ~~121.~~ While Amgen and the other participants are members of the ~~Off-Label~~False

13   Marketing Enterprise, they have an existence that is separate and distinct from the Enterprise.  The

14   ~~Off-Label~~False Marketing Enterprise oversees, coordinates, and facilitates the commission of

15   predicate offenses.

16       B.    ~~The Kidney Dialysis Enterprise~~Pattern of Racketeering Activity

17       ~~122.    The Kidney Dialysis Enterprise ("KDE") is an ongoing organization which has~~

18   ~~existed continuously since at least since 2002.  The Defendants associated with this enterprise are~~

19   ~~Amgen and dialysis providers DaVita and Fresenius.  These Defendants are sometimes referred to as~~

20   ~~the "KDE Defendants."~~

21       99.    [See Consol. Compl. 145] As alleged above, the False Marketing Enterprise is

22   separate and distinct from the patterns of racketeering activity in which they engage.  The members

23   of the enterprise share a common purpose, and the enterprise is continuing and has a structure for

24   decision-making, oversight, coordination, and facilitation of the predicate acts.  Amgen asserted

25   control over this association-in-fact enterprise, and used its position of control over the entities to

26   ensure that EPO was fraudulently and unlawfully promoted.  The enterprise successfully and

27   fraudulently promoted EPO for dangerous off-label uses and obtained excessive payments from

28

1 payors, including Plaintiffs and Class members, on claims for reimbursement submitted to them for

2 the unsafe off-label uses described herein.

3     100.   [See Consol. Compl. 146]The pattern of racketeering activity includes numerous acts

4 of mail and wire fraud in furtherance of Amgen's fraudulent scheme, including the use of the United

5 States mails and wires, to disseminate marketing materials such as press releases, educational and

6 CME materials, and/or physician handbooks/brochures, which Amgen and the other participants in

7 the False Marketing Enterprise utilized to falsely promote off-label uses and doses of EPO, as well as

8 correspondence, contracts, and agreements between the members of each of the enterprises.  In

9 addition, claims were sent to Plaintiffs and Class members through the mails for payment of EPO for

10 the aforementioned unsafe purposes.

11     101.   [Consol. Compl. 147]The enterprise operates on a nationwide basis and utilizes

12 interstate communications including the United States mail and wire across state lines.  The activities

13 of the enterprise are national in scope and have a substantial impact upon interstate commerce.

14     **C.**    **Injury**

15     102.   [See Consol. Compl. 148]As a result of Amgen's scheme as detailed above, Plaintiffs

16 and other Class members were required to pay claims for reimbursement for EPO for unsafe uses.

17 Amgen's misrepresentations and omissions were necessary to encourage the use of EPO for such

18 uses.  This scheme proximately caused the Plaintiffs and the Class to pay for reimbursement of EPO

19 for unsafe and unproven purposes.  As a result, Plaintiffs and Class members have been injured in

20 fact and lost money, business or property by this scheme and the overt acts of mail and wire fraud

21 detailed above.

22     **D.**    **Fraudulent Concealment**

23     103.   [See Consol. Compl. 149]Amgen has affirmatively and fraudulently concealed its

24 unlawful scheme and course of conduct from Plaintiffs and the Class.  Plaintiffs and Class members

25 had no knowledge of Amgen's scheme detailed above and could not reasonably have discovered that

26 Amgen's representations were false or that it had concealed information and materials until shortly

27 before the filing of this Complaint.  Moreover, as Amgen engaged in a conspiracy with the members

28 of the False Marketing Enterprise as detailed above, that scheme continued until the last overt act of

1  the conspiracy took place, when Amgen finally publicly admitted the true facts detailed herein.  In

2  fact, the scope and extent of this conspiracy has still been not fully revealed.

3      104.    [See Consol. Compl. 150]Accordingly, any applicable statutes of limitations have

4  been tolled with respect to any claims Plaintiffs have brought as a result of the wrongful conduct

5  alleged herein.

6          **VI.    ADDITIONAL WRONGFUL CONDUCT**

7      105.    ~~123. The purpose of the Kidney Dialysis Enterprise was~~Amgen also sought to profit

8  from increased sales of EPO by promoting ~~wasteful dispensing and administration practices that had~~

9  ~~the effect of achieving a hemoglobin of 13 g/dL and above—an unlawful off-label use of these drugs~~

10 ~~—and thereby extract~~through wasteful dispensing the intravenous administration of EPO to treat

11 anemia in kidney dialysis patients (which resulted in significantly more usage than subcutaneous

12 administration) as a safer route of administration, even though this route of administration had the

13 predictable and consistent effect of achieving dangerously high hemoglobin levels of 13g/dL or

14 above.  This promotion led directly to the extraction of excessive and illegal payments from

15 Plaintiffs and Class members.  To effect its scheme, Amgen enlisted the aid of dialysis providers,

16 including DaVita, Inc. ("DaVita") and Fresenius Medical Care Holdings, Inc. d/b/a Fresenius

17 Medical Care North America ("Fresenius").  Further, to increase profit, Amgen also entered into

18 incentive agreements with DaVita and Fresenius.

19     106.    [See Consol. Compl. 25] DaVita is a Delaware corporation headquartered at 601

20 Hawaii Street, El Segundo, California 90245.  DaVita is a leading provider of dialysis services in the

21 United States for patients suffering from chronic kidney failure, also known as end stage renal

22 disease.  As of December 31, 2006, DaVita operated or provided administrative services to

23 approximately 1,300 outpatient dialysis centers located in 42 states and the District of Columbia,

24 serving approximately 103,000 patients.  Of the 1,300 for-profit dialysis facilities operated by

25 DaVita in 2006, 153 were located within the State of California.  DaVita also provides acute

26 inpatient dialysis services in approximately 770 hospitals and related laboratory services.  DaVita's

27 net operating revenues for the years ended December 31, 2006, 2005, and 2004 were $4.880 billion,

28 $2.973 billion, and $2.177 billion, respectively.  DaVita achieved EPO revenues of $1.16 billion in

40

1    2006 from one or more drug supply contracts with Amgen.  Upon information and belief, the

2    contracts were negotiated and executed in California, and the arrangements to pay incentives and

3    rebates for the excessive dispensing of EPO occurred in California.  DaVita received 35% of its 2006

4    revenues from reimbursements from commercial payors, including Plaintiffs and the Class, while

5    65% came from government sources, including the California Medi-Cal program.  DaVita received

6    subpoenas in 2004, 2005, and 2006 from federal prosecutors, to produce documents relating to its

7    suspect relationships with pharmaceutical companies, financial relationships with physicians and

8    joint ventures, and certain patient records relating to the administration and billing of EPO.  In

9    addition, in 2004, DVA Renal Healthcare, a division of DaVita, was fined $310 million and placed

10   under a five-year corporate integrity agreement.  The fine was imposed as a result of a Department of

11   Justice investigation of DaVita's Medicare and Medicaid billing practices, and issues involving

12   physicians and pharmaceutical manufacturers.

13        107.    [See Consol. Compl. 26] Fresenius is a New York corporation headquartered at 920

14   Winter Street Waltham, MA 02451.  Fresenius is a wholly owned subsidiary of Fresenius Medical

15   Care AG & Co.  KGaA, located in Bad Homburg, Germany.  Fresenius operates for profit dialysis

16   services in over 1,100 Company-owned and controlled facilities in the United States, including

17   locations within the State of California.  Revenues for the years ended December 31, 2006, 2005, and

18   2004 were $6.026 billion, $4.578 billion, and $4.250 billion.  Upon information and belief, Amgen

19   paid incentives and rebates to Fresenius from its headquarters in California.  Epogen, supplied under

20   contract with Amgen, accounted for approximately 21% of total revenue for Fresenius for the year

21   ended December 31, 2006.  Fresenius, its parent, subsidiaries, and predecessors received subpoenas

22   in 2004, 2005, and 2006 from federal prosecutors, in connection with civil and criminal

23   investigations, to produce documents relating to suspect relationships with pharmaceutical

24   companies, financial relationships with physicians and joint ventures, and certain patient records

25   relating to the administration and billing of EPO.

26        108.    124. DaVita's and Fresenius's SEC filings reveal that their profitability could be

27   materially impacted by a change in the utilization of EPO or failure to earn the drug rebates and other

28   incentives provided by Amgen.

41

109. ~~125. Defendant~~ DaVita's SEC Form 10-K for the year ended December 31, 2006, indicates that its profitability is dependent upon its relationship with Amgen. According to the 10-K, the administration of EPO accounts for approximately 25% of DaVita's dialysis revenue, and Amgen is DaVita's sole supplier of EPO. According to the Form 10-K, DaVita has "entered into an agreement with Amgen to provide for EPO pricing for a fixed time period that includes potential discounts depending upon the achievement of certain clinical and other criteria," as well as "specific rebates and incentives." DaVita's Form 10-K acknowledges that "[c]hanges in EPO pricing" or "[f]ailure to qualify for discounts or meet or exceed the targets and earn the specified rebates and incentives [available under its contract with Amgen] could have a material adverse effect on [DaVita's] earnings and cash flow." According to Gary Lieberman, an analyst at Stanford Group Company, the administration of EPO is responsible for 44 percent of DaVita's earnings before interest, taxes, depreciation and amortization.

110. ~~126. Defendant~~ Fresenius's SEC Form 20-F for the fiscal year ended December 31, 2006, indicates that its profitability is also heavily dependent on its relationship with Amgen. According to Fresenius's 2006 Form 20-F, "[r]eimbursement and revenue from the administration of erythropoietin, or EPO, accounted for approximately 21% of total revenue in [the company's] North America segment for the year ended December 31, 2006." In addition, Fresenius's Form 20-F acknowledges that "a change in the utilization of EPO could materially reduce [its] revenue and operating profit."

~~127. The structure of the Kidney Dialysis Enterprise includes the following: (a) contractual relationships amongst the Kidney Dialysis Enterprise Defendants, and (b) financial incentives tied to promotion and use of EPO for unlawful off-label purposes. The Kidney Dialysis Enterprise Defendants associate with, participate in and control the affairs of the Kidney Dialysis Enterprise.~~

111. ~~128. The members of Kidney Dialysis Enterprise have participated in the operation and management of the Kidney Dialysis Enterprise by working together to promote~~ Amgen, through contractual arrangements, including financial incentives tied to promotion and use of EPO for unsafe purposes, promoted intravenous administration of EPO to kidney dialysis patients, even though this

42

1    route of administration had the predictable and consistent effect of achieving a hemoglobin

2    target levels of 13 g/dL or above — an unlawful, off-label unsafe use of these drugs. Defendants

3    furthered their promotion of Amgen further promoted intravenous administration of EPO through

4    false statements, issued by Amgen, regarding the necessity of intravenous administration of EPO to

5    dialysis patients, on the basis that subcutaneous injections resulted in greater risk of pure red cell

6    aplasia.

7    112.   [See Consol. Compl. 8, 64] With respect to its deceptive promotion of the intravenous

8    administration of EPO as a safer route of administration, in November 2005, Amgen issued a "Dear

9    Health Care Professional" letter in which it sought to inform the health care community about

10   updates to Aranesp's product prescribing information.  In the letter, Amgen warned health care

11   providers of the risk of pure red cell aplasia in patients treated with Aranesp, and significantly, the

12   letter notes that reports of pure red cell aplasia were "predominantly in patients with [chronic renal

13   failure] receiving Aranesp by subcutaneous administration." Amgen issued this deceptive letter

14   despite its awareness of a 2005 Johnson & Johnson study that demonstrated that subcutaneous

15   administration of EPO was not the primary cause of increased incidences of pure red cell aplasia

16   during the last decade.  Rather, as Amgen knew, these increased incidences had been found to be

17   largely attributable to the contamination of the drug from uncoated rubber syringe stoppers during

18   the dispensing and administration of EPO.  In fact, Amgen disclosed in its Canadian version of this

19   letter that out of approximately 1.4 million patients that had been treated with Aranesp, a mere "two

20   cases of antibody-mediated pure red cell aplasia (PRCA) [were] reported and confirmed associated

21   with Aranesp® in patients who have not received other recombinant erythropoietins." Thus,

22   although less profitable to Amgen and its for-profit dialysis cohorts, subcutaneous administration of

23   EPO did not present a significantly greater risk of pure red cell aplasia.  Conversely, intravenous

24   administration, although more profitable to Amgen, risked raising hemoglobin levels in patients to

25   dangerously high levels in excess of 10 to 12 grams per deciliter of blood.

26   113.   [See Consol. Compl. 67] In addition, in its March 13, 2006 press release, discussed in

27   Section IV.C. above, Amgen continued to promote the misconception that it was safer for patients on

28   dialysis to receive Aranesp intravenously rather than through smaller doses received subcutaneously.

In the "Important Safety Information" section at the end of this and later press releases, Amgen stated that pure red cell aplasia "has been reported predominately in patients with chronic renal failure (CRF) receiving Aranesp by subcutaneous administration."

114.    [Consol. Compl. 96] On October 24, 2006, the BOSTON GLOBE published an article entitled, "Some See Profiteering In Clinics' Use of Drugs – US may spend $537m needlessly," which revealed that although "[a]bout 95 percent of the nation's 325,000 dialysis patients receive Epogen intravenously . . . studies have shown dialysis clinics could use 30 percent less if it was administered subcutaneously – injected beneath the skin" because "Epogen remains in the body longer when injected, requiring a lower dose."

115.    [Consol. Compl. 97] Then, on November 16, 2006, a NEW ENGLAND JOURNAL OF MEDICINE article announced that the use of epoetin alfa to reach a target hemoglobin level of 13.5g/dL, as compared with a target of 11.3g/dL, in patients with chronic kidney disease resulted in increased patient risk and zero improvement in patient quality of life.  Indeed, the end result of the study was a composite of death, myocardial infarction, hospitalization for congestive heart failure, and stroke.

116.    [Consol. Compl. 98] In response to this report, Amgen issued a press release on December 4, 2006, entitled, "Amgen Responds to Reports About Use and Safety of EPOGEN and Aranesp in CKD Anemia Therapy." Notwithstanding its knowledge of the numerous adverse study results described above, Amgen sought to stem any adverse effect on its lucrative income stream from off-label uses of EPO that might result from these reports, and in the press release stated that:

> Hemoglobin maintenance is difficult and physicians are not necessarily acting inappropriately when patients' hemoglobin levels temporarily exceed the FDA label target range.
>
> CMS reimbursement guidelines are consistent with the FDA labeling policy and allow doctors to provide patients with the best possible care.
>
> Changes to current guidelines should be approached judiciously and based on the rigorous review of data and patient care.

117.    ~~129.~~ ~~DaVita~~ also promoted the intravenous administration of EPO to its kidney dialysis patients, for instance, on its website, where ~~DaVita~~ it posted an article by Dr. Robert Lynn, "Common drugs prescribed for dialysis patients," which states that "[m]ost patients with anemia due

44

1   to chronic kidney disease who are not yet on dialysis will receive it as an injection – directly under

2   the skin.  Most patients with renal failure on hemodialysis will get the hormone during each

3   treatment by intravenous injection into the return dialysis tubing."

4       118.   ~~130.~~ Fresenius likewise has a long history of promoting ~~off-label~~such usage of EPO.

5   For example, in 2002 the Department of Health & Human Services, Office of Inspector General

6   ("OIG") audited Fresenius's Massachusetts offices.  The audit found that in a sample of just 200

7   claims submitted to Medicare, 14 involved the administration of more EPO than called for by the

8   label.  Another 9 claims were found to lack sufficient documentation to support the amount of EPO.

9   Further, the overdosing did not come from the physician's order but stemmed from Fresenius's

10  implementation:

> One claim billed for 104,000 units of EPO totaling $832 and the
> treatment forms indicate the provider's staff administered 104,000
> units of EPO; however, based on the physician's order the EPO dose
> was to be reduced 20 percent to 6,400 units per treatment if the
> hemoglobin was greater than 12.  The patient's hemoglobin was 13.5
> prior to the claim period and remained greater than 12 throughout the
> month.  Therefore, the patient's EPO dosage should have decreased 20
> percent to 6,400 units per treatment for all 13 treatments in the month.
> Therefore, we are questioning 20,800 units of EPO totaling $166.

16      119.   ~~131.~~ According to the U.S. Attorney in St. Louis, the government has received

17  information that Fresenius was filing improper claims for End Stage Renal Disease services to

18  Medicare beneficiaries.  Pursuant to 18 U.S.C. § 3486, the United States issued an administrative

19  subpoena to Fresenius on or about April 30, 2005.  Regarding Epogen, that subpoena sought general

20  information concerning Fresenius's policies and practices concerning the administration of Epogen

21  to patients at its clinics.  The time frame for production included documents and materials prepared

22  up through the date of compliance, namely April 30, 2005.

23      120.   ~~132.~~ While waiting for Fresenius to produce the documents requested by the first

24  administrative subpoena, the U.S. Attorney's Office ("USAO") also conducted a preliminary review

25  of Fresenius's Medicare claims for Epogen, using information directly obtained from the Medicare

26  program.  The results of that review became available to the United States late in 2005.  The review

27  showed that Fresenius had submitted a significant number of claims to Medicare for Epogen on

28  behalf of beneficiaries whose hematocrit levels were above 37.5% on a rolling average basis, 37.5%

1 being the current high end of the target range set forth in Medicare's End Stage Renal Disease

2 reimbursement rules regarding the administration of Epogen.

3      121.   ~~133.~~ Based on the information gained through its preliminary review of Fresenius's

4 Medicare claim history, the USAO issued a second subpoena to Fresenius on or about March 10,

5 2006.

6      122.   ~~134.~~ The United States is now investigating whether Fresenius failed to follow its

7 own internal protocols, repeatedly overdosed patients with excessive Epogen, in violation of

8 Medicare's reimbursement rules, and therefore submitted false claims for Epogen to the Medicare

9 program.

10      123.   ~~135.~~ The government has asserted that its investigation of Fresenius has a reasonable

11 basis.  For example, Fresenius has an unusual claims history, with the number of patients receiving

12 high doses of Epogen growing every year while the total number of patients serviced by Fresenius

13 has not grown as rapidly.  The government asserts that Fresenius's medical records for patients

14 receiving Epogen sometimes have disturbing patterns, with large doses of Epogen being

15 administered while the patient's hematocrit range greatly exceeded the suggested target hematocrit

16 range of 33 to 37.5.  Numerous studies have suggested there may be health problems for dialysis

17 patients with high hematocrits and high Epogen dosages.  According to the government, "[a]lthough

18 the investigation is not complete, these are troubling billing patterns that raise both financial program

19 integrity and beneficiary health concerns.  More Epogen® dosages may create more revenue from

20 the Medicare program, but not improved patient outcomes."

21      124.   ~~136.~~ In order to boost EPO sales, and as part of ~~the KDE scheme~~ its scheme to

22 fraudulently promote the intravenous administration of EPO, Amgen provided anemia management

23 training and support to dialysis centers without charge.  This was part of a package of services that

24 Amgen hoped would boost EPO use including at off-label doses and would switch patients from

25 subcutaneous dosing to intravenous dosing, which costs more.  The relationship between Amgen's

26 actions and the promotion of EPO use is chronicled in a *qui tam* complaint versus Renal Care Group

27 ("RCG") (now owned by Fresenius), where the relator alleges:

28      RCG has also violated 42 U.S.C. §§ 1320a-7a & 7b in that:

a.      At all relevant times hereto, Amgen has provided anemia management training and support to RCG staff without charge.

b.      Through its relationship with Amgen, RCG's per-patient EPO usage has increased significantly, without a corresponding increase in clinical outcomes.  Cost of EPO per treatment has also increased.

c.      In return for RCG's purchases of EPO, Amgen also provides RCG with clinical and sales staff at no charge and expends significant funds entertaining clinic staff and physicians.

d.      The anemia management training, clinical and sales staff, and entertainment funds provided to RCG by Amgen constitute prohibited in-kind remuneration under 42 U.S.C. §§ 1320a-7a & -7b because it is provided in exchange for RCG's purchase of EPO, for which RCG is reimbursed by Medicare.

125.    ~~137.~~ Moreover, in furtherance of its unlawful scheme to maximize profits by encouraging increased usage of EPO, RCG regularly compelled its Medical Directors to switch patients from subcutaneous dosing to intravenous dosing.  This is significant because subcutaneous dosing requires approximately 20% less EPO than intravenous dosing for the same clinical outcome. As a result of this scheme, RCG further bolstered its profits with Medicare footing the bill. *See Williams v. Renal Care Group*, Civil Action 4:05-cv-985 (E.D. Mo.).

126.    ~~138.~~ On information and belief, Amgen has similar arrangements with other dialysis centers which have resulted in an increase in ~~off-label use~~ unsafe uses.

127.    ~~139.~~ Indeed, the large for-profit dialysis providers, including DaVita and Fresenius, administer EPO more often by IV than non-profit dialysis providers, and also use larger doses and target higher hemoglobin levels than non-profit centers.

128.    ~~140.~~ An American Medical Association article entitled, "Dialysis Facility Ownership and Epoetin Dosing in Patients Receiving Hemodialysis," indicates that large, for-profit chain dialysis centers, including DaVita and Fresenius, use larger EPO doses.  More specifically, the authors' results indicate that "[c]ompared with patients in nonprofit dialysis facilities (n=28 1999), patients in larger for-profit dialysis chain facilities (n=106116) were consistently administered the highest doses of epoetin regardless of anemia status." The authors concluded that dialysis facility organizational status and ownership are associated with variation in epoetin dosing.  According to the article, "different epoetin dosing patterns suggest that large for-profit chain facilities used larger

47

1   dose adjustment and targeted higher hematocrit levels." The authors further noted that their findings

2   suggest "that reimbursement policy and clinical performance measures may provide incentives for

3   dialysis facilities, in particular, for-profit facilities."

4       129.   ~~141.~~ Along the same lines, an article in the *American Journal of Kidney Diseases*,

5   entitled "Factors Influencing Route of Administration for Epoetin Treatment among Hemodialysis

6   Patients in the United States," which published the results of a study designed to examine the factors

7   associated with route of epoetin administration in hemodialysis patients, indicated that the

8   subcutaneous route of administration was most widely used by providers not affiliated with chains,

9   and in hospital-based and not-for-profit freestanding units.  The study concluded that physician

10  decision making for epoetin administration route is influenced primarily by type of ownership and

11  financial incentives, and that the for-profit chains were less likely to use the subcutaneous

12  administration route, which can decrease doses and is thus an opportunity for cost savings.

13      130.   ~~142.~~ Similarly, the "US Renal Data System Annual Data Report" indicates that

14  Fresenius and DaVita patients are the most likely to overshoot target hemoglobin levels as compared

15  to patients of other dialysis providers.  The report concludes from this that hemoglobin variations are

16  thus seemingly related, in part, to dialysis center actions rather than non-treatable biological

17  phenomenon.  In addition to Fresenius and DaVita treating patients who are the most likely to

18  overshoot hemoglobin levels, these centers are also among those that use the highest dosing levels of

19  EPO.  According to the report, the fact that some dialysis centers are able to control hemoglobin

20  levels more successfully indicates the success of their anemia management protocols.

21      131.   ~~143.~~ Tellingly, in a BOSTON GLOBE article entitled, "Some See Profiteering in

22  Clinics' Use of Drug," one Fresenius patient, James Roberts, stated that the "the staff at the Fresenius

23  clinic where he receives Epogen was reluctant to reduce his doses." According to Roberts, he is

24  "their cash cow."

25  ~~144.      While the Kidney Dialysis Enterprise Defendants participate in and are members of~~

26  ~~the Kidney Dialysis Enterprise, they have an existence that is separate and distinct from the~~

27  ~~Enterprise.  The Kidney Dialysis Enterprise oversees, coordinates, and facilitates the commission of~~

28  ~~predicate offenses.~~

1        C.        **Pattern of Racketeering Activity**

2        145.    As alleged above, both the Off-Label Marketing Enterprise and Kidney Dialysis

3    Enterprise are separate and distinct from the patterns of racketeering activity in which they engage.

4    The members of each enterprise share a common purpose, and the enterprises are continuing and

5    have a structure for decision-making, oversight, coordination, and facilitation of the predicate acts.

6    Defendant Amgen asserted control over each of these association-in-fact enterprises, and used its

7    position of control over the entities to ensure that EPO was fraudulently and unlawfully promoted.

8    These enterprises successfully and fraudulently promoted EPO for dangerous off-label uses and

9    obtained excessive payments from payors, including Plaintiffs and Class members, on claims for

10    reimbursement submitted to them for the unsafe off-label uses described herein.

11        146.    The pattern of racketeering activity includes numerous acts of mail and wire fraud in

12    furtherance of Defendants' fraudulent scheme, including the use of the United States mails and wires,

13    to disseminate marketing materials such as press releases, educational and CME materials, and/or

14    physician handbooks/brochures, which Amgen and the other participants in the Off-Label Marketing

15    Enterprise and Kidney Dialysis Enterprise utilized to promote off-label uses and doses of EPO, as

16    well as correspondence, contracts, and agreements between the members of each of the enterprises.

17    In addition, claims were sent to Plaintiffs and Class members through the mails for payment of EPO

18    for the aforementioned off-label purposes.

19        147.    The enterprises operate on a nationwide basis and utilize interstate communications

20    including the United States mail and wire across state lines.  The activities of the enterprises are

21    national in scope and have a substantial impact upon interstate commerce.

22        D.        **Injury**

23        148.    Defendants' fraudulent scheme caused Plaintiffs and other Class members to pay

24    claims for reimbursement for EPO for unsafe, off-label uses.  Defendant Amgen's

25    misrepresentations and omissions were necessary to encourage the use of EPO for off-label purposes.

26    Defendants' fraudulent schemes proximately caused the Plaintiffs and the Class to pay for

27    reimbursement of EPO for unsafe off-label purposes.  In addition, Plaintiffs and Class members

28    reasonably relied on the misrepresentations and omissions in paying for EPO for these off-label

1  purposes.  As a result, Plaintiffs and Class members have been injured in their business or property

2  by Defendants' fraudulent scheme and overt acts of mail and wire fraud.

3      E.    Fraudulent Concealment

4      149.   Defendants have affirmatively and fraudulently concealed their unlawful scheme and

5  course of conduct from Plaintiffs and the Class.  Plaintiffs and Class members had no knowledge of

6  Defendants' fraudulent scheme and could not have discovered that Amgen's representations were

7  false or that it had concealed information and materials until shortly before the filing of this

8  Complaint.

9      150.   Accordingly, the statute of limitations has been tolled with respect to any claims

10  which Plaintiffs have brought as a result of the unlawful and fraudulent conduct alleged herein.

11      132.   [See Consol. Compl. 12]As a result of these abuses and the revelations following the

12  publication of The Cancer Letter, discussed above, on July 20, 2007, CMS announced that it will

13  reduce by 50 percent the reported ESA dosage used by dialysis facilities for which payment will be

14  made if the facility reports that the beneficiary's hemoglobin has exceeded 13 g/dL for three

15  consecutive months including the current billed month.

16      133.   [See Consol. Compl. 95]Furthermore, at a December 2007 hearing of the House

17  Ways and Means Committee, the committee's then-chairman noted federal data showing that an

18  estimated 40% of dialysis patients treated with EPO have hemoglobin levels above the target of 12.

19  The prescribing behavior that led to these levels was caused in part by Amgen's promotion,

20  "educational," and financing efforts.

21  VI. DEFENDANTS'VII.   AMGEN'S UNLAWFUL SCHEME CAUSED PLAINTIFFS
       AND CLASS MEMBERS TO PAY CLAIMS FOR EPOGEN AND ARANESP
22      PRESCRIBED FOR UNSAFE, OFF-LABEL AND UNPROVEN USES

23      134.   151.During the Class Period, Plaintiffs and other Class members paid hundreds of

24  millions, if not billions, of dollars in claims for EPO prescribed for unsafe off-labeland unproven

25  uses as a result of Defendants' fraudulent schemethe illegal schemes alleged herein, resulting in

26  Plaintiffs and Class members paying for prescriptions that were unnecessary and/or posed serious

27  health risks to their members.

28

50

135.   ~~152.~~ Plaintiffs and Class members are ultimately responsible for the payment of EPO prescriptions as payors of prescription benefit plans that pay on behalf of their participants either part of or the entire purchase price of prescribed medications.

136.   ~~153.~~ As a result of this responsibility, third-party payors, such as certain of the Class members, rely on Pharmacy Benefit Managers to assess the clinical safety, efficacy, and cost effectiveness of a drug before including that drug on a "formulary" or list of drugs that have been approved for coverage by the third-party payor.

137.   ~~154.~~ In addition, the listing for Aranesp as an accepted treatment for anemia of cancer led directly to Medicare reimbursement for the drug for off-label use.  The health care industry often follows Medicare's lead in reimbursement coverage and the listing of Aranesp for anemia of cancer resulted in third-party acceptance of such use, which in turn led to reimbursement for Medicare co-pays and supplemental payment by the Plaintiffs and Class members.

138.   <u>Amgen, either directly or indirectly, received payments from Plaintiffs and Class members resulting from the off-label uses of EPO, directly resulting in increased sales.</u>

139.   ~~155. Defendants, by their fraudulent~~<u>Amgen, as a result of its</u> scheme of concealing and misrepresenting the serious safety risks of EPO and <u>deceptively</u> promoting ~~its off-label~~<u>unsafe, unproven,</u> and unnecessary use<u>s</u>, succeeded in causing physicians to prescribe EPO for ~~off-label~~<u>such</u> uses without knowledge of these risks, <u>foreseeably and directly</u> resulting in Plaintiffs and Class members paying for prescriptions that were unnecessary and/or posed serious health risks to their members.

## ~~VII.~~ <u>VIII.</u> CLASS ACTION ALLEGATIONS

140.   ~~156.~~ Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and/or (c)(4), seeking damages and equitable relief, including disgorgement and restitution, on behalf of the Class.

141.   ~~157.~~ The Class consists of

All persons or entities that paid for EPO when EPO was ~~administered for an off-label purpose~~<u>administered for anemia of cancer and/or heart failure and/or for treatment of cancer (the "Fraudulent Marketing Class"); and</u>

51

All persons or entities that paid for EPO when EPO was administered through intravenous administration and/or at dosages that achieved a hemoglobin of 13g/dL and above (the "Kidney Dialysis Subclass").

142. ~~158.~~ The Class Period is May 21, 2002 through March 9, 2007.

143. ~~159.~~ Excluded from the Class are governmental entities.

144. ~~160.~~ Plaintiffs reserve the right to modify the class definition based on discovery.

145. ~~161.~~ Upon information and belief, thousands of Class members suffered monetary injury as a result of ~~Defendants'~~Amgen's deceptive and fraudulent scheme to obtain payments for the unnecessary, unsafe, and off-label use of EPO. The members of the Class are so numerous and dispersed throughout the United States that joinder of all members is impracticable.

146. ~~162.~~ The factual and legal issues involving ~~Defendants'~~Amgen's scheme are common to all members of the Class and are based upon a common course of misconduct which caused injury to Plaintiffs and all members of the Class. These issues include:

- Whether Defendants engaged in a pattern of racketeering activity including mail and wire fraud;

- Whether Defendants participated in a RICO enterprise;

- Whether ~~Defendants~~Defendant made false representations and/or material omissions in promoting use of EPO and failed to adequately warn of the adverse effects of EPO;

- Whether Defendants engaged in unfair, deceptive, or illegal conduct in violation of California unfair competition and false advertising laws;

- Whether Defendants engaged in a fraudulent scheme involving misrepresentations and omissions regarding the efficacy and safety of EPO when used for off-market purposes;

- ~~Whether Defendants engaged in an unlawful scheme of improperly marketing, selling or administering EPO for off-label uses which were not safe or medically effective;~~

52

- Whether ~~Defendants illegally marketed or promoted EPO for off-label use; and~~Defendant's RICO misconduct proximately caused injuries to Plaintiffs and the Fraudulent Marketing Class; and

- Whether ~~Defendants' RICO~~Defendant's misconduct under § 17200 and § 17500 proximately caused injuries to Plaintiffs and the Class.

147. ~~163.~~ Plaintiffs will fairly and adequately protect the interests of the Class, as required by Rule 23(a)(4).  Plaintiffs have retained counsel competent and experienced in class action lawsuits, and have no interests antagonistic to or in conflict with those of the Class.  Plaintiffs and their counsel will vigorously prosecute this action on behalf of the Class.

148. ~~164. Defendants~~Defendant, by ~~their~~its fraudulent scheme in violation of RICO and California's consumer and false advertising laws, obtained excessive payments from health benefit providers, including Plaintiffs, for ineffective, unsafe, and unnecessary treatment of patients with EPO and have acted on grounds generally applicable to the ~~e~~Class under Rule 23(b)(2), causing Defendants to be unjustly enriched at the expense of the Class, so that equitable relief, including disgorgement, is appropriate.

149. ~~165.~~ Questions of law and facts involving ~~Defendants'~~Defendant's common fraudulent scheme and course of conduct predominate over any questions affecting only individual members as required by Rule 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because the damages suffered by individual members of the Class are too small to warrant the initiation of individual actions.  Adjudication of this controversy through a class action will avoid the possibility of inconsistent and possibly conflicting adjudications of similar claims that may result from individual actions.  As the claims of Plaintiffs and Class members arise from a common scheme, and the injuries to Plaintiffs and Class members were caused by the common scheme, the case is manageable as a class action. Alternatively, to the extent that one or more claims are determined to be unmanageable as a result of individual issues, the common issues are properly certified under Rule 23(c)(4).

## COUNT I

**Violation of 18 U.S.C. § 1962(c) Against Defendant Amgen**

1    150.   166. Plaintiffs incorporate herein and make a part hereof the allegations in the

2    preceding paragraphs 1 through 104 and 134 through 149 as if fully set forth.

3    151.   167. This cause of action for violation of 18 U.S.C. § 1962(c) is brought by Plaintiffs

4    against defendant Amgen in connection with the activities of the Off-LabelFalse Marketing

5    Enterprise.

6    152.   168. As set forth above, Amgen and the other participants in the OLMEFalse

7    Marketing Enterprise have conducted or participated in conducting the affairs of the OLMEFalse

8    Marketing Enterprise through a pattern of racketeering activity.

9    153.   169. As a direct and proximate result, Plaintiffs and members of the Class have been

10   injured in their business or property by the predicate acts constituting the pattern of racketeering

11   activity.  Specifically, Plaintiffs and members of the Class have been injured in their business or

12   property by paying for EPO for unsafe off-label, unproven and unsubstantiated purposes, which they

13   would not have done absent Amgen's and the other OLME participants' unlawful conduct.

14   154.   170. Accordingly, Amgen is liable to Plaintiffs and the Class for three times their

15   actual damages as proven at trial, plus interest and attorneys' fees.

16                                **COUNT II**

17               ~~Violation of 18 U.S.C. § 1962(c)Against Defendants~~

18                      ~~Amgen, DaVita, and Fresenius~~

19     **Violation of the California UCL, Business & Professions Code § 17200, _et seq._**

20           **(as to Amgen's "Fraudulent Marketing" Conduct")**

21   155.   171. Plaintiffs incorporate herein and make a part hereof the allegations contained in

22   the preceding paragraphs 1 through 104 and 134 through 154 as if fully set forth above.

23   ~~172.    This cause of action for violation of 18 U.S.C. § 1962(c) is brought by Plaintiffs~~

24   ~~against Defendants Amgen, DaVita, and Fresenius in connection with the activities of the Kidney~~

25   ~~Dialysis Enterprise (the "Kidney Dialysis Enterprise Defendants").~~

26   ~~173.    As set forth above, Amgen and the other participants in the Kidney Dialysis~~

27   ~~Enterprise have conducted or participated in conducting the affairs of the Kidney Dialysis Enterprise~~

28   ~~through a pattern of racketeering activity.~~

1      ~~174.   As a direct and proximate result, Plaintiffs and members of the Class have been~~

2  ~~injured in their business or property by the predicate acts constituting the pattern of racketeering~~

3  ~~activity.  Specifically, Plaintiffs and members of the Class have been injured in their business or~~

4  ~~property by paying for EPO for unsafe off-label purposes, which they would not have done absent~~

5  ~~Amgen's and the other Kidney Dialysis Enterprise participants' unlawful conduct.~~

6      ~~175.   Accordingly, Amgen is liable to Plaintiffs and the Class for three times their actual~~

7  ~~damages as proven at trial, plus interest and attorneys' fees.~~

8                            ~~COUNT III~~

9      ~~Violation of the California UCL, Business & Professions Code §17200, *et seq*.~~

10     ~~176.   Plaintiffs incorporate herein and make a part hereof the allegations contained in the~~

11 ~~preceding paragraphs as if fully set forth above.~~

12     156.   ~~177. Defendants' scheme~~Defendant's acts and practices detailed above, including the

13 deceptive ~~and illegal~~ promotion, marketing~~,~~ and distribution~~, sales, dispensing, and administration~~ of

14 EPO, which occurred in significant part in California, constitutes unlawful, unfair, and fraudulent

15 business acts and practices under the UCL.  ~~Defendant's unlawful, unfair, and fraudulent~~Such acts

16 and practices included:

17          ~~(a)~~ (a) Fostering the belief in the medical community of unproven and false safety and

18                 efficacy for ~~off-label~~various uses of ESAs;

19          ~~(b)~~ (b) Marketing and promoting use of the drugs ~~outside of the approved FDA~~

20                 ~~indication, *i.e.*, for off label uses not approved by the FDA~~for unsafe,

21                 unproven and unsubstantiated uses; and

22          ~~(c)~~ (c) The concealment of adverse study results, and the selective and unbalanced

23                 disclosure of positive test results.

24     ~~178.   Defendants violated the UCL through their creation of lucrative business partnerships~~

25 ~~and contracts, which through enormous financial incentives and rebates deceptively encouraged a~~

26 ~~pattern and practice of over-dosing patients and subjecting them to unsafe, off-label uses of EPO.~~

27

28

1   ~~179.   Defendants' deceptive scheme also violates the UCL, in that it caused Plaintiffs~~

2   ~~injury in the form of increased payments for EPO that would not have occurred absent defendants'~~

3   ~~multiple schemes as described above.~~

4   157.   Defendant's scheme also violates the UCL as a "fraudulent" business practice, in that

5   it was likely to deceive persons into believing such off-label uses were safe and effective when they

6   were not and consequently Plaintiffs and the Class being required to pay for such use.  Such conduct

7   also constitutes an "unfair" business act or practice in that the gravity of the consequences of such

8   conduct outweighed any benefit therefrom considering the reasonably available alternatives, and is

9   tethered to a policy to only use such products for proper authorized purposes.

10   158.   ~~180.~~ Plaintiffs' claims involve questions of common and general interest as provided

11   under Cal. Code. Civ. P. § 382.

12   159.   ~~181.~~ Plaintiffs and the Class members suffered injury in fact in the form of increased

13   payments for EPO that would not have occurred absent the scheme as described above.  Plaintiffs

14   have suffered losses of money and property as a result of ~~Defendants'~~ the commission of unlawful,

15   ~~deceptive,~~ fraudulent and unfair business practices.  ~~As a result of Defendants' violations of the UCL,~~

16   ~~Plaintiffs and members of the Class named in this Count are~~ as detailed above.  Plaintiffs and

17   members of the Class are therefore entitled to bring this claim ~~for disgorgement and~~ to recover

18   restitution, ~~reasonable~~ and disgorgement of profits made at their expense, attorneys' ~~fees, and costs,~~

19   ~~and they are entitled to other~~ fees and costs pursuant to the common fund and substantial benefit

20   doctrines and C.C.P. Section 1021.5, and injunctive or declaratory relief as may be available.

21   <center>~~COUNT IV~~</center>

22   <center>**COUNT III**</center>

23   <center>**Violation of the California FAL, Business and Professions Code § 17500, *et seq.***</center>

24   <center>**(as to Amgen's "Fraudulent Marketing" Conduct)**</center>

25   160.   ~~182.~~ Plaintiffs incorporate herein and make a part hereof the allegations contained in

26   the preceding ~~allegations~~ paragraphs 1 through 104 and 134 through 159 as if fully set forth.

27   161.   ~~183. Defendants~~ Defendant violated California's ~~false advertising laws~~ FAL because

28   ~~their~~ scheme detailed above involved the making, either directly or indirectly, of deceptive, untrue,

<center>56</center>

1   and misleading promotional and advertising statements designed either in whole or in part to

2   encourage the use of EPO for ineffective, unsafe, and off-label uses.  This misconduct was instigated

3   and controlled by Amgen from its headquarters in California, furthered by DaVita from its

4   headquarters in California, and caused injuries to Plaintiffs and Class members in California and

5   throughout the United States.  Amgen knew that the promotional statements and advertising

6   materials it disseminated either directly or indirectly regarding the propriety, safety and legitimacy of

7   such off-label uses and promoting and encouraging such use were untrue, deceptive or misleading.

8        162.    184. Defendants' Defendant's unlawful and deceptive conduct in terms of engaging in

9   untrue and misleading advertising included, *inter alia*:

10            (a)    Fostering the false belief through misleading promotions promotional and

11                   advertising materials as detailed above that EPO was safe and effective for

12                   off-label various uses and at doses exceeding the FDA approved label;

13            (b)    Selectively presenting in press releases positive test results in press releases

14                   that were designed either in whole or in part to encourage or not dissuade the

15                   use of EPO while concealing the true safety hazards of EPO;.

16            (c)    Encouraging unnecessary intravenous administration of EPO in dialysis

17                   patients that risked raising hemoglobin to dangerously high levels.

18        185.    Defendants' deceptive scheme violated the FAL, in that it caused Plaintiffs injury

19        163.    [See Consol. Compl. 185] The scheme as detailed herein resulted in Plaintiffs and the

20   Class suffering injury in fact and a loss of money or property in the form of increased payments for

21   EPO that, which loss would not have occurred absent defendants' multiple schemes nor such monies

22   paid absent the deceptive, untrue and misleading advertising and promotional materials disseminated

23   by Amgen as described above.

24        186.    Defendants should be ordered to disgorge and make restitution to Plaintiffs and Class

25   members of the excessive payments and profits obtained at their expense.

26        164.    [See Consol. Compl. 186] Plaintiffs and members of the Class are therefore entitled to

27   bring this claim to recover restitution and disgorgement of profits made at their expense, attorneys

28

1  fees and costs pursuant to the common fund and substantial benefit doctrines and C.C.P. Section

2  1021.5, and injunctive or declaratory relief as may be available.

3  ### COUNT IV

4  ### Violation of the California UCL, Business & Professions Code § 17200 *et seq.*

5  ### (as to Amgen's "Kidney Dialysis" Conduct)

6      165.    [See Consol. Compl. 176] Plaintiffs incorporate herein and make a part hereof the

7  allegations contained in the preceding paragraphs 1 through 164 as if fully set forth.

8      166.    [See Consol. Compl. 177] Defendant's acts and practices detailed above, including

9  the deceptive promotion, marketing and distribution of EPO, which occurred in significant part in

10  California, constitutes unlawful, unfair, and fraudulent business acts and practices under the UCL.

11  Such acts and practices included:

12          (a)    Fostering the belief in the medical community of false safety and efficacy

13                 regarding the administration route of its ESAs;

14          (b)    Marketing and promoting use of intravenous administration of the drugs and

15                 the resulting overdosing; and

16          (c)    The concealment of study results regarding the safety of administration routes

17                 of its ESAs.

18      167.    [See Consol. Compl. 178] Defendant violated the UCL through the creation of

19  lucrative business partnerships and contracts, which through enormous financial incentives and

20  rebates, deceptively encouraged a pattern and practice of overdosing patients and subjecting them to

21  unsafe, off-label uses of EPO.  Such conduct violates numerous laws, including RICO and the FAL.

22      168.    Defendant's scheme also violates the UCL as a "fraudulent" business practice, in that

23  it was likely to deceive persons into believing that intravenous administration was more safe when

24  instead it resulted in overdosing of patients and consequently Plaintiffs and the Class being required

25  to pay for such use.  Such conduct also constitutes an "unfair" business act or practice in that the

26  gravity of the consequences of such conduct outweighed any benefit therefrom considering the

27  reasonably available alternatives, and is tethered to a policy to only use such products for proper

28  authorized purposes.

1  169. [See Consol. Compl. 180] Plaintiffs' claims involve questions of common and

2 general interest as provided under Cal. Code. Civ. P. § 382.

3  170. Plaintiffs and the Class members suffered injury in fact in the form of increased

4 payments for EPO that would not have occurred absent the scheme as described above.  Plaintiffs

5 have suffered losses of money and property as a result of the commission of unlawful, fraudulent and

6 unfair business practices as detailed above.  Plaintiffs and members of the Class are therefore entitled

7 to bring this claim to recover restitution and disgorgement of profits made at their expense, attorneys

8 fees and costs pursuant to the common fund and substantial benefit doctrines and C.C.P. Section

9 1021.5, and injunctive or declaratory relief as may be available.

10          **OTHER COUNTS**

11  171. Solely for the purpose of preserving Plaintiffs' right to appeal the Court's December

12 19, 2008 Order (the "Order") dismissing the Complaint, Plaintiffs reallege and incorporate by

13 reference the following counts and related allegations of Plaintiffs' Consolidated Class Action

14 Complaint, filed July 2, 2008:  Count I (RICO 18 U.S.C. § 1962(c) against Amgen), Count II (RICO

15 18 U.S.C. § 1962(c) against Amgen, DaVita and Fresenius), Count III (§17200), and Count IV

16 (§17500).  Because Plaintiffs are asserting these claims solely to preserve their appeal rights and

17 because Plaintiffs assert no additional claims or facts regarding DaVita and Fresenius that were not

18 addressed by the Order, Plaintiffs acknowledge that the Order addresses these claims and that no

19 additional answer or response by DaVita or Fresenius is required.

20          **PRAYER FOR RELIEF**

21  WHEREFORE, Plaintiffs demand judgment on behalf of themselves and Class members as

22 follows:

23  A. A. Awarding Plaintiffs actual and treble damages against Amgen and the other Defendants

24 in an amount to be determined at trial, together with prejudgment interest at the maximum rate

25 allowable by law;

26  B. Ordering Defendants to disgorge the payments and profits they wrongfully obtained

27 at the expense of Plaintiffs and Class members;

28

1      C. B. Ordering that restitution and disgorgement of profits be made to Plaintiffs and Class

2 members for Defendants' unjust enrichmentas a result of Amgen's illegal conduct;

3      D. C. Ordering that an accounting be made by DefendantsAmgen of their wrongfully

4 obtained payments and profits;

5      E. D. Awarding Plaintiffs and Class members the costs of this suit,; including reasonable

6 attorneys' fees and other disbursements;

7      F. E. Enjoining DefendantsAmgen from continuing the illegal and deceptive activities

8 alleged herein; and

9      G. F. Awarding Plaintiffs and Class members such other and further relief as this Court may

10 deem just and proper.

11

12                                JURY DEMAND

13         Plaintiffs hereby demand a trial by jury on all causes of action so triable.

14 DATED: July 2, 2008.

15 DATED: January 30, 2009

16 DATED:  February 24, 2009.

17

18                          WHATLEY DRAKE & KALLAS, LLC

19

20                          By    /s/ Edith M. Kallas

21                          By:_____

22                            Edith M. Kallas
                             Joe R. Whatley, Jr.

23                            Deborah Clark-Weintraub
                           Lili R. Sabo

24                          1540 Broadway, 37th Floor

25                          New York, NY  10036

26                          Telephone:  (212) 447-7070

27                          Facsimile:  (212) 447-7077

28                          Co-Lead Counsel for All Plaintiffs and

                              60

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>Attorneys for Plaintiff</u>
<u>Sheet Metal Workers National Health Fund</u>
<u>And Glenn Randle, Trustee, Individually and</u>
<u>on Behalf of All Other Similarly Situated</u>

HAGENS BERMAN SOBOL SHAPIRO LLP

By   ~~/s/ Steve W. Berman~~

By: _____
          Steve W. Berman
          Robert F. Lopez

1301 Fifth Avenue, Suite 2900

Seattle, Washington 98101

Telephone:  (206) 623-7292

Facsimile:  (206) 623-0594

Co-Lead Counsel for <u>All </u>Plaintiffs <u>and</u>
<u>Attorneys for Plaintiff</u>
<u>United Food & Commercial Workers Central</u>
<u>Pennsylvania & Regional Health & Welfare</u>
<u>Fund</u>

HENNIGAN, BENNETT & DORMAN LLP
Roderick G. Dorman
Mieke K. Malmberg
865 S. Figueroa Street, Suite 2900
Los Angeles, CA 90017
Telephone:  (213) 694-1200
Facsimile:  (213) 694-1234

61

~~BRANSTETTER STRANCH~~
~~& JENNINGS PLLC~~
~~J. Gerard Stranch, IV~~
~~227 Second Avenue North, 4th Floor~~
~~Nashville, TN 37201~~
~~Telephone: (615) 254-8801~~
~~Facsimile: (615) 250-3937~~

Liaison Counsel for All Plaintiffs

LOWEY DANNENBERG
  COHEN & HART, P.C.
Gerald Lawrence, Jr.
Peter D. St. Phillip, Jr.
White Plains Plaza
One North Broadway
White Plains, NY 10601-2310
Telephone:  (914) 997-0500
Facsimile:  (914) 997-0035

Attorneys for Plaintiff United Food &
Commercial Workers Central Pennsylvania
Regional Health and Welfare Fund

MILLER LAW LLC
Marvin A. Miller
Lori A. Fanning
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone:  (312) 332-3400
Facsimile:  (312) 676-2676

Attorneys for Plaintiff Painters District
Council No. 30 Health & Welfare Fund

JACOBS BURNS ORLOVE
  STANTON & HERNANDEZ
Brandon M. Anderson
Joseph M. Burns
122 South Michigan Avenue, Suite 1720
Chicago, IL 60603-6145
Telephone:  (312) 372-1646
Facsimile:  (312) 580-7175

Attorneys for Painters District Council No. 30
Health & Welfare Fund

62

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FINKELSTEIN THOMPSON LLP
Tracy D. Rezvani
The Duvall Foundry
1050 30th Street, N.W.
Washington, DC 20007
Telephone:  (202) 337-8000
Facsimile:  (202) 337-8090

~~MILLER LAW LLC~~
~~Marvin A. Miller~~
~~115 South LaSalle Street, Suite 2910~~
~~Chicago, IL 60603~~
~~Telephone: (312) 332-3400~~
~~Facsimile: (312) 676-2676~~

~~J. THOMPSON & ASSOCIATES PLC~~
~~Jason J. Thompson~~
~~2000 Town Center, Suite 1000~~
~~Southfield, MI 48075~~
~~Telephone: (248) 436-8448~~
~~Facsimile: (248) 436-8453~~

Attorneys for Plaintiffs
Ironworkers Local Union No. 68 and
Participating Employers Health and Welfare
Funds;
Ironworkers Local Union No. 339 and
Participating Employers Health and Welfare
Funds;
Ironworkers District Council of Philadelphia
and Vicinity Benefit and Pension Plan

BARNOW AND ASSOCIATES, P.C.
Ben Barnow
One N. LaSalle Street
Suite 4600
Chicago, IL 60602
Telephone:  (312) 621-2000
Facsimile:  (312) 641-5504

~~COOK, PORTUNE & LOGOTHETIS~~
~~David M. Cook~~
~~22 West 9th Street~~
~~Cincinnati, OH 45202~~
~~Telephone: (513) 721-0444~~
~~Facsimile: (513) 721-1178~~

63

EYSTER KEY TUBB ROTH
  MIDDLETON & ADAMS, LLP
Nicholas B. Roth
402 East Moulton Street
P.O. Box 1607
Decatur, AL 35602
Telephone: (256) 353-6761
Facsimile: (256) 353-6767

GILBERT & SACKMAN
Robert A. Cantore
3699 Wilshire Boulevard, Suite 1200
Los Angeles, CA 90010-2732
Telephone: (323) 938-3000
Facsimile: (323) 937-9139

HARRY R. BLACKBURN AND ASSOCIATES
Harry R. Blackburn
208 Kings Highway South
Cherry Hill, NJ 08034
Telephone: (856) 795-5758

JACOBS BURNS ORLOVE
  STANTON & HERNANDEZ
Brandon M. Anderson
Joseph M. Burns
122 South Michigan Avenue, Suite 1720
Chicago, IL 60603-6145
Telephone: (312) 372-1646
Facsimile: (312) 580-7175

LOWEY DANNENBERG
  COHEN & HART, P.C.
Gerald Lawrence, Jr.
Peter D. St. Phillip, Jr.
White Plains Plaza
One North Broadway
White Plains, NY 10601-2310
Telephone: (914) 997-0500
Facsimile: (914) 997-0035

ROSNER & MANSFIELD, LLP
Alan M. Mansfield
10085 Carroll Canyon Rd., Suite 100
San Diego, CA 92131
Telephone: (858) 348-1005
Facsimile: (858) 348-1150

Attorneys for Plaintiffs
Ironworkers Local Union No. 68 and
Participating Employers Health and Welfare
Funds;
Ironworkers Local Union No. 399 and
Participating Employers Health and Welfare

64

Funds;
Ironworkers District Council of Philadelphia
and Vicinity Benefit and Pension Plan

SHELLER P.C.
Stephen A. Sheller
Brian J. McCormick
1528 Walnut Street, 3rd Floor
Philadelphia, PA 19102
Telephone: (215) 790-7300
Facsimile: (215) 546-0942

Attorneys for Plaintiffs
Ironworkers Local Union No. 68 and
Participating Employers Health and Welfare
Funds;
Ironworkers Local Union No. 339 and
Participating Employers Health and Welfre
Funds;
Ironworkers District Council of Philadelphia
and Vicinity Benefit and Pension Plan

HARRY R. BLACKBURN AND
ASSOCIATES
Harry R. Blackburn
208 Kings Highway South
Cherry Hill, NJ 08034
Telephone: (856) 795-5758

Attorneys for Plaintiffs
Ironworkers Local Union No. 68 and
Participating Employers Health and Welfare
Funds;
Ironworkers Local Union No. 399 and
Participating Employers Health and Welfare
Funds;
Ironworkers District Council of Philadelphia
and Vicinity Benefit and Pension Plan

SOMMERS SCHWARTZ, P.C.
Jason J. Thompson
Henri O. Harmon
2000 Town Center, Suite 900
Southfield, MI 48075
Telephone:  (248) 355-0300
Facsimile:  (248) 746-4001

Attorneys for Plaintiff Kenneth Ross,
Commissioner Offices of Financial and
Insurance Services for the State of Michigan

ZIMMERMAN REED
Timothy J. Becker
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Telephone:  (612) 341-0400
Facsimile:  (612) 341-0844

Attorneys for Plaintiff Kenneth Ross,
Commissioner Offices of Financial and
Insurance Services for the State of Michigan

BRANSTETTER STRANCH
  & JENNINGS PLLC
J. Gerard Stranch, IV
227 Second Avenue North, 4th Floor
Nashville, TN 37201
Telephone:  (615) 254-8801
Facsimile:  (615) 250-3937

Attorneys for Plaintiff
Sheet Metal Workers National Health Fund
and Glenn Randle, Trustee, Individually and
on Behalf of All Others Similarly Situated

66

ROSNER & MANSFIELD, LLP
Alan M. Mansfield
10085 Carroll Canyon Rd., Suite 100
San Diego, CA 92131
Telephone: (858) 348-1005
Facsimile: (858) 348-1150

Attorneys for Plaintiff Sheet Metal Workers
National Health Fund and Glenn Randle,
Trustee, Individually and on Behalf of All
Others Similarly Situated

COOK, PORTUNE & LOGOTHETIS
David M. Cook
22 West 9th Street
Cincinnati, OH 45202
Telephone: (513) 721-0444
Facsimile: (513) 721-1178
Attorneys for Plaintiff
Sheet Metal Workers National Health Fund
and Glenn Randle, Trustee Individually and
on Behalf of All Other Similarly Situated

EYSTER KEY TUBB ROTH
  MIDDLETON & ADAMS, LLP
Nicholas B. Roth
402 East Moulton Street
P.O. Box 1607
Decatur, AL 35602
Telephone: (256) 353-6761
Facsimile: (256) 353-6767

Attorneys for Plaintiff
Sheet Metal Workers National Health Fund
and Glenn Randle, Trustee Individually and
on Behalf of All Other Similarly Situated

67

Exhibit A
Page 73

1

GILBERT & SACKMAN
Robert A. Cantore
3699 Wilshire Boulevard, Suite 1200
Los Angeles, CA 90010-2732
Telephone:  (323) 938-3000
Facsimile:  (323) 937-9139

Attorneys for Plaintiff
Sheet Metal Workers National Health Fund
and Glenn Randle, Trustee Individually and
on Behalf of All Other Similarly Situated

*Counsel for Plaintiffs*

68